# 25-108-cv(L), 25-280-cv(CON), 25-281-cv(CON), 25-320-cv(CON), 25-325-cv(CON), 25-327-cv(CON)

## United States Court of Appeals

*for the*

### Second Circuit

IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001

ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF NEW YORK

## BRIEF FOR PLAINTIFFS-APPELLANTS

CARTER G. PHILLIPS
CHRISTOPHER A. EISWERTH
MADELEINE JOSEPH
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

RICHARD KLINGLER
ELLIS GEORGE LLP
3222 Woodland Drive, N.W.
Washington, D.C. 20008
(202) 492-4678

JERRY S. GOLDMAN
BRUCE STRONG
ALEXANDER GREENE
ANDERSON KILL P.C.
7 Times Square, 15th Floor
New York, New York 10036
(212) 278-1000

SEAN P. CARTER
J. SCOTT TARBUTTON
ABBY J. SHER
COZEN O'CONNOR
One Liberty Place
1650 Market Street, Suite 2800
Philadelphia, Pennsylvania 19103
(215) 665-2000

ROBERT T. HAEFELE
JOHN M. EUBANKS
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, South Carolina 29464
(843) 216-9000

MICHAEL J. QUIRK
MOTLEY RICE LLC
1717 Arch Street, Suite 3610
Philadelphia, Pennsylvania 19103
(610) 579-9932

*Attorneys for Plaintiffs-Appellants*
*(For Continuation of Appearances See Inside Cover)*

DAVID A. PAUL
CANTOR FITZGERALD
110 East 59th Street, 7th Floor
New York, New York 10022
(212) 610-2298

EDWARD M. PINTER
FORD MARRIN ESPOSITO WITMEYER
    & GLESER, LLP
Wall Street Plaza
88 Pine Street, 16th Floor
New York, New York 10005
(212) 269-4900

*Attorneys for Plaintiffs-Appellants*

## <u>CORPORATE DISCLOSURE STATEMENT</u>

In accordance with Federal Rule of Appellate Procedure 26.1, Plaintiffs certify as follows:

***Docket No. 25-108 (Lead) (Estate of John P. O'Neill, Sr. et al. v. Al Baraka Inv. & Dev. Corp., et al.):***

Plaintiffs are natural persons.

***Docket No. 25-280 (Con) (Federal Insurance Co., et al. v. Al Qaida, et al.):***

Plaintiffs Federal Insurance Company, Pacific Indemnity Company, Chubb Custom Insurance Company, Chubb Indemnity Insurance Company, Chubb Insurance Company of Canada, Chubb Insurance Company of New Jersey, Great Northern Insurance Company, and Vigilant Insurance Company are members of the Chubb Group of Insurance Companies. Chubb Limited is the ultimate parent of these subsidiaries and the only entity within the Chubb Group of Insurance Companies that is traded on any public exchange. Chubb Limited trades on the New York Stock Exchange under the symbol CB. No publicly held corporation owns 10% or more of the stock of Chubb Limited.

Plaintiff TIG Insurance Company is a member of the Fairfax Financial Group. Plaintiffs' parent organization, Fairfax Financial Holdings Ltd., a publicly traded company, owns more than 10% of their stock.

Plaintiffs OneBeacon Insurance Company, OneBeacon American Insurance Company, The Camden Fire Insurance Association, Homeland Insurance Company

of New York and/or their successors in interest are members of the OneBeacon Insurance Group, now known as Intact Insurance Company. Plaintiffs' parent organization, Intact Financial Corporation, is a publicly traded company that owns more than 10% of their stock.

Plaintiff American Employers' Insurance Company, previously a member of the OneBeacon Group, is now a subsidiary of SPARTA Insurance Company, which is wholly owned by Catalina Holdings (Bermuda) Ltd. Apollo Global Management is a publicly traded company that owns more than 10% of the stock of Catalina Holdings (Bermuda) Ltd.

Plaintiffs American Alternative Insurance Corporation, Great Lakes Reinsurance U.K. PLC, The Princeton Excess and Surplus Lines Insurance Company, and/or their successors in interest are members of the Munich Re Group. Plaintiffs' parent organization, Munich Reinsurance Company, a publicly traded corporation, owns more than 10% of their stock.

Plaintiff Allstate Insurance Company is a member of The Allstate Insurance Group. Allstate Insurance Company is wholly owned by The Allstate Corporation, a publicly traded corporation.

Plaintiffs Boston Old Colony Insurance Company n/k/a Buckeye Union Insurance Company, Continental Insurance Company, Commercial Insurance Company of Newark, NJ, CNA Casualty of California, Continental Insurance

Company of New Jersey, Fidelity and Casualty Company of New York, Glen Falls Insurance Company, National Ben Franklin Insurance Company of Illinois, and/or their successors in interest are members of the CNA Insurance Companies. Plaintiffs' parent organization, the CNA Financial Corporation, a publicly traded corporation, owns more than 10% of their stock. Plaintiffs' ultimate parent, Loews Corporation, is also a publicly traded company.

Plaintiff Hiscox Dedicated Corporation Member, Ltd., a wholly owned indirect subsidiary of Hiscox Ltd., is a member of Lloyds' Syndicate 33.

Plaintiffs ACE American Insurance Company, ACE Capital V Ltd for itself and as representative of all subscribing underwriters for ACE Global Markets Syndicate 2488, ACE Bermuda Insurance Ltd., ACE INA (Canada), ACE Indemnity Insurance Company, ACE Insurance SA-NV, ACE Property & Casualty Insurance Company, Atlantic Employers Insurance Company, Bankers Standard Insurance Company, Indemnity Insurance Company of North America, Insurance Company of North America, Westchester Fire Insurance Company, Westchester Surplus Lines Insurance Company, Pacific Employers Insurance Company, and/or their successors in interest are direct and indirect subsidiaries of Chubb Limited, formerly named ACE Limited. Chubb Limited is the ultimate parent and the only entities within the Chubb Group of Companies that is traded on any public exchange. Chubb Limited

iii

trades on the New York Stock Exchange under the symbol CB. No publicly held corporation owns 10% or more of the stock of Chubb Limited.

Plaintiff Woburn Insurance Ltd. is wholly-owned subsidiary of Paramount Global, formerly Viacom, Inc., a publicly traded corporation.

Plaintiffs AXA Corporate Solutions Assurance, AXA Corporate Solutions Insurance Company, AXA Corporate Solutions Assurance UK Brand, AXA Corporate Solutions Assurance (Canada), AXA RE Asia Pacific Pte. Limited, AXA RE n/k/a Colisee Re, AXA RE Canadian Branch, AXA RE UK Plc., AXA Corporate Solutions Reinsurance Company, AXA Art Insurance, SPS Reassurance, AXA Re Madeira Branch, Compagnie Generale de Reinsurance de Monte Carlo, AXA Versicherung AG, AXA Cessions, AXA Global Risks UK, Ltd., and/or their successors in interest are members of the AXA Group. Plaintiffs' parent organization, AXA S.A., a publicly traded corporation, owns more than 10% of their stock.

### Docket No. 25-281 (Con) (Continental Casualty Co., et al. v. Al Qaeda, et al.):

All of Valley Forge Insurance Company's common stock is owned by American Casualty Company of Reading, Pennsylvania, which is not publicly traded. All of American Casualty Company of Reading, Pennsylvania's common stock is owned by Continental Casualty Company, which is not publicly traded. Transcontinental Insurance Company merged directly or indirectly with and into

iv

National Fire Insurance Company of Hartford, which is not publicly traded. All of National Fire Company of Hartford's common stock is owed by Continental Casualty Company, which is not publicly traded. All of Transportation Insurance Company's common stock is owned by Continental Casualty Company, which is not publicly traded.

Boston Old Colony Insurance, The Buckeye Union Insurance Company, Commercial Insurance of Newark, New Jersey, The Fidelity & Casualty Company of New York, The Glens Falls Insurance Company, and National-Ben Franklin Insurance Company of Illinois all merged directly or indirectly with and into The Continental Insurance Company with The Continental Insurance Company being the successor in interest.

CNA Casualty of California merged with Continental Casualty Company with Continental Casualty Company being the successor in interest. All of The Continental Insurance Company's common stock is owned by Continental Casualty Company, which is not publicly traded. All of Continental Casualty Company's common stock is owned by The Continental Corporation, which is not publicly traded. All of The Continental Corporation's common stock is owned by CNA Financial Corporation, which has issued shares to the public. Loews Corporation owns the majority of CNA Financial Corporation's common stock and is publicly

traded. No other corporation owns 10% or more of CNA Financial Corporation's common stock.

***Docket No. 25-320 (Con) (Cantor Fitzgerald Associates, L.P., et al. v. Akida Bank Private Ltd., et al.):***

No public corporation owns 10% or more of Cantor Fitzgerald & Co.; Cantor Fitzgerald Securities; Cantor Fitzgerald, L.P.; C02e.com, LLC (now known as CantorC02e, LLC); Cantor Index Limited; and Cantor Fitzgerald Europe.

BGC Group, Inc, a public corporation, owns 10% or more of eSpeed, Inc. (now known as BGC Partners, Inc. and is no longer a publicly traded company); Cantor Fitzgerald Associates, L.P. (now known as BGC Capital Markets, L.P.); Cantor Fitzgerald Brokerage, L.P. (now known as BGC Environmental Brokerage Services, L.P.); Cantor Fitzgerald International (now known as BGC International); Cantor Fitzgerald Partners (now known as Mint Brokers); Tradespark, L.P and eSpeed Government Securities, Inc. (now known as BGC Technology Brokerage, L.P.).

***Docket No. 25-325 (Con) (Thomas Burnett, Sr., et al. v. Al Baraka Inv. & Dev. Corp., et al.):***

Plaintiffs are natural persons.

***Docket No. 25-327 (Con) (Euro Brokers, Inc., et al. v. Al Baraka Inv. & Dev. Corp. et al.):***

BGC Brokers US, L.P. (successor to Euro Brokers, Inc.) has no parent corporation; BGC Group, Inc., a publicly-traded corporation, indirectly owns more than 10% of it.

BGC Financial, L.P. *(f/k/*a Maxcor Financial, Inc.) has no parent corporation; BGC Group, Inc., a publicly-traded corporation, indirectly owns more than 10% of it.

BGC Financial Asset Management, Inc. (successor to Maxcor Financial Asset Management, Inc.) dissolved December 23, 2010; BGC Information, L.P. (successor to Maxcor Information, Inc.) dissolved April 2, 2025; Seminole Financial Limited (successor to Euro Brokers Ltd.) dissolved June 12, 2020; Tradesoft Technologies, Inc., has been voided in the state of Delaware since 2007; Euro Brokers Financial Services Limited dissolved April 23, 2008; Euro Brokers (Switzerland) S.A. dissolved September 22, 2023.

Plaintiff Euro Brokers Mexico, S.A. de C.V. has no parent corporation; BGC Group, Inc., a publicly-traded corporation, indirectly owns more than 10% of it.

## <u>TABLE OF CONTENTS</u>

**Page**

CORPORATE DISCLOSURE STATEMENT ........................................................ i

TABLE OF AUTHORITIES ...................................................................x

PRELIMINARY STATEMENT .................................................................1

JURISDICTIONAL STATEMENT ..............................................................2

ISSUE PRESENTED .......................................................................3

STATEMENT OF THE CASE ................................................................3

STATEMENT OF FACTS ...................................................................6

I.   DIB Served As A Key Financial Conduit For Al Qaeda. ...................................6

II.  DIB Knew That Al Qaeda Intended To Harm The United States.....................10

III. DIB's Support Enabled Al Qaeda To Gain The Strike Capabilities
     Needed To Attack The United States. ...........................................11

SUMMARY OF ARGUMENT .................................................................12

STANDARD OF REVIEW ..................................................................15

ARGUMENT .............................................................................16

I.   The Federal Courts Have Authority To Render A Judgment On
     Plaintiffs' Anti-Terrorism Act Claims Against DIB ....................................16

     A.   The Anti-Terrorism Act And Federal Rule Of Civil
          Procedure 4(k)(2) Provide Adequate Statutory Bases For
          Personal Jurisdiction .........................................................17

     B.   The District Court Erred By Applying The Minimum-Contacts Test
          To Determine Whether Exercising Personal Jurisdiction Was
          Consistent With Due Process ..................................................20

     C.   Exercising Personal Jurisdiction Over Plaintiffs' Anti-Terrorism
          Act Claims Against DIB Complies With Due Process And Thus
          The Decision Below Should Be Reversed .........................................22

1.    Congress Has Authorized The Federal Courts To
      Exercise Jurisdiction Over Anti-Terrorism Act Claims
      Against Foreign Defendants ......................................................23

2.    Requiring DIB To Defend Against Anti-Terrorism
      Act Claims In Federal Court Is Reasonable.............................30

D.    At A Minimum, Exercising Personal Jurisdiction Over
      Plaintiffs' Claims Against DIB Is Consistent With The
      Original Understanding Of The Fifth Amendment.............................33

IV. Plaintiffs Have Also Demonstrated Personal Jurisdiction Over
    DIB Through Alternative Means...................................................36

A.    DIB's Tortious Activities Expressly Directed At The Forum
      Support Personal Jurisdiction.............................................37

B.    DIB's Concerted Action With Al Qaeda Supports Personal
      Jurisdiction. .........................................................43

CONCLUSION...........................................................................44

CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32 .........................48

CERTIFICATE OF SERVICE .............................................................49

ix

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*Asahi Metal Industry Co. v. Superior Court of Cal.*,
   480 U.S. 102 (1987)......................................................................31

*Ball v. Metallurgie Hoboken-Overpelt, S.A.*,
   902 F.2d 194 (2d Cir. 1990) ........................................................16

*Best Van Lines, Inc. v. Walker*,
   490 F.3d 239 (2d Cir. 2007) ........................................................36

*Calder v. Jones*,
   465 U.S. 783 (1984)..............................................................22, 37

*Charles Schwab Corp. v. Bank of Am. Corp.*,
   883 F.3d 68 (2d Cir. 2018) ...............................................37, 43, 44

*Chew v. Dietrich*,
   143 F.3d 24 (2d Cir. 1998) ...................................................19, 20

*Costello v. City of Burlington*,
   632 F.3d 41 (2d Cir. 2011) ..........................................................41

*Dardana Ltd. v. Yuganskneftegaz*,
   317 F.3d 202 (2d Cir. 2003) ........................................................19

*Douglass v. Nippon Yusen Kabushiki Kaisha*,
   46 F.4th 226 (5th Cir. 2022) (en banc) .....................................19, 34

*Dubai Islamic Bank v. Citibank, N.A.*,
   126 F. Supp. 2d 659 (S.D.N.Y. 2000) ..........................................32

*Dubai Islamic Bank v. Citibank, N.A.*,
   2002 WL 1159699 (S.D.N.Y. May 31, 2002) .................................32

*EEOC v. Arabian Am. Oil Co.*,
   499 U.S. 244 (1991)....................................................................23

*Ezrasons, Inc. v. Travelers Indem. Co.*,
   89 F.4th 388 (2d Cir. 2023) .........................................................16

*Fuld v. Palestine Liberation Org.*,
606 U.S. __, 145 S. Ct. 2090 (2025)............................................................*passim*

*Fuld v. Palestine Liberation Org.*,
82 F.4th 74 (2d Cir. 2023) .................................................................................21

*Fuld v. PLO*,
101 F.4th 190 (2d Cir. 2024) ............................................................20, 26, 33, 34

*Halberstam v. Welch*,
705 F.2d 472 (D.C. Cir. 1983).................................................................39, 43, 44

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010)................................................................................................24

*In re Terrorist Attacks on Sept. 11, 2001*,
714 F.3d 659 (2d Cir. 2013) (*Terrorist Attacks VII*) ..................................*passim*

*In re Terrorist Attacks on Sept. 11, 2001*,
718 F. Supp. 2d 456 (S.D.N.Y. 2010) ...............................................4, 16, 18, 19

*In re Terrorist Attacks on September 11, 2001*,
538 F.3d 71 (2d Cir. 2008) (*Terrorist Attacks III*) .....................................22, 37

*Int'l Shoe Co. v. Washington*,
326 U.S. 310 (1945).............................................................................................36

*IUE AFL-CIO Pension Fund v. Herrmann*,
9 F.3d 1049 (2d Cir. 1993) ................................................................................17

*Jesner v. Arab Bank, PLC*,
584 U.S. 241 (2018).............................................................................................31

*Kaplan v. Lebanese Canadian Bank, SAL*,
999 F.3d 842 (2d Cir. 2021) ..............................................................................39

*Lewis v. Mutond*,
62 F.4th 587 (D.C. Cir. 2023)......................................................................33, 34

*Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*,
673 F.3d 50 (2d Cir. 2012) ....................................................................15, 16, 18

xi

*Lightfoot v. Cendant Mortg. Corp.*,
   580 U.S. 82 (2017) ...................................................................................16

*Linde v. Arab Bank, PLC*,
   882 F.3d 314 (2d Cir. 2018) ...........................................................39, 40

*Mark v. Republic of the Sudan*,
   77 F.4th 892 (D.C. Cir. 2023) ................................................................31

*Murray's Lessee v. Hoboken Land & Improvement Co.*,
   59 U.S. (18 How.) 272 (1856) ................................................................35

*Mwani v. Bin Laden*,
   417 F.3d 1 (D.C. Cir. 2005) ....................................................................19

*Omni Capital International v. Rudolf Wolff & Co.*,
   484 U.S. 97 (1987), Fed. R. Civ. ............................................................19

*Picquet v. Swan*,
   19 F. Cas. 609 (C.C.D. Mass 1828) ........................................................34

*Toland v. Sprague*,
   37 U.S. (12 Pet.) 300 (1838) ...................................................................35

*Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*,
   779 F. App'x 66 (2d Cir. 2019) ...............................................37, 39, 41

*United States v. Epskamp*,
   832 F.3d 154 (2d Cir. 2016) ...........................................................23, 26

*Waldman v. Palestine Liberation Org.*,
   835 F.3d 317 (2d Cir. 2016) ...................................................................16

*Zobay v. MTN Grp. Ltd.*,
   695 F. Supp. 3d 301 (E.D.N.Y. 2023) .....................................................18

## Constitutional Provisions

U.S. Const. amend V ......................................................................*passim*

U.S. Const. amend XIV .......................................................20, 30, 36, 41

U.S. Const. art. I, § 8, cls. 10, 11 ...........................................................34

U.S. Const. art. III, § 2, cls. 1, 3 ................................................................34

**Statutes and Rules**

18 U.S.C. § 2331 *et seq.* ..........................................................................2

18 U.S.C. § 2333 ....................................................................................18

18 U.S.C. § 2333(a) ..................................................................19, 23, 29

18 U.S.C. § 2333(d)(2)..............................................................19, 23, 29

18 U.S.C. § 2338 ....................................................................................20

18 U.S.C. § 2339A(a) .............................................................................27

18 U.S.C. § 2339A(b)(1) .........................................................................37

28 U.S.C. § 1291 ......................................................................................3

28 U.S.C. § 1331 ......................................................................................2

28 U.S.C. § 1367 ....................................................................................17

Fed. R. Civ. P. 4(k) ................................................................................35

Fed. R. Civ. P. 4(k)(1)(A) ..........................................................17, 18, 35

Fed. R. Civ. P. 4(k)(1)(C) ..........................................................12, 17, 18

Fed. R. Civ. P. 4(k)(2)......................................................................*passim*

Fed. R. Civ. P. 54(b) .................................................................................3

Justice Against State Sponsors of Terrorism Act, Pub. L. No. 114-222,
   130 Stat. 852 (2016) (codified at 28 U.S.C. § 1605B) .............................*passim*

Promoting Security and Justice for Victims of Terrorism Act of 2019,
   Pub. L. No. 116-94 § 903, 133 Stat. 2534, 3082 (2019) ............................24, 25

**Legislative History and Materials**

H.R. Rep. No. 115-858 (2018)................................................................28

S. Rep. No. 102-342 (1992) ....................................................................23

138 Cong. Rec. S17252-04 ........................................................................27

**Other Authorities**

Executive Order 14040, *Declassification Reviews of Certain
  Documents Concerning the Terrorist Attacks of September 11,
  2001*, 86 FR 50439 (Sept. 3, 2021)........................................................4

## **PRELIMINARY STATEMENT**

On the morning of September 11, 2001, as part of a meticulously planned and well-funded plot to attack the United States, al Qaeda operatives hijacked four commercial airliners. They used those planes to kill thousands of people, wound many more, and destroy property worth billions of dollars. For more than two decades, the victims of those attacks—and their estates, heirs, and insurers—have sought relief under the Anti-Terrorism Act against not only the perpetrators of that devastation, but also those who enabled it through material support to Osama bin Laden and al Qaeda.

This appeal concerns Plaintiffs' efforts to hold Dubai Islamic Bank accountable for its years-long assistance to al Qaeda—support that helped make the attacks possible. The Central Intelligence Agency concluded that DIB's chairman was a close personal friend of bin Laden and of al Qaeda's financial chief. He personally approved lines of credit for bin Laden and his network. Senior al Qaeda leaders held accounts at DIB, regularly moving large sums through the bank as the group expanded and trained recruits at its terrorist camps. The United States intervened with the United Arab Emirates government to end DIB's support. But the bank continued aiding al Qaeda until the day before the attacks, when Khalid Sheikh Mohammed's nephew, who helped finance and facilitate the plot, withdrew funds to finance his escape.

1

Despite the deep ties between DIB, al Qaeda, and the September 11th attacks, the district court concluded that DIB lacked sufficient "minimum contacts" with the United States to warrant exercising personal jurisdiction over Plaintiffs' claims against DIB. That decision relied on Circuit precedent that the Supreme Court has since overruled. *See Fuld v. Palestine Liberation Org.*, 606 U.S. __, 145 S. Ct. 2090 (2025). *Fuld* held that the Fourteenth Amendment's minimum-contacts test does not apply to the Fifth Amendment's Due Process Clause. *Id.* at 2105. Instead, the Fifth Amendment requires a "more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority." *Id.*

This standard is readily satisfied where Congress has empowered the federal courts to hear claims against foreign defendants—wherever they are—who harm U.S. nationals in terrorist attacks and who materially support the attackers, as it has done under the Anti-Terrorism Act and the Federal Rules of Civil Procedure. *See id.* Plaintiffs' evidence demonstrates a meaningful nexus exists between the United States' and DIB's conduct. Exercising jurisdiction here aligns with the United States' counterterrorism policy and is fully reasonable. The district court's judgment should be reversed or, at a minimum, vacated and the case remanded in light of *Fuld*.

## JURISDICTIONAL STATEMENT

The district court had subject-matter jurisdiction under 28 U.S.C. § 1331. Plaintiffs' claims arise under the Anti-Terrorism Act, 18 U.S.C. § 2331 *et seq.*, as

amended by the Justice Against Sponsors of Terrorism Act (JASTA), Pub. L. No. 114-222, 130 Stat. 852 (2016).

This Court has jurisdiction under 28 U.S.C. § 1291. These consolidated appeals arise from six lawsuits consolidated for pre-trial proceedings in Docket No. 03-MDL-1570 (S.D.N.Y.). On March 9, 2023, the district court entered its Memorandum Decision and Order granting DIB's motion for summary judgment for lack of personal jurisdiction. *See* SPA14-34. On January 6, 2025, the district court entered final judgment in favor of DIB and against Plaintiffs under Federal Rule of Civil Procedure 54(b). *See* SPA56. Plaintiffs in *O'Neill* filed a timely notice of appeal on January 6, 2025. *See* JA9005. Plaintiffs in the other cases filed timely notices of appeal on February 4 and 5, 2025. *See* JA9006-15.

## ISSUE PRESENTED

1.     Whether the district court erred in concluding that Plaintiffs failed to demonstrate that the court had personal jurisdiction over Dubai Islamic Bank.

## STATEMENT OF THE CASE

This appeal arises out of Plaintiffs' years-long efforts to hold DIB accountable for aiding and abetting al Qaeda and bin Laden in the lead up to the September 11th attacks. Plaintiffs include victims of the attacks, their heirs and estates, and commercial entities that sustained billions of dollars in property damage in the attacks. They brought suit in district court against DIB under the Anti-Terrorism Act

and state common law, and these claims have been consolidated alongside others for pre-trial proceedings.

On June 17, 2010, the district court denied DIB's motion to dismiss and held that Plaintiffs' claims supported the exercise of jurisdiction over DIB. *See In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 489 (S.D.N.Y. 2010) ("*Terrorist Attacks IV*") (ECF No. 2252), *aff'd in part*, 714 F.3d 659 (2d Cir. 2013). Specifically, the district court concluded that Plaintiffs' "allegations indicate[d] that DIB was an intentional, knowing and direct participant in providing money laundering services to al Qaeda, which allowed for direct funding of terrorist attacks." *Id.*

The parties then engaged in coordinated discovery as part of the multi-district litigation. DIB moved for summary judgment based on lack of personal jurisdiction. But before Plaintiffs' deadline to respond, on September 3, 2021, the President issued Executive Order 14040, mandating declassification reviews of certain documents concerning the September 11th attacks, including "records that previously were withheld as classified, in full or in part, in discovery in *In re Terrorist Attacks on September 11, 2001*." JA7522 (Aver. ¶ 68). On March 29 and April 1, 2022, the government declassified CIA documents, including finished intelligence reports and findings regarding DIB's program of "witting" support for al Qaeda and bin Laden. *Id.* (Aver. ¶ 69). The district court then denied a joint

4

request to pause briefing on DIB's motion to resolve discovery issues. *See* MDL Dkt. 8096.[1]

On June 17, 2022, DIB filed another motion for summary judgment and renewed motion to dismiss for lack of personal jurisdiction. *See* MDL Dkt. 8127. Plaintiffs sought to compel supplemental discovery responses from DIB and served additional targeted discovery requests related to new information in the CIA documents. *See* MDL Dkt. 8505. The district court largely denied these efforts and excluded as untimely a supplemental expert report addressing the new information. *See* SPA1-13 (Opinion & Order), SPA44-49 (Memorandum Decision and Order).

On March 9, 2023, Judge George B. Daniels granted DIB's motion for summary judgment for lack of jurisdiction. *See* SPA14-43. The district court acknowledged that Plaintiffs could proceed under Rule 4(k)(2), admitted the CIA documents, and found that exercising personal jurisdiction over DIB would be reasonable. *See* SPA25-26, SPA28-29, SPA32. But it applied the Fourteenth Amendment's minimum-contacts test and concluded that exercising jurisdiction over Plaintiffs' claims against DIB would not comport with due process. *See* SPA32-43. Plaintiffs timely noticed their appeals. *See* JA9005-15.

---

[1] All citations to "MDL Dkt." refer to the docket in the multidistrict litigation pending in the United States District Court for the Southern District of New York, 03-md-1570.

5

## STATEMENT OF FACTS

**I.  DIB Served As A Key Financial Conduit For Al Qaeda.**

Finished CIA intelligence reports from before the September 11th attacks concluded that DIB "served as a key financial conduit for Al-Qa'ida and for Bin Laden's companies in Sudan" starting in the 1990s. JA7524-25 (Aver. ¶¶ 79, 81, 84). The CIA detailed the numerous accounts that al Qaeda members held at DIB, which were facilitated by the close friendship between DIB Chairman Saeed Ahmed Lootah and bin Laden. *Id.* (Aver. ¶¶ 80, 81, 84(g)). The CIA further recognized that al Qaeda's "choice of financial institutions in Sudan and abroad probably is based on personal contacts at the banks and security concerns." JA7821.

According to the CIA, "Bin Ladin's Sudan based companies and his financial officers opened bank accounts and letters of credit at Dubai Islamic Bank (DIB) with the active help of DIB Chairman Sa'id Ahmed Lootah." JA7530, 7533 (Aver. ¶¶ 92, 108). The CIA specifically determined that "DIB Chairman Lootah personally authorized, stamped, and signed some letters of credit opened by Bin Ladin's companies in Khartoum through DIB," JA7527-29 (Aver. ¶ 84(g)), and that al Qaeda financial chief Saidi Madani al-Tayyib "and other al-Qaida members held numerous accounts at Dubai Islamic Bank because of Bin Ladin's reported friendship with DIB Chairman, Saeed Ahmed Lootah." JA7524, 7533 (Aver. ¶¶ 80, 108(a)). The accounts DIB provided to al-Tayyib were used to facilitate critical fund movements

for core al Qaeda operations. *See* JA7532-35 (Aver. ¶¶ 106-16). Al-Tayyib's relationship with Lootah and DIB has further been corroborated by the CIA documents. *See* JA7533 (Aver. ¶ 108).

Numerous other high-ranking al Qaeda officials and associates held accounts at DIB, including Ali Abdul Aziz Ali, Khalid Sheikh Mohammed's nephew and a key figure in the financing of the September 11th attacks. *See* JA7537-38 (Aver. ¶¶ 130-39). Ali opened an account at DIB on August 8, 2000, during the same period he was carrying out orders for his uncle, and during the months that followed, Ali provided financial and logistical assistance to the hijackers. *See* JA7537 (Aver. ¶¶ 130-31).

In addition, DIB Chairman Lootah and his businesses worked with an al Qaeda company in Jabal Ali, UAE, managed by Abu Khalifa al Omani, an al Qaeda member who "handles Bin Ladin's money in the Gulf under Madani Al-((Tayyib))'s supervision." JA7533 (Aver. ¶ 108(c)). The al Qaeda company was providing money to "Saudi and Yemeni" groups, while working with Lootah's businesses, "which in turn cooperate with Bin Ladin's companies." *Id.*

The CIA thus determined that Lootah personally took steps to establish mechanisms to support al Qaeda through DIB, and that Lootah had connections to terrorist and militant causes and organizations. *See* JA7524-29 (Aver. ¶¶ 79, 81, 84, 89). For example, DIB's Board also included Sheikh Youssif Jassim Al Haji, the

"chairman of the Kuwait-based International Islamic Charities Organization (IICO)." JA7527-29 (Aver. ¶ 84(g)). According to the CIA, IICO "was established in 1986 as a cover entity for the safe and efficient management of MB [Muslim Brotherhood] finances. [REDACTED] the IICO sends funds [REDACTED] to the Peshawar, Pakistan-based Maktab-ul Khedamat, an NGO that coordinates activities of militant Afghanis and supports the Bosnian Mujaheddin." JA7528 (Aver. ¶ 84(g)). The CIA assessed that Jassim likely served as a "principal connection" between DIB and "several NGOs that purportedly fund militant causes."[2] *Id.* In addition, DIB's Shariah Board included Islamic scholars who openly advocated assistance to terrorist organizations and "encouraging one to bomb himself." JA7539-41 (Aver. ¶¶ 144-49).

Based on all this evidence, the CIA concluded that DIB's support for al Qaeda and bin Laden "stand[s] out from other Islamic financial institutions because of their management's apparently *witting involvement* in the financial activities" of al Qaeda and several other terrorist organizations. JA7526-27 (Aver. ¶ 84(f)) (emphasis added).

---

[2] In addition, Dr. Hussein Hamid Hassan, the chair of DIB's Shariah Board, who DIB offered as a witness in this case, has connections to Abdullah Azzam, the co-founder of al Qaeda. *See* JA7541 (Aver. ¶ 151). Dr. Hassan confirmed that he knew Azzam, and the foreword of Azzam's *fatwa* was reviewed and approved by Dr. Hassan. *See* JA7542-43 (Aver. ¶¶ 156-58).

DIB's collaboration with al Qaeda remained ongoing at least into 1999, under two years before the September 11th attacks and at a point when operational preparations for the September 11th attacks had already commenced. *See* 9/11 Commission Report at 149. According to a July 8, 1999 article in *The New York Times*, the CIA had obtained evidence that bin Laden "has been allowed to funnel money through the Dubai Islamic Bank in Dubai, which the United Arab Emirates Government effectively controls," and intelligence officials had evidence that bin Laden had a relationship with the bank, which was arranged with approval of the bank's officials. JA7536 (Aver. ¶ 126).

As reflected in contemporaneous media reports and statements by U.S. officials, the United States initiated a high-level diplomatic mission to the United Arab Emirates in 1999 "to lobby for a halt to a suspected financial relationship between a Government-controlled bank and Osama bin Laden, the Saudi exile charged in the bombings of the United States embassies in Africa last year." JA7536 (Aver. ¶ 125). The mission was carried out during a period of intensive focus on al Qaeda's financing, and focused on lobbying for a halt to DIB's supportive relationships with al Qaeda and bin Laden, necessarily indicating that the United States government believed those supportive relationships to remain in place at that time. *See* JA7537 (Aver. ¶ 129). Contrary to DIB's assertions (which the district court improperly accepted), the Averment provides ample support for Plaintiffs'

position that DIB's response to the U.S. engagements concerning its involvement in supporting al Qaeda was perfunctory and unserious. *See* JA7544-46 (Aver. ¶¶ 171-186).

Indeed, discovery obtained from DIB indicates that the support DIB provided to al Qaeda in furtherance of its terrorist objectives continued in the years preceding the September 11th Attacks, and that al Qaeda members and affiliates, including hijackers, maintained accounts at DIB in the at that time. *See* JA7537-38 (Aver. ¶¶ 130-138). Evidence shows that Ali Abdul Aziz Ali, Khalid Sheikh Mohammed's nephew, withdrew nearly all the money from his DIB account on September 10, 2001, to fund his escape from Dubai to Karachi, Pakistan. *See* JA7537 (Aver. ¶ 132). This evidence establishes that DIB acted as more than a "passive conduit" for al Qaeda, and that the decision by bin Laden and members of al Qaeda to use DIB's banking and financial services evidenced a witting and intentional collaboration between DIB and al Qaeda, founded on Lootah's "personal friendship" with bin Laden. JA7538 (Aver. ¶ 139).

## II.    DIB Knew That Al Qaeda Intended To Harm The United States.

Throughout the time period that DIB was providing witting support to bin Laden and al Qaeda, al Qaeda was actively targeting the United States.

As early as 1992 and repeatedly thereafter, bin Laden made clear to his collaborators—including Lootah and DIB, as well as other accountholders of DIB—

10

his objectives to target the United States for attack, emphasizing the need to cut off "the head of the snake." JA7543 (Aver. ¶¶ 160-62). DIB was thus expressly aware that al Qaeda was targeting the United States for attack, and DIB specifically intended for its support to advance that goal. *See* JA7543-44 (Aver. ¶¶ 159-170). From 1992 onward, al Qaeda did carry out numerous attacks against United States targets, which were publicly attributed to al Qaeda, and which culminated with the September 11th attacks. *See* JA7543-44 (Aver. ¶¶ 163-168).

## III. DIB's Support Enabled Al Qaeda To Gain The Strike Capabilities Needed To Attack The United States.

The assessments by the CIA confirm that the support DIB provided in the 1990s enabled al Qaeda to gain the global strike capabilities necessary to attack the United States. *See* JA7524-35 (Aver. ¶¶ 79, 84, 91-92, 96, 98-120).

In the 1990s, the financial supporters of al Qaeda and bin Laden facilitated various efforts to harm United States interests during this time, including the bombing of a hotel housing U.S. servicemen in Yemen and plans to develop methods to deliver poisonous gases in explosives or develop cyanide gas bombs aimed at harming U.S. troops. *See* JA7530 (Aver. ¶¶ 95-96).

But beyond these attacks, a finished intelligence report by the CIA found that the period al Qaeda spent embedded in Sudan, from 1992-1996, enabled al Qaeda to transform "from an only partially realized idea to an international organization ready to operate on its own." JA7530 (Aver. ¶ 91). To do this "Al Qaeda received funding

11

from wealthy backers of the Sudanese regime." *Id.* Important here, "during this critical period of incubation for al Qaeda, bin Laden forged and used financial relationships that he had developed with DIB and Lootah." *Id.* (Aver. ¶ 92).

## SUMMARY OF ARGUMENT

**I.** The district court erred in concluding that it lacked personal jurisdiction over Plaintiffs' Anti-Terrorism Act claims against DIB under the Fifth Amendment. Plaintiffs have demonstrated that they properly served DIB, that statutory jurisdiction exists, and that exercising jurisdiction comports with due process.

**A.** The Anti-Terrorism Act and Federal Rule of Civil Procedure 4(k)(2) supply the statutory bases for jurisdiction in this case. The Anti-Terrorism Act's service-of-process provision authorizes the Court to exercise personal jurisdiction here. *See* 18 U.S.C. § 2334(a); *see also* Pub. L. No. 114-222 § 2(b), 130 Stat. at 853; Fed. R. Civ. P. 4(k)(1)(C). Even if it did not, Rule 4(k)(2) provides an alternative statutory basis. As the district court already determined, Plaintiffs properly served DIB. DIB has denied that the New York and District of Columbia courts have jurisdiction over it, and it has not volunteered an alternative American forum. Rule 4(k)(2) applies in exactly this scenario.

**B.** The district court erred in applying the Fourteenth Amendment's minimum-contacts test to assess whether the exercise of jurisdiction over DIB satisfied the Fifth Amendment's guarantee of due process. In *Fuld*, the Supreme

12

Court held that the Fifth Amendment requires a "more flexible" analysis, not bound by federalism-based limitations that constrain the States.

   **C.**   Under *Fuld*'s framework, the exercise of jurisdiction over Plaintiffs' Anti-Terrorism Act claims against DIB satisfies the Fifth Amendment.

   **1.**   Congress and the Executive possess broad authority to extend the federal courts' jurisdiction over foreign defendants in terrorism cases. Congress enacted the Anti-Terrorism Act to remove jurisdictional barriers and authorize U.S. nationals to seek treble damages from perpetrators of terrorist attacks and those who provided them material support. JASTA reinforced that the federal courts have "the broadest possible basis" for asserting jurisdiction over these claims consistent with the Constitution, which necessarily includes obtaining personal jurisdiction over a foreign defendant under Rule 4(k)(2). Pub. L. No. 114-222 § 2(b), 130 Stat. at 853. DIB's support for al Qaeda is precisely the kind of conduct that Congress sought to reach: DIB provided longstanding financial assistance to al Qaeda's leadership, including lines of credit personally authorized by its chairman. This support helped enable al Qaeda's attacks on U.S. soil on September 11th, and creates a meaningful nexus with the United States. Additionally, DIB's conduct here implicates core foreign-policy concerns. Congress designed the Anti-Terrorism Act to provide Americans a federal forum to hold perpetrators of terrorist attacks accountable. Exercising jurisdiction over Plaintiffs' Anti-Terrorism Act claims against DIB

13

fulfills the statute's core purpose. No more is necessary to conclude that exercising jurisdiction over DIB comports with *Fuld* and the Fifth Amendment.

**2.** Exercising jurisdiction over DIB here is also reasonable. The United States has a compelling interest in ensuring that U.S. victims of terrorism can seek redress in its courts, and Congress and the Executive have repeatedly expressed that interest through legislation and counterterrorism policy. Plaintiffs, for their part, have a strong interest in proceeding in what is likely their only forum. By contrast, DIB faces no undue burden. It identified none in the district court, has litigated this case for years, is ably represented by U.S.-based counsel, and previously invoked the jurisdiction of U.S. courts for its own benefit. As a sophisticated banking company, DIB cannot credibly claim surprise at being required to answer in a U.S. court for supporting a terrorist organization it knew was intent on striking the United States.

**D.** Even if this case were distinguishable from *Fuld*, Rule 4(k)(2) remains constitutional under the Fifth Amendment's original meaning and authorizes jurisdiction. In the early republic, any limits on the federal courts' power to adjudicate claims against foreign defendants came from international law, not the Constitution. Congress has the power to override those limits. By allowing Rule 4(k)(2) to take effect, Congress authorized federal courts to exercise jurisdiction over foreign defendants in a narrow class of cases like this one. DIB will receive fair

14

process and a neutral arbiter. The Fifth Amendment, as originally understood, requires no more.

**II.**     In any event, the district court's decision fails even under a "more flexible" minimum-contacts test.

**A.**     DIB took purposeful, tortious action aimed at the United States. It provided financial support to bin Laden, al Qaeda, and their affiliated entities. Senior al Qaeda leaders moved large sums of money through the bank, and DIB's chairman personally authorized lines of credit. The evidence shows that DIB was generally aware that this assistance advanced al Qaeda's terrorist and anti-United States agenda. The effects of that conduct are more than sufficient to support jurisdiction.

**B.**     Alternatively, DIB conspired with and aided and abetted al Qaeda in its terrorist attacks. Al Qaeda's direct contacts with the United States—including the September 11th attacks themselves—are attributable to DIB. The Constitution does not bar the federal courts from exercising jurisdiction in these circumstances.

## STANDARD OF REVIEW

The Court "review[s] a district court's dismissal of an action for want of personal jurisdiction *de novo*." *Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 673 F.3d 50, 59 (2d Cir. 2012). When reviewing a grant of summary judgment, it "constru[es] the evidence in the light most favorable to the party against whom summary judgment was granted and draw[s] all reasonable inferences in that party's

favor." *Ezrasons, Inc. v. Travelers Indem. Co.*, 89 F.4th 388, 394 (2d Cir. 2023); *see Waldman v. Palestine Liberation Org.*, 835 F.3d 317, 327 n.5 (2d Cir. 2016) (This "Court typically reviews factual findings in a district court's decision on personal jurisdiction for clear error and its legal conclusions *de novo.*"). A plaintiff may meet its burden to establish jurisdiction by proffering "an averment of facts that, if credited by the trier, would suffice to establish jurisdiction over the defendant." *Ball v. Metallurgie Hoboken-Overpelt, S.A.*, 902 F.2d 194, 197 (2d Cir. 1990).

## ARGUMENT

### I. The Federal Courts Have Authority To Render A Judgment On Plaintiffs' Anti-Terrorism Act Claims Against DIB

The Supreme Court has "long held" that, to satisfy due process, "a 'court must have … power over the parties before it (personal jurisdiction) before it can resolve a case.'" *Fuld*, 145 S. Ct. at 2102 (quoting *Lightfoot v. Cendant Mortg. Corp.*, 580 U.S. 82, 95 (2017)). "The lawful exercise of personal jurisdiction by a federal court requires satisfaction of three primary requirements." *Licci*, 673 F.3d at 59. First, "service of process … must have been procedurally proper." *Id.* In this case, the district court already found that Plaintiffs satisfied this requirement. *See Terrorist Attacks IV*, 718 F. Supp. 2d at 499-91. "Second, there must be a statutory basis for personal jurisdiction that renders such service of process effective." *Licci*, 673 F.3d at 59. The Anti-Terrorism Act and Federal Rule of Civil Procedure 4(k)(2) provide that authorization here. Third, "the exercise of personal jurisdiction must comport"

16

with the Constitution. *Id.* at 60. The district court concluded that Plaintiffs failed to clear this last hurdle, *see* SPA32-43, but *Fuld* shows that conclusion was mistaken. In any event, requiring DIB to defend this Anti-Terrorism Act suit in the United States would not be contrary to the original understanding of the Fifth Amendment's Due Process Clause. Plaintiffs have thus carried their burden of showing that the federal courts may proceed with adjudicating the Anti-Terrorism Act claims against DIB in this case, and the district court's decision to the contrary should be reversed.

### A. The Anti-Terrorism Act And Federal Rule Of Civil Procedure 4(k)(2) Provide Adequate Statutory Bases For Personal Jurisdiction

The federal courts may exercise jurisdiction over Plaintiffs' Anti-Terrorism Act claims against DIB under the Act itself and Rule 4(k)(2).[3]

Ordinarily, a federal court exercises personal jurisdiction over a defendant under a state long-arm statute, *see* Fed. R. Civ. P. 4(k)(1)(A), or, less commonly, under a federal statute that expressly authorizes service, *see* Fed. R. Civ. P. 4(k)(1)(C). This case, like *Fuld*, falls within that "subset of federal cases" where

---

[3] Plaintiffs have also brought claims under state common law. *See, e.g.*, JA44-53 (*Euro Brokers* Complaint); JA440-447 (*Burnett* Complaint); JA631-640 (*Federal Insurance* Complaint); JA1317-1332 (*Cantor Fitzgerald* Complaint); JA1622-1625 (*Continental Casualty* Complaint); JA4378-4391 (*O'Neill* Complaint). Because there is personal jurisdiction over Plaintiffs' federal claims, the district court may also exercise personal jurisdiction over Plaintiffs' state-law claims "under the doctrine of pendent personal jurisdiction." *IUE AFL-CIO Pension Fund v. Herrmann*, 9 F.3d 1049, 1056 (2d Cir. 1993); *see* 28 U.S.C. § 1367.

17

Congress has chosen directly to establish jurisdiction over defendants who have been served a summons. 145 S. Ct. at 2102. The Anti-Terrorism Act provides that "[p]rocess in … a civil action [under 18 U.S.C. § 2333] may be served in any district where the defendant resides, is found, or has an agent," 18 U.S.C. § 2334(a), and that clause "clearly confers … jurisdiction under Rule 4(k)(1)(C)," *Zobay v. MTN Grp. Ltd.*, 695 F. Supp. 3d 301, 322 (E.D.N.Y. 2023); *see Licci*, 673 F.3d at 59 n.8 (recognizing that Section 2334(a) may be a "relevant" "statutory bas[is] for personal jurisdiction" in "lawsuits brought under the Anti-Terrorism Act"). Congress has acted to give plaintiffs asserting Anti-Terrorism Act claims "the broadest possible basis … to seek relief" against perpetrators and supporters of international terrorism, specifically including the September 11th attacks. *See* Pub. L. No. 114-222 §§ 2(b), 7(2), 130 Stat. at 853, 855. This provision thus authorizes jurisdiction in these circumstances where Plaintiffs have properly served DIB under the Federal Rules. *See Terrorist Attacks IV*, 718 F. Supp. 2d at 490.

Even if the Anti-Terrorism Act itself did not provide an adequate basis, Rule 4(k)(2) does.[4] Promulgated in 1993 to "correct a gap in the enforcement of federal

---

[4] Contrary to DIB's argument in the district court, *see* MDL Dkt. 8127 at 30, Plaintiffs' invocation of the relevant state long-arm statutes does not foreclose reliance on the Anti-Terrorism Act or Rule 4(k)(2)—as the district court correctly recognized, *see* SPA28-29. If Plaintiffs are right that the state long-arm statutes authorize jurisdiction, then jurisdiction is proper under Rule 4(k)(1)(A). But if not, the analysis simply shifts to the Anti-Terrorism Act and then Rule 4(k)(2). Plaintiffs invoked the Anti-Terrorism Act and Rule 4(k)(2) in the district court, *see* MDL Dkt.

law" identified in *Omni Capital International v. Rudolf Wolff & Co.*, 484 U.S. 97 (1987), Fed. R. Civ. P. 4(k) advisory committee's note, 1993 amendments, the rule permits federal courts to exercise jurisdiction over foreign defendants when plaintiffs assert federal claims but no State has jurisdiction, so long as it complies with the Constitution and laws of the United States, *see Chew v. Dietrich*, 143 F.3d 24, 27 n.3 (2d Cir. 1998); *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 276 (5th Cir. 2022) (en banc) (Elrod, J., dissenting), *cert. denied*, 143 S. Ct. 1021 (2023). In the Second Circuit, the only constitutional restraint on the exercise of personal jurisdiction over claims that otherwise satisfy the rule is the Fifth Amendment. *See Dardana Ltd. v. Yugaskneftegaz*, 317 F.3d 202, 207 (2d Cir. 2003).

Plaintiffs fulfill Rule 4(k)(2)'s requirements. First, they properly served DIB. *See Terrorist Attacks IV*, 718 F. Supp. 2d at 490. And they assert claims under the Anti-Terrorism Act, 18 U.S.C. § 2333(a), (d). Second, Plaintiffs fall squarely within Rule 4(k)(2)'s narrow scope: DIB has categorically denied that it is subject to the power of any court in New York or the District of Columbia, *see* MDL Dkt. 8127 at 30, and it has not suggested that it is subject to the jurisdiction of courts in any other State, *cf. Mwani v. Bin Laden*, 417 F.3d 1, 11 (D.C. Cir. 2005). Nor could any state

---

8315 at 28, and because exercising jurisdiction comports with the Fifth Amendment and *Fuld*, *see* Parts I.C. and I.D, *infra*, the federal courts may exercise personal jurisdiction over DIB. Either way, there is personal jurisdiction here.

court exercise jurisdiction over Plaintiffs' Anti-Terrorism Act claims. *See* 18 U.S.C. § 2338 (granting "[t]he district courts of the United States" "exclusive jurisdiction" over Anti-Terrorism Act claims).

Because exercising personal jurisdiction over DIB complies with the Fifth Amendment, *see* Parts I.C & I.D, *infra*, Rule 4(k)(2) also provides a valid statutory basis for personal jurisdiction.

### B. The District Court Erred By Applying The Minimum-Contacts Test To Determine Whether Exercising Personal Jurisdiction Was Consistent With Due Process

For many years, the Second Circuit has treated "the due process analysis" as "basically the same under both the Fifth and Fourteenth Amendments." *Chew*, 143 F.3d at 28 n.4. The district court followed that precedent, assessing DIB's contacts with the United States through the lens of the familiar minimum-contacts test. *See* SPA32-43. But the Supreme Court has now rejected that analytical approach. *See Fuld*, 145 S. Ct. at 2105; *accord Fuld v. PLO*, 101 F.4th 190, 205 (2d Cir. 2024) (Menashi, J., joined by Livingston and Park, JJ., dissenting from denial of rehr'g en banc).

*Fuld* held that the principles governing personal jurisdiction under the Fourteenth Amendment do not control the analysis under the Fifth. The Court recognized that the former is shaped by federalism and the limits of state sovereignty—"ensur[ing] that the States, through their courts, do not reach out

20

beyond the limits imposed on them by their status as coequal sovereigns in a federal system," *Fuld*, 145 S. Ct. at 2104, and that individuals are "subject only to lawful power," *id.* at 2103. The latter is not. Unlike the States, the federal government possesses "both nationwide and extraterritorial authority," *id.* at 2104, and it has a distinct interest "in holding accountable those who perpetrate an 'act of violence against' U.S. nationals" wherever they may be, *id.*

The Court also recognized that "to the extent that the Due Process Clauses of the Fourteenth and Fifth Amendment both implicitly limit the jurisdictional authority of courts," "they do so with respect to the distinct sovereignties from which those courts derive their authority." *Id.* at 2105. As a result, the Fifth Amendment "permits a more flexible jurisdictional inquiry commensurate with the Federal Government's broader sovereign authority," and abstract "fairness considerations" that shape the Fourteenth Amendment's limits—particularly those grounded in federalism—"do not compel" parallel restrictions. *Id.* at 2105-06.

*Fuld* thus overruled the Second Circuit's practice of treating the two constitutional inquiries as interchangeable. *Id.* (citing *Fuld v. Palestine Liberation Org.*, 82 F.4th 74, 102–05 (2d Cir. 2023)). The district court's 2023 decision, however, relied on that now-overruled precedent and expressly refused to accept "a lesser showing of minimum contacts" as sufficient to exercise jurisdiction over the Anti-Terrorism Act claims against DIB. *See* SPA32. That reasoning cannot survive

*Fuld*. And the tests set forth in *Calder v. Jones*, 465 U.S. 783, 789 (1984), and *In re Terrorist Attacks on September 11, 2001*, 538 F.3d 71 (2d Cir. 2008) (*Terrorist Attacks III*), are no longer useful in this context.

In sum, the district court "applied the wrong constitutional test," *Fuld*, 145 S. Ct. at 2109, and its decision cannot stand. At least, the Court should vacate the judgment and remand the case for proceedings consistent with *Fuld*.

### C. Exercising Personal Jurisdiction Over Plaintiffs' Anti-Terrorism Act Claims Against DIB Complies With Due Process And Thus The Decision Below Should Be Reversed

Rather than remanding this long-running case for the district court to reconsider its jurisdiction, this Court should apply *Fuld* itself and confirm that the federal courts have personal jurisdiction over Plaintiffs' Anti-Terrorism Act claims against DIB.

In *Fuld*, the Court upheld a statute amending the Anti-Terrorism Act that (1) "tie[d] the assertion of federal jurisdiction … to conduct that involves the United States" and (2) "implicate[d] sensitive foreign policy matters within the prerogative of the political branches." 145 S. Ct. at 2110. Plaintiffs here also invoke the Anti-Terrorism Act and seek to hold DIB liable for "conduct closely related to the United States"—the witting aiding and abetting of bin Laden and al Qaeda—"that implicates important foreign policy concerns." *Id.* at 2106. The Anti-Terrorism Act and Rule 4(k)(2), understood and applied in light of Congress's commands in

JASTA, Pub. L. No. 114-222, 130 Stat. 852, satisfy the considerations identified in *Fuld*. And for the same reasons there, exercising jurisdiction in this Anti-Terrorism Act case is reasonable and fits within "the Fifth Amendment's outer limits on the territorial jurisdiction of federal courts." *Fuld*, 145 S. Ct. at 2106.

### 1. Congress Has Authorized The Federal Courts To Exercise Jurisdiction Over Anti-Terrorism Act Claims Against Foreign Defendants

"Congress has the authority to enforce its laws beyond the territorial boundaries of the United States." *EEOC v. Arabian Am. Oil Co.*, 499 U.S. 244, 248 (1991). That includes the power to criminalize conduct abroad. *See, e.g.*, *United States v. Epskamp*, 832 F.3d 154, 168 (2d Cir. 2016). Congress enacted the Anti-Terrorism Act to "open[] the courthouse door to victims of international terrorism" and "extend[] the same jurisdictional structure that undergirds the reach of American criminal law to the [Act's] civil remedies." S. Rep. No. 102-342 at 45 (1992). The Act thus authorizes victims, including their estates and survivors, to recover treble damages from those who commit, plan, and authorize acts of international terrorism and those who provide them material support, whether in the United States or abroad. *Fuld*, 145 S. Ct. at 2099 (citing 18 U.S.C. § 2333(a), (d)(2)). The Supreme Court has already addressed how authorizing jurisdiction under the Anti-Terrorism Act furthers longstanding federal policy. *Id.* at 2107-08. And in this case, Rule

23

4(k)(2) gives practical effect to that mandate by ensuring that such claims may proceed against foreign defendants in federal court in circumstances like these.

*Fuld* confirms that Congress and the Executive together have broad authority to authorize personal jurisdiction over perpetrators of international terrorism. The Court noted that, "[i]n respectively passing and signing" the Promoting Security and Justice for Victims of Terrorism Act of 2019 (PSJVTA), Pub. L. No. 116-94 § 903, 133 Stat. 2534, 3082 (2019), the political branches "made a considered judgment to subject the PLO and PA to liability in U.S. courts" as part of the United States's "comprehensive legal response" to "international terrorism," *Fuld*, 145 S. Ct. at 2107. That judgment, which "balanced … competing concerns over 'sensitive and weighty interests of national security and foreign affairs' and fairness to these particular defendants," was entitled to substantial deference. *Id.* (quoting *Holder v. Humanitarian Law Project*, 561 U.S. 1, 33-34 (2010)). The Court also emphasized that the statute targeted "a narrow category of claims that provide civil remedies only for Americans injured by acts of international terrorism," *id.*, and that jurisdiction was tied to "conduct that involves the United States and implicates sensitive foreign policy matters within the prerogative of the political branches," *id.* at 2110. The Court therefore held that the PSJVTA "comports with the Due Process Clause of the Fifth Amendment." *Id*.

Similar reasoning supports the exercise of personal jurisdiction over Plaintiffs' Anti-Terrorism Act claims here. First, Congress made the same judgment to subject foreign defendants to suit in the United States when it enacted the Anti-Terrorism Act and Rule 4(k)(2) as it did when passing the PSJVTA. It designed the Anti-Terrorism Act "to 'remove the jurisdictional hurdles in the courts confronting victims of international terrorism.'" Br. of Sen. Grassley et al. at 5, *Fuld v. Palestine Liberation Org.*, No. 24-20 (U.S. Feb. 2025) (cleaned up); *see* 18 U.S.C. §§ 2334(a) (authorizing nationwide service), 2338(a) (granting federal courts exclusive jurisdiction). When courts—including this one—dismissed Anti-Terrorism Act suits on jurisdictional grounds, Congress responded with additional legislation—including JASTA. That statute declared that "civil litigants" have "the broadest possible basis, consistent with the Constitution," to pursue claims against foreign defendants "*wherever acting and wherever they may be found*" who "engage[d] in terrorist activities against the United States" or "provide[d] material support" to those who did. Pub. L. No. 114-222 § 2(b), 130 Stat. at 853 (emphasis added). And Congress has made clear that JASTA applies to cases arising from injuries sustained on or after September 11th. *See id.* § 7(2), 130 Stat. at 855.

Here, to be sure, personal jurisdiction is based on the Anti-Terrorism Act service-of-process provision and Rule 4(k)(2) and not the PSJVTA. But nothing in the Anti-Terrorism Act, JASTA, or *Fuld* suggests that Congress intended to

foreclose reliance on Section 2334(a) or Rule 4(k)(2) to establish personal jurisdiction over foreign perpetrators of terrorist acts against the United States. To the contrary, the congressional enactments—as interpreted in *Fuld*—authorize jurisdiction to the fullest extent that the Constitution allows.

Second, as in *Fuld*, a significant nexus exists here between the United States and DIB's alleged conduct. *Cf. Fuld*, 101 F.4th at 221 (Menashi, J., dissenting from denial of reh'g en banc) ("extraterritorial application of American criminal law requires only 'a sufficient nexus between the defendant and the United States, so that such application would not be arbitrary or unfair'" (quoting *Epskamp*, 832 F.3d at 168)). As early as 1992, bin Laden called for violence against Americans—as he termed it, "cut[ting] off the head of the snake." JA7543 (Aver. ¶¶ 162, 165); *see* Nat'l Comm'n on Terrorist Attacks Upon the U.S., 9/11 Commission Report at 48, 54, 59. "Plans to attack the United States were pursued with unwavering single-mindedness throughout the 1990s." 9/11 Commission Report at 48. Al Qaeda succeeded in those efforts when it bombed American embassies in 1998, *see* JA7543 (Aver. ¶ 167), blasted a hole in the U.S.S. Cole's side in 2000, *see* JA7544 (Aver. ¶ 168), and struck U.S. nationals on U.S. soil with planes on September 11th, an operation that bin Laden personally approved in late 1998 or 1999, *see* JA7543 (Aver. ¶ 165); *see also* 9/11 Commission Report at 68-70, 190, 285-88.

For decades, attacking the material support that terrorist organizations receive has been a key part of U.S. counterterrorism policy. Congress has made it a criminal offense to "provide[] material support or resources … that are to be used in preparation for, or in carrying out," a terrorist attack. 18 U.S.C. § 2339A(a). It has authorized the Department of Justice to seek civil penalties from financial institutions who facilitate terrorist funding. *See id.* § 2339B(b). And it has enacted the Anti-Terrorism Act to allow victims of terrorism to "strik[e] at the resource that keeps international terrorists in business—their money." Grassley Br. at 8 (quoting 138 Cong. Rec. S17252-04 (statement of Sen. Grassley)) (cleaned up).

The record shows that, throughout this period, when al Qaeda was targeting the United States and carrying out attacks on United States targets with public attribution, DIB served as "a key financial conduit for Usama bin Ladin's Islamic Army [al Qaeda]." JA7525 (Aver. ¶84(b)). The CIA found that DIB's chairman, Lootah, "[wa]s a close friend of Bin Lad[e]n's," JA7524 (Aver. ¶79), which made him privy to bin Laden's early calls for anti-American violence. Further, bin Laden, his businesses, and senior al Qaeda leaders maintained accounts at DIB, likely because of bin Laden's relationship with Lootah, *see* JA7524 (Aver. ¶ 80). Far from just "performing routine banking services for customers having terrorist ties," SPA36, Lootah "personally authoriz[ed], stamp[ed], and sign[ed] 'some of bin Lad[e]n's letters of credit," JA7524 (Aver. ¶ 79). Al-Tayyib, al Qaeda's financial

27

chief and another friend of Lootah, deposited and withdrew large amounts of money from his DIB accounts during the critical period when al Qaeda obtained the capability to strike in the United States. *See* JA7533-35 (Aver. ¶¶ 108-116). And DIB continued to help other key al Qaeda figures right up to the attacks despite U.S. government engagement with the UAE to shut down DIB's assistance. *See* JA7537 (Aver. ¶¶ 129-30). These actions—and others, *see* pp. 6-12, *supra*; pp. 37-42, *infra*—demonstrate that a sufficient nexus exists as in *Fuld*.

Third, asserting jurisdiction over DIB in this case furthers important national interests as articulated by Congress and the Executive. International terrorism "threatens the vital interests of the United States," Pub. L. No. 114-222 § 2(a)(1), 130 Stat. at 852, and JASTA affirms the United States's "vital interest in providing persons and entities injured as a result of terrorist attacks committed within the United States with full access to the court system," *id.* § 2(a)(7), 130 Stat. at 852-53. The Anti-Terrorism Act works as "part of a comprehensive legal response to 'halt, deter, and disrupt' acts of international terrorism that threaten the life and limb of American citizens." *Fuld*, 145 S. Ct. at 2107 (quoting H.R. Rep. No. 115-858 at 7-8 (2018)). Plaintiffs have properly brought such claims against DIB for providing material support to al Qaeda. And courts should not "cavalierly interfere" with such nuanced, foreign-policy-related judgments, *id.*, particularly where Congress has

provided the "broadest possible basis" for jurisdiction, Pub. L. No. 114-222 § 2(b), 130 Stat. at 853.

Finally, consistent with *Fuld*, exercising jurisdiction under the Anti-Terrorism Act and Rule 4(k)(2) over Plaintiffs' Anti-Terrorism Act claims against DIB would not amount to "an anything-goes approach" that risks ordinary foreign entities "being haled into U.S. courts for myriad civil liability actions." *Fuld*, 145 S. Ct. at 2107. The Anti-Terrorism Act applies only to a narrow category of claims brought by U.S. nationals against those who committed or materially supported acts of international terrorism. 18 U.S.C. § 2333(a), (d). Accepting jurisdiction here would not unleash a wave of unrelated litigation: the Anti-Terrorism Act does not extend to ordinary commercial disputes, and Rule 4(k)(2)'s application here would not affect the "run-of-the-mill private defendant." *Fuld*, 145 S. Ct. at 2108. The Court can decide later whether Rule 4(k)(2) could permissibly support jurisdiction in other types of civil cases. But in this case, where the political branches have made clear that courts should hear claims brought under this statute, the Fifth Amendment poses no bar. *Fuld* shows that exercising jurisdiction under the Anti-Terrorism Act or Rule 4(k)(2) for this case satisfies due process, "whatever the Fifth Amendment's outer limits on the territorial jurisdiction of federal courts." *Fuld*, 145 S Ct. at 2107.

\* \* \*

29

Because DIB's conduct bears a meaningful connection to the United States and because exercising jurisdiction advances compelling national interests defined by the political branches, allowing Plaintiffs to pursue their Anti-Terrorism Act claims here is "permissible" under the Fifth Amendment. *Id.*

### 2. Requiring DIB To Defend Against Anti-Terrorism Act Claims In Federal Court Is Reasonable

While the Supreme Court "made clear" in *Fuld* that the Fourteenth Amendment's tests do not apply equally to the Fifth Amendment, it left open whether the Fifth Amendment might involve "a similar 'inquiry into the reasonableness of the assertion of jurisdiction in a particular case'"—noting only that any such standard was "easily" met in that instance. *Id.* at 2109. To be clear, the Fifth Amendment imposes no such requirement. *See* Part I.D, *infra*. But even if it did, the outcome here would be no different.

Reasonableness traditionally turns on multiple factors such as "the interests of the forum State," "the plaintiff's interest in obtaining relief," and "the burden on the defendant." *Fuld*, 145 S. Ct. at 2109. As the district court found, these factors "[o]n balance" support "exercising jurisdiction over DIB" even under the more demanding Fourteenth Amendment framework. SPA32.[5] That remains true following *Fuld*.

---

[5] The district court also considered two other factors: "the interstate judicial system's interest in obtaining the most efficient resolution of controversies" and "the shared

30

First, the United States has—as described above, *see* Part. I.C.1, *supra*— "an exceedingly compelling interest" in affording American victims of terrorism a forum in which to hold perpetrators accountable under the Anti-Terrorism Act. *Fuld*, 145 S. Ct. at 2109; *accord* SPA32. The political branches' judgment carries "special power and force" in the reasonableness analysis. *Jesner v. Arab Bank, PLC*, 584 U.S. 241, 273 (2018) (plurality op.).

Second, Plaintiffs have a strong interest in litigating in their chosen forum. They are victims of "one of the most fatal attacks on the United States homeland." *Mark v. Republic of the Sudan*, 77 F.4th 892, 898 (D.C. Cir. 2023). As the district court observed, "their witnesses and evidence are primarily within the United States and the U.S. court system is likely the only venue that could hear their claims." SPA32. In short, these "American plaintiffs have a strong interest in seeking justice through an [Anti-Terrorism Act] damages action in U.S. courts." *Fuld*, 145 S. Ct. at 2109. And that too shows that exercising jurisdiction is reasonable in this case.

Third, requiring DIB to litigate these terrorism-related claims in federal court would not impose an undue burden. *See* SPA32. In the district court, DIB identified

---

interest of the several [s]tates in furthering fundamental substantive social policies." SPA31 (quoting *Asahi Metal Industry Co. v. Superior Court of Cal.*, 480 U.S. 102, 113 (1987)) (brackets in original). Given that those two factors on their face relate to the Fourteenth Amendment's concern with federalism, their relevance to the Fifth Amendment analysis may be limited. But to the extent that they have purchase, they too support the exercise of jurisdiction over DIB. *See* MDL Dkt. 8127 at 26-27.

31

no particular impediment to litigating in the United States, and it has already "participated in this litigation for years" with the able assistance of "U.S.-based counsel." *Id.* Indeed, it appears that, in 1999, DIB brought suit in the federal courts against a U.S. bank to enforce its rights, *see, e.g.*, *Dubai Islamic Bank v. Citibank, N.A.*, 126 F. Supp. 2d 659 (S.D.N.Y. 2000), and continued to litigate even after the September 11th attacks, *see, e.g.*, *Dubai Islamic Bank v. Citibank, N.A.*, 2002 WL 1159699 (S.D.N.Y. May 31, 2002). A party that invokes the jurisdiction of the federal courts to protect its interests cannot claim some inherent unfairness when called to defend itself in the same forum.

Nor can DIB plausibly argue it lacked notice that it could be haled into a U.S. court. DIB is a publicly traded, sophisticated banking company capable of processing millions of transactions for hundreds of thousands of different customers. *See* JA1877 (SUMF ¶¶ 1, 7); *cf. Fuld*, 145 S. Ct. at 2109. Any such sophisticated company, particularly a bank, that knowingly conducts business with designated terrorist groups—and continues to do so after government intervention—can reasonably expect to face suit in the United States if those groups attack Americans. Here, the United States government intervened with the United Arab Emirates government before the attacks in an effort to stop DIB's assistance to al Qaeda. *See* JA7537 (Aver. ¶¶ 129-30). DIB persisted in the relationship, fully aware of the consequences. It therefore had ample notice that it could be subject to suit in the

32

United States for claims alleging it wittingly aided and abetted bin Laden and al Qaeda. *See Fuld*, 145 S. Ct. at 2110.

Whatever burden DIB may claim from continuing to litigate in federal court pales in comparison to the United States's sovereign interest in combatting terrorism and Plaintiffs' interest in obtaining justice in their chosen forum. DIB's supposed burden does not "render the 'exercise of personal jurisdiction unreasonable and unfair.'" *Id.* (cleaned up). And taken together, as the district court rightly concluded, exercising jurisdiction over Plaintiffs' claims against DIB is reasonable.

### D.    At A Minimum, Exercising Personal Jurisdiction Over Plaintiffs' Claims Against DIB Is Consistent With The Original Understanding Of The Fifth Amendment.

Even if the Court concludes that Plaintiffs' Anti-Terrorism Act claims against DIB are distinguishable from the claims in *Fuld*, exercising jurisdiction under Rule 4(k)(2)—regardless of the underlying claim—is consistent with the Fifth Amendment's original meaning.

The Supreme Court chose not "to delineate the outer bounds of the Federal Government's power … to hale foreign defendants into U.S. courts." *Fuld*, 145 S. Ct. at 2106. As Justice Thomas and others have explained, however, those powers are considerable under the original understanding of the Fifth Amendment. *See id.* at 2110-21 (Thomas, J., joined by Gorsuch, J., concurring in the judgment); *Fuld*, 101 F.4th at 217-23 (Menashi, J., dissenting from denial of rehr'g en banc); *Lewis v.*

33

*Mutond*, 62 F.4th 587, 597-98 (D.C. Cir. 2023) (Rao, J., concurring); *Douglass*, 46 F.4th at 249-82 (Elrod, J., dissenting); *id.* at 284-87 (Oldham, J., dissenting). Under this original understanding, Congress has broad authority to extend the federal courts' jurisdiction over foreign defendants, as it has done here.

As Judge Menashi put it, "outside of the limits imposed by service of process, 'a federal court's writ may run as far as Congress, within its enumerated powers, would have it go.'" *Fuld*, 101 F.4th at 218 (Menashi, J., dissenting from denial of rehr'g en banc); *see* U.S. Const. art. III, § 2, cls. 1, 3. And Congress's enumerated powers include express authority to legislate extraterritorially. *See, e.g.*, U.S. Const. art. I, § 8, cls. 10, 11. At the founding, any constraints on the federal courts' authority to act on foreign defendants "derive[d] from the international law of nations, not the Constitution." *Fuld*, 145 S. Ct. at 2116 (Thomas, J., concurring in judgment). "Congress always possessed the power to legislate beyond the boundaries that these international-law principles imposed." *Id.*

This understanding shaped federal practice in the early Republic. In *Picquet v. Swan*, 19 F. Cas. 609, 613 (C.C.D. Mass 1828), Justice Story acknowledged that while Congress had not yet authorized broad jurisdiction, "[i]f Congress had prescribed such a rule, the court would certainly be bound to follow it, and proceed upon the law," even if it violated "principles of … immutable justice." *See Fuld*, 145 S. Ct. at 2118 (Thomas, J., concurring in judgment). The Supreme Court adopted the

34

same view a decade later when it recognized "federal courts would be bound to exercise" jurisdiction over "those 'who were in a foreign jurisdiction'" "if Congress required it through 'positive legislation,' no matter how 'unjust.'" *Fuld*, 145 S. Ct. at 2118 (Thomas, J., concurring in judgment) (quoting *Toland v. Sprague*, 37 U.S. (12 Pet.) 300, 328–30 (1838)).

Rule 4(k)(2), as adopted and approved by Congress, provides that kind of positive authorization. The rule was designed to fill a jurisdictional gap in federal-question cases where a defendant is not subject to any State's courts of general jurisdiction. *See* Fed. R. Civ. P. 4(k) advisory committee's note to 1993 amendment. In allowing the rule to take effect, Congress necessarily considered its foreign-policy implications—and chose to extend the federal courts' jurisdiction over foreign defendants in such cases. That decision ensured that plaintiffs asserting federal claims would not be left without a forum merely because a defendant's contacts with any one State were insufficient to justify jurisdiction under a state long-arm statute and Rule 4(k)(1)(A). And it did so without depriving defendants of core procedural protections. Rule 4(k)(2) does not deny defendants "an independent judge, 'regular allegations, opportunity to answer, and a trial according to some settled course of judicial proceedings.'" *Fuld*, 145 S. Ct. at 2115 (Thomas, J., concurring in judgment) (quoting *Murray's Lessee v. Hoboken Land & Improvement Co.*, 59 U.S. (18 How.) 272, 277 (1856)). Accordingly, the exercise of jurisdiction over Plaintiffs' claims

35

against DIB under Rule 4(k)(2) fully accords with the original meaning of the Fifth Amendment and the constitutional structure that the Framers adopted.

## IV. Plaintiffs Have Also Demonstrated Personal Jurisdiction Over DIB Through Alternative Means

Before *Fuld* clarified that the Fifth Amendment requires "a more flexible jurisdictional inquiry," 145 S. Ct. at 2105, the district court concluded that jurisdiction was lacking here under the minimum-contacts test, *see* p. 5, *supra*. Errors pervade the district court's reasoning. Reversal is therefore warranted on the additional ground that the exercise of jurisdiction here comports with a "more flexible" version of the minimum-contacts test under the Fifth Amendment.

Under the Fourteenth Amendment, a court may exercise jurisdiction when the defendant has "certain minimum contacts with the relevant forum … 'such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice.'" *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 673 (2d Cir. 2013) (*Terrorist Attacks VII*) (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).[6] Plaintiffs have satisfied that standard (particularly the "more flexible" version) here in two separate ways. *See, e.g.*, *Best Van Lines, Inc. v. Walker*, 490 F.3d 239, 243 (2d Cir. 2007) (recognizing that there are multiple, "independent,

---

[6] "The exercise of jurisdiction" must also be "reasonable in the circumstances." *Terrorist Attacks VII*, 714 F.3d at 673. Jurisdiction is reasonable here, as the district court rightly held. *See* Part I.C.2, *supra*.

if conceptually overlapping, methods of demonstrating minimum contacts"). First, Plaintiffs have shown that DIB engaged in "intentional, and allegedly tortious, actions … expressly aimed at the forum." *Terrorist Attacks III*, 538 F.3d at 93; *see also Calder*, 465 U.S. at 789. Second, Plaintiffs have shown that DIB conspired with (and aided and abetted) al Qaeda in attacking the United States, and so al Qaeda's constitutionally adequate contacts with the United States may be attributed to DIB. *See Charles Schwab Corp. v. Bank of Am. Corp.*, 883 F.3d 68, 86-87 (2d Cir. 2018).

### A.     DIB's Tortious Activities Expressly Directed At The Forum Support Personal Jurisdiction.

Prior to *Fuld*, this Court held that "personal jurisdiction properly exists" under the minimum-contacts test "where the defendant took 'intentional, and allegedly tortious, actions ... expressly aimed' at the forum." *Terrorist Attacks VII*, 714 F.3d at 674 (quoting *Calder*, 465 U.S. at 789). In the antiterrorism context, that standard is met where the defendant provided "direct" financial support to al Qaeda or its affiliates "with the specific intent to further Al Qaeda's terrorism against the United States." *Underwriting Members of Lloyd's Syndicate 2 v. Al Rajhi Bank*, 779 F. App'x 66, 68 (2d Cir. 2019). For example, this Court has upheld the exercise of personal jurisdiction over defendants who provided "material support"[7] to al Qaeda when al Qaeda "was known to be targeting the United States." *Terrorist Attacks VII*,

---

[7] The term "material support" expressly includes "currency or monetary instruments of financial securities" and "financial services." 18 U.S.C. § 2339A(b)(1).

714 F.3d at 678. These principles, especially when applied "more flexibl[y]," *Fuld*, 145 S. Ct. at 2105, readily establish personal jurisdiction over DIB.

To see why, start with the evidence that DIB provided direct, material financial support to al Qaeda. DIB, as the CIA put it, "served as a key financial conduit for Al-Qa'ida" and bin Laden's related businesses. JA7524-29 (Aver. ¶¶ 79, 81, 84). Starting in the early 1990s and continuing through the lead-up to the September 11th Attacks, bin Laden, his Sudanese businesses (which funded al Qaeda operations), and multiple high-ranking al Qaeda members held bank accounts at, and engaged in financial transactions with, DIB. *See* pp. 6-8, *supra*. These numerous links to al Qaeda were no accident: Through its chairman, Lootah, DIB actively fostered these connections with al Qaeda affiliates. The CIA concluded that key "al-Qaida members"—including its finance chief and others integral to financing the September 11th attacks—"held numerous accounts at [DIB] *because of* bin Ladin's reported friendship with" Lootah. JA7524, JA7533 (Aver. ¶ 80 (emphasis added), 108(a)); *see also* JA7561 (acknowledging that al Qaeda's "choice of financial institutions in Sudan and abroad probably is based on personal contacts as well as the banks and security concerns"). In turn, Lootah provided "active help" for and "personally facilitated" the opening of bank accounts or the authorization of letters of credit for these al Qaeda-affiliated individuals and entities. JA7530, JA7533, JA7527 (Aver. ¶¶ 92, 108, 84(g)). The CIA found that DIB's support made

38

a difference for Al Qaeda: Bin Laden "forged and used financial relationships that he had developed with DIB and Lootah" to help grow Al Qaeda into an organization equipped to engage in "international jihad." JA7530 (Aver. ¶ 92); *see also id.* (Aver. ¶ 91).

Turn next to the evidence establishing that this material assistance was carried out "with the specific intent to further al Qaeda's terrorism against the United States." *Al Rajhi Bank*, 779 F. App'x at 68. Although this Court's cases have not elaborated on the standard for "specific intent" in this context, the well-developed intent standard for aiding and abetting terrorism under the Anti-Terrorism Act (as amended by JASTA) is instructive. *See* SPA34. In that context, a defendant has the requisite intent to further terrorism if it "was 'generally aware' that it was … playing a 'role' in [the terrorist organization's] violent or life-endangering activities." *Linde v. Arab Bank, PLC*, 882 F.3d 314, 329 (2d Cir. 2018) (quoting *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983)); *see also Kaplan v. Lebanese Canadian Bank, SAL*, 999 F.3d 842, 856 (2d Cir. 2021) (recognizing aiding and abetting liability under the ATA for supporting known intermediaries to terrorist organization).

In the 1990s and early 2000s, al Qaeda's desire to carry out deadly attacks inside the United States was well-known, especially to the organization's collaborators. *See* pp. 10-11, *supra*. And the evidence confirms that DIB knew it was playing a "role" in that mission: Assessing the partnership between Lootah's bank

39

and the al Qaeda affiliates, the CIA determined that DIB "stand[s] out from other Islamic financial institutions because of their management's apparently *witting involvement* in the financial activities" of al Qaeda. JA7527 (Aver. ¶ 84(f)) (emphasis added). That "witting involvement"—at a time when al Qaeda was working to strike the United States—demonstrates DIB's "general[] aware[ness]" that it was "playing a role" in al Qaeda's targeting the United States. *Linde*, 882 F.3d at 329-30.[8]

Taken all together, the evidence establishes that DIB's support for al Qaeda and its affiliates was intentional, tortious activity expressly aimed at the United States. DIB and Lootah's support for al Qaeda and its affiliates was direct and material, and that support was not only premeditated but was rendered with knowledge that al Qaeda was determined to attack the United States. This Court has upheld personal jurisdiction for financial supporters of al Qaeda under similar circumstances. *See Terrorist Attacks VII*, 714 F.3d at 678 (upholding exercise of personal jurisdiction where defendants "sent financial and other material support" to

---

[8] This evidence of DIB's intent cannot be overcome by self-serving "testimony from DIB witnesses" stating "that, when confronted with allegations that the Bank was facilitating terrorism financing, it initiated an investigation and offered its cooperation to the U.S. government." SPA37. DIB's response to the U.S. government was perfunctory and unproductive. *See* JA7544-46 (Aver. ¶¶ 171-186). If anything, by the late 1990s, the bank was undisputedly aware that it was financing terrorism; its subsequent failure to stop that financing is further evidence of the bank's intent.

al Qaeda "when al Qaeda allegedly was known to be targeting the United States");
*cf. Al Rajhi Bank*, 779 F. App'x at 68 (reversing dismissal for lack of personal jurisdiction based on allegations that a bank "provided financial services and donations to charities that it knew financially supported al Qaeda"). It should do the same here.

The district court's decision that it lacked personal jurisdiction over DIB was flawed on multiple levels even if the Court applies a "more relaxed" minimum-contacts test. Apart from applying the Fourteenth Amendment rubric, *see* Part I.B, *supra*, the district court's first error was viewing DIB as "a 'passive conduit' through which funds were 'indirectly channeled to and from al Qaeda," rather than as a deliberate booster of the organization. SPA38. The CIA found that DIB's support for al Qaeda and its affiliates was "witting," and it backed up that finding with the ample evidence discussed. *See* pp. 6-12, *supra*. The district court's contrary view— that "[t]here is no evidence that DIB … was aware of the terrorist nature of the accountholders," SPA37—improperly "constru[es] the evidence" discussed above against Plaintiffs and refuses to "draw[] all reasonable inferences" in Plaintiffs' favor, *Costello v. City of Burlington*, 632 F.3d 41, 45 (2d Cir. 2011).

It was also error for the district court to disregard the evidence of DIB's close partnership with al Qaeda in the 1990s, because that "period [is] too remote to establish the requisite contacts." SPA37 (citing *Terrorist Attacks VII*, 714 F.3d at

676). *Terrorist Attacks VII* lays down no such rule. There, this Court deemed the bin Laden family construction company's shareholder distributions and government contracts to be *not* "connected in any meaningful way … to the September 11, 2001 attacks." 714 F.3d at 676. This was not because those distributions occurred in 1993, but because there was no evidence that they were intended to, or did in fact, fund al Qaeda. DIB's partnership with bin Laden and his al Qaeda allies in the 1990s was different. For example, the district court itself highlighted DIB bank statements from 1993 to 1995 that "show multiple" large deposits and withdrawals from DIB accounts by al-Tayyib, "a high-ranking member of al Qaeda in charge of most of Osama bin Ladin's money" and who "had a relationship with Lootah." SPA21. As the CIA explained, these transactions—and DIB's other dealings with bin Laden and his affiliates in the early to mid-1990s—occurred at a critical time for al Qaeda, when bin Ladin, al-Tayyib, and others were using "funding from wealthy backers" to build the global strike capabilities necessary to attack the United States. JA7530 (Aver. ¶ 91). So the connection between DIB's activities and al Qaeda's effort to attack the United States on September 11th is "meaningful," *Terrorist Attacks VII*, 714 F.3d at 676—not "remote," SPA37. Thus, "whatever the Fifth Amendment's outer limits on the territorial jurisdiction of the federal courts," the exercise of personal jurisdiction over DIB here "does not transgress them." *Fuld*, 145 S. Ct. at 2106.

**B.    DIB's Concerted Action With Al Qaeda Supports Personal Jurisdiction.**

Personal jurisdiction is proper under the "minimum-contacts" test—and its Fifth Amendment equivalent—for a second and independent reason: Because DIB conspired with (and abetted) al Qaeda's attack on the United States, al Qaeda's constitutionally adequate contacts with that forum may be attributed to DIB. *See Charles Schwab*, 883 F.3d at 87. Under *Charles Schwab*, the forum contacts of another entity may be attributed to the defendant if: "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with [the forum] to subject that co-conspirator to jurisdiction in that [forum]." *Id.*

DIB participated in a conspiracy with al Qaeda to attack the United States. The existence of that conspiracy can be inferred from all the evidence already discussed tying DIB to Al Qaeda: Lootah's close friendship with bin Laden and al Qaeda's financial chief, DIB's "witting" support for the terrorist organization, and DIB's facilitation of financial transactions supporting al Qaeda and its affiliates. *See supra* Part II.A; *see also Halberstam*, 705 F.2d at 479-80. And al Qaeda undoubtedly had sufficient contacts with the United States to subject it—and by extension, DIB—to jurisdiction here.

The district court erred in deeming "[t]hese facts … not indicative of" a conspiracy because (according to that court) DIB's "support of al Qaeda" was not

even "somewhat connected to al Qaeda's anti-American operations." SPA40. But that misunderstands the evidence, as already explained. *See supra* Part II.A. Regardless, after *Fuld*, the standard for showing personal jurisdiction via a conspiracy should be "more flexible" than the approach followed by the district court. *Fuld*, 145 S. Ct. at 2105.

Finally, the district court erred in declining to extend the concerted-action theory of personal jurisdiction to aiding and abetting. *See* SPA38-43. Both conspiracy and aiding and abetting are types of common or joint activity where all the participants advance a common objective, *Halberstam*, 705 F.2d at 476-78, and so *Charles Schwab*'s test should apply to co-conspirators and aiders and abettors just the same. Here, as already outlined, the evidence shows that DIB substantially advanced al Qaeda's mission to harm the United States, and did so with general awareness of its role in fostering al Qaeda's global strike capabilities. That is more than enough for personal jurisdiction under the Fifth Amendment.

## CONCLUSION

For the foregoing reasons, the district court's decision dismissing Plaintiffs' Anti-Terrorism Act and related claims against DIB for lack of personal jurisdiction should be reversed. At a minimum, after *Fuld*, the judgment should be vacated and the case remanded for further proceedings consistent with the Supreme Court's opinion.

Dated: July 11, 2025

Respectfully submitted,

 /s/ Sean P. Carter
Sean P. Carter
J. Scott Tarbutton
Abby J. Sher
COZEN O'CONNOR
1650 Market Street, Suite 2800
Philadelphia, PA 19103
(215) 665-2000

-and-

Carter G. Phillips
Christopher A. Eiswerth
Madeleine Joseph
SIDLEY AUSTIN LLP
1501 K Street, N.W.
Washington, D.C. 20005
(202) 736-8000

-and-

Richard Klingler
ELLIS GEORGE LLP
3222 Woodland Drive, N.W.
Washington, D.C. 20008
(202) 492-4678

Attorneys for the *Federal Insurance Co.* Plaintiffs-Appellants (25-280-cv(Con))

Robert T. Haefele
John M. Eubanks
MOTLEY RICE LLC
28 Bridgeside Boulevard
Mount Pleasant, SC 29464
(843) 216-9000

-and-

Michael J. Quirk
MOTLEY RICE LLC
1717 Arch Street, Suite 3610
Philadelphia, PA 19103
(610) 579-9932

Attorneys for the *Burnett* and *Euro Brokers* Plaintiffs-Appellants (25-325-cv(Con) and 25-327-cv(Con))

Jerry S. Goldman
Bruce Strong
Alexander Greene
ANDERSON KILL P.C.
7 Times Square, 15th Floor
New York, NY 10036
(212) 278-1000

Attorneys for the *O'Neill* Plaintiffs-Appellants (25-108-cv(L))

Edward M. Pinter
FORD MARRIN ESPOSITO WITMEYER & GLESER LLP
Wall Street Plaza
88 Pine Street, 16th Floor
New York, NY 10005
(212) 269-4900

Attorneys for the *Continental Casualty Co.* Plaintiffs-Appellants (25-281-cv(Con))

David A. Paul
CANTOR FITZGERALD
110 East 59th Street, 7th Floor
New York, NY 10022
(212) 610-2298

Attorneys for the *Cantor Fitzgerald* Plaintiffs-Appellants (25-320-cv(Con))

## <u>CERTIFICATE OF COMPLIANCE WITH FED. R. APP. P. 32</u>

On April 10, 2025, this Court issued an Order increasing the word limit for this consolidated brief to 22,000 words. *See* Dkt. No. 42. This consolidated brief complies with the Court's Order because it contains 10,557 words, excluding the portions of the brief exempted by Fed. R. App. P. 32(f).

This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in Times New Roman, 14 point font.

Dated: July 11, 2025

/s/    *J. Scott Tarbutton*
J. Scott Tarbutton, Esq.

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that I caused to be filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Second Circuit by using the appellate CM/ECF system on July 11, 2025. I further certify that the foregoing was served on all counsel of record in this appeal by CM/ECF pursuant to Second Circuit Rule 25.1.

/s/     *J. Scott Tarbutton*
J. Scott Tarbutton, Esq.