# 25-108

### 25-280 (CON), 25-281 (CON), 25-320 (CON), 25-325 (CON), 25-327 (CON)

## IN THE UNITED STATES COURT OF APPEALS FOR THE SECOND CIRCUIT

IN RE: TERRORIST ATTACKS ON SEPTEMBER 11, 2001

On Appeal from the United States District Court
for the Southern District of New York, No. 03 MDL 1570 (Daniels, J.)

## BRIEF FOR DEFENDANT-APPELLEE DUBAI ISLAMIC BANK

Juan P. Morillo
QUINN EMANUEL
URQUHART & SULLIVAN, LLP
1300 I Street NW
Suite 900
Washington, D.C. 20005
(202) 538-8000

Noel J. Francisco
Steven T. Cottreau
C. Kevin Marshall
Gabrielle E. Pritsker*
Brett J. Wierenga
Julia E. Fine*
JONES DAY
51 Louisiana Avenue, N.W.
Washington, D.C. 20001
(202) 879-3939

*admission pending

*Counsel for Defendant-Appellee Dubai Islamic Bank*

## CORPORATE DISCLOSURE STATEMENT

Under Federal Rule of Appellate Procedure 26.1, Dubai Islamic Bank states that it has no parent corporation and that no publicly held corporation owns 10% or more of its stock.

# **TABLE OF CONTENTS**

INTRODUCTION ...................................................................................1

BACKGROUND ...................................................................................3

    A.    Dubai Islamic Bank ...............................................................3

    B.    Pre-9/11 Fraud and Investigations.......................................4

    C.    The 1999 *New York Times* Article and DIB's Investigation.................5

    D.    The 9/11 Attacks and Initial Litigation ...............................9

    E.    A Decade of Discovery ......................................................10

    F.    The CIA Files ....................................................................14

    G.    Summary Judgment on Personal Jurisdiction ....................18

SUMMARY OF ARGUMENT.............................................................21

ARGUMENT ......................................................................................24

I.    Personal Jurisdiction Fails under Any Standard Because DIB Lacks Any Relevant Contacts with the United States. .................................................24

    A.    The minimum-contacts analysis requires intentional conduct aimed at the forum and causing in-forum effects. ...........................................24

    B.    Plaintiffs' jurisdictional allegations found no evidentiary support. ....27

    C.    Discovery further confirmed the absence of DIB contacts with the United States.........................................................................28

    D.    The District Court should have excluded the CIA documents as inadmissible hearsay, which would have reinforced its recognition that DIB lacks minimum contacts. ............................................34

    E.    Personal jurisdiction would remain inappropriate under any "more flexible" standard than minimum contacts that might conceivably apply here. ...........................................................................40

II.    The Traditional Requirement of Minimum Contacts Continues to Govern This Case as a Matter of Due Process. .........................................43

    A.    Jurisdiction depends on a defendant's initiation of a relationship with a sovereign indicating submission to its authority and making the exercise of judicial power predictable.................................................44

    B.    Under *Fuld*, Congress and the President may define U.S.-related conduct triggering personal jurisdiction as to specific claims apart from "minimum contacts," but they have not done so here.................51

C.     Due process constraints on personal jurisdiction are consistent with the original meaning of the Fifth Amendment. ....................................63

III.     No Statute Authorizes Service Here Without Satisfying Minimum Contacts. ....................................................................................................70

A.     The ATA authorizes service only within the United States or, at most, on a defendant with minimum contacts. ............................................71

B.     Since its inception, Rule 4(k)(2) has been understood to authorize service only over defendants having minimum contacts with the United States as a whole........................................................................73

IV.     Plaintiffs' Theory of Jurisdiction Based on Conspiracy Fails on the Evidence...................................................................................................78

V.     Plaintiffs' Novel Theory of "Aiding and Abetting" Jurisdiction Fails on the Law and the Evidence......................................................................79

A.     Anding and abetting liability requires both general awareness and knowing and substantial assistance of terrorism.................................80

B.     Plaintiffs have not established aiding and abetting even if that were the standard for personal jurisdiction.................................................85

VI.     In the Alternative, This Court Should Affirm Because Plaintiffs' Claims Fail on the Merits. ....................................................................................88

CONCLUSION .............................................................................................92

# TABLE OF AUTHORITIES

**Page**

**CASES**

*Asahi Metal Industry Co. v. Superior Ct. of Cal., Solano Cty.*,
480 U.S. 102 (1987)................................................................51

*Ashley v. Deutsche Bank Aktiengesellschaft*,
144 F.4th 420 (2d Cir. 2025) .....................................passim

*Baker v. Dorfman*,
239 F.3d 415 (2d Cir. 2000) ............................................89

*Blackmer v. United States*,
284 U.S. 421 (1932).........................................................44

*Bridgeway Corp. v. Citibank*,
201 F.3d 134 (2d Cir. 2000) ....................................35, 36

*Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*,
582 U.S. 255 (2017).........................................................46

*Burger King Corp. v. Rudzewicz*,
471 U.S. 462 (1985)..........................................25, 47, 48

*Burnet v. Brooks*,
288 U.S. 378 (1933).................................................65, 67

*Burnham v. Superior Ct. of Cal., Cnty. of Marin*,
495 U.S. 604 (1990)..............................................passim

*Calder v. Jones*,
465 U.S. 783 (1984).........................................................25

*Center for Reproductive L. & Pol'y v. Bush*,
304 F.3d 183 (2d Cir. 2002) ............................................88

*Charkhy v. Altman*,
   678 N.Y.S.2d 40 (N.Y. App. Div. 1998) ............................................................90

*Charles Schwab Corp. v. Bank of Am.*,
   883 F.3d 68 (2d Cir. 2018) ....................................................................25, 28, 79

*City of New York v. Pullman Inc.*,
   662 F.2d 910 (2d Cir. 1981) ...............................................................................34

*Coughlin v. Tailhook Ass'n*,
   1994 WL 780904 (D. Nev. Sept. 2, 1994)............................................................36

*D'Arcy v. Ketchum*,
   52 U.S. 165 (1850).................................................................................................65

*Douglass v. Nippon Yusen Kabushiki Kaisha*,
   46 F.4th 226 (5th Cir. 2022) (en banc) ........................................................73, 75

*Dynegy Midstream Servs. v. Trammochem*,
   451 F.3d 89 (2d Cir. 2006) .................................................................................57

*Ex parte Graham*,
   10 F. Cas. 911(C.C.E.D. Pa. 1818).....................................................................70

*Ferguson v. Valero Energy Corp.*,
   2010 WL 11550025 (E.D. Pa. Feb. 16, 2010) ..............................................35, 37

*Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*,
   592 U.S.351 (2021)....................................................................45, 46, 48, 50

*Freeman v. HSBC Holdings PLC*,
   57 F.4th 66 (2d Cir. 2023) ...................................................................................79

*Fuld v. PLO*,
   101 F.4th 190 (2d Cir. 2024) .........................................................................41, 69

*Fuld v. PLO*,
   606 U.S. 1 (2025)...........................................................................................passim

*Fuld v. PLO*,
   82 F.4th 74 (2d Cir. 2023) ...............................................................53

*Gilead Cmty. Servs. v. Town of Cromwell*,
   112 F.4th 93 (2d Cir. 2024) .............................................................57

*Grant v. Lockett*,
   2021 WL 5816245 (2d Cir. Dec. 8, 2021).......................................37

*Halberstam v. Welch*,
   705 F.2d 472 (D.C. Cir. 1983)...........................................79, 81, 82, 83

*Halliburton Energy Servs. v. Ironshore Specialty Ins. Co.*,
   921 F.3d 522 (5th Cir. 2019) ...........................................................80

*Hawkins v. i-TV Digitalis Tavkovlesi zrt.*,
   935 F.3d 211 (4th Cir. 2019) ...........................................................80

*Hines v. Brandon Steel Decks*,
   886 F.2d 299 (11th Cir. 1989) .........................................................37

*Howell v. New York Post*,
   612 N.E.2d 699 (N.Y. 1993)............................................................90

*I.A.M. Nat'l Pension Fund v. Wakefield Indus.*,
   699 F.2d 1254 (D.C. Cir. 1983) .......................................................72

*In re Sept. 11 Litig.*,
   621 F. Supp. 2d 131 (S.D.N.Y. 2009) .......................................35, 36

*In re Terrorist Attacks on Sept. 11, 2001*,
   538 F.3d 71 (2d Cir. 2008) ......................................................passim

*In re Terrorist Attacks on Sept. 11, 2001*,
   714 F.3d 118 (2d Cir. 2013) ............................................................91

*In re Terrorist Attacks on Sept. 11, 2001*,
   714 F.3d 659 (2d Cir. 2013) .....................................................passim

*In re Terrorist Attacks on Sept. 11, 2001*,
    718 F. Supp. 2d 456 (S.D.N.Y. 2010) ............................................passim

*Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*,
    456 U.S. 694 (1982)..................................................................44, 48, 51

*Int'l Shoe Co. v. Washington*,
    326 U.S. 310 (1945)........................................................................45, 48

*Isbrandtsen Co. v. Johnson*,
    343 U.S. 779 (1952)................................................................................69

*J. McIntrye Mach., Ltd. v. Nicastro*,
    564 U.S. 873 (2011)........................................................................passim

*Kibbe v. Kibbe*,
    1 Kirby 119 (Conn. Sup. Ct. 1786)......................................................65

*Kilburn v. Woodworth*,
    5 Johns 37 (N.Y. Sup. Ct. 1809)..........................................................65

*Lakah v. UBS AG*,
    996 F. Supp. 2d 250 (S.D.N.Y. 2014) ..................................................37

*Lewis v. Mutond*,
    62 F.4th 587 (D.C. Cir. 2023)..............................................................75

*Licci v. Lebanese Canadian Bank, SAL*,
    732 F.3d 161 (2d Cir. 2013) ..................................................................4

*Lightfoot v. Cendant Mortgage Corp.*,
    580 U.S. 82 (2017)................................................................................44

*Mallory v. Norfolk S. Ry. Co.*,
    600 U.S. 122 (2023)........................................................................passim

*Meroni v. Holy Spirit Ass'n for Unification of World Christianity*,
    119 A.D.2d 200 (N.Y. App. Div. 1986) ..............................................91

*Miller v. Field*,
　35 F.3d 1088 (6th Cir. 1994) ............................................................37

*Murray's Lessee v. Hoboken Land & Imp. Co.*,
　59 U.S. 272 (1855) .................................................................64, 65

*Omni Capital Int'l v. Rudolf Wolff & Co.*,
　484 U.S. 97 (1987) .................................................................passim

*Parsons v. Honeywell, Inc.*,
　929 F.2d 901 (2d Cir. 1991) .......................................................37, 38

*Pennoyer v. Neff*,
　95 U.S. 714 (1877) .............................................................44, 45, 64

*Picquet v. Swan*,
　19 F. Cas. 609 (C.C.D. Mass. 1828)..........................................65, 66, 67, 69

*Pisula v. Roman Cath. Archdiocese of New York*,
　159 N.Y.S.3d 458 (App. Div. 2021)...................................................91

*PT United Can Co. v. Crown Cork & Seal Co.*,
　138 F.3d 65 (2d Cir. 1998) ...........................................................72

*Rambus, Inc. v. Infineon Techs.*,
　222 F.R.D. 101 (E.D. Va. 2004) ......................................................37

*Riccio v. Kid Fit, Inc.*,
　5 N.Y.S.3d 521 (App. Div. 2015)......................................................91

*Schrier v. Qatar Islamic Bank*,
　632 F. Supp. 3d 1335 (S.D. Fla. 2022) ...............................................71

*Semtek Int'l v. Lockheed Martin*,
　531 U.S. 497 (2001)...................................................................77

*Smith & Wesson Brands v. Estados Unidos Mexicanos*,
　605 U.S. 280 (2025)..........................................................80, 83, 87, 90

*Steel Co. v. Citizens for a Better Environment*,
532 U.S. 83 (1998)..................................................................................88

*Sullivan v. Dollar Tree Stores*,
623 F.3d 770 (9th Cir. 2010) ..........................................................35, 40

*Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*,
576 U.S. 519 (2015).................................................................................76

*Toland v. Sprague*
37 U.S. 300 (1838)......................................................................66, 67, 68

*Twitter v. Taamneh*,
598 U.S. 471 (2023)......................................................................passim

*United States v. Al Kassar*,
660 F.3d 108 (2d Cir. 2011) ...................................................................43

*United States v. El-Mezain*,
664 F.3d 467 (5th Cir. 2011) ..................................................................36

*United States v. Epskamp*,
832 F.3d 154 (2d Cir. 2016) ...................................................................42

*United States v. Gluk*,
831 F.3d 608 (5th Cir. 2016) ............................................................38, 39

*United States v. Prado*,
933 F.3d 121 (2d Cir. 2019) ...................................................................60

*United States v. Russo*,
302 F.3d 37 (2d Cir. 2002) .....................................................................80

*Vanegas v. Signet Builders*,
125 F.4th 837 (7th Cir. 2025) ................................................................78

*Vasquez v. Hong Kong & Shanghai Banking Corp.*,
477 F. Supp. 3d 241 (S.D.N.Y. 2020) ...................................................34

*Volunteer Fire Ass'n of Tappan v. Cnty. of Rockland*,
956 N.Y.S.2d 102 (N.Y. App. Div. 2012) .........................................90

*Waetzig v. Halliburton Energy Servs.*,
604 U.S. 305 (2025) .......................................................................74

*Walden v. Fiore*,
571 U.S. 277 (2014) .......................................................................25

*Waldman v. PLO*,
835 F.3d 317 (2d Cir. 2016) ..........................................................52

*Wells Fargo & Co. v. Wells Fargo Express Co.*,
556 F.2d 406 (9th Cir. 1977) .........................................................75

*West Virginia v. EPA*,
597 U.S. 697 (2022) .......................................................................77

*Woods v. Centro of Oneida, Inc.*,
103 F.4th 933 (2d Cir. 2024) .........................................................89

*World-Wide Volkswagen Corp. v. Woodson*,
444 U.S. 286 (1980) ..........................................................48, 50, 56

*Zobay v. MTN Grp. Ltd.*,
695 F. Supp. 3d (E.D.N.Y. 2023) ..............................................58, 59

**STATUTES**

18 U.S.C. § 2333 .................................................................53, 59, 80

18 U.S.C. § 2334 ....................................................................passim

22 U.S.C. § 2378b .........................................................................41

22 U.S.C. § 2378c-1 ......................................................................42

22 U.S.C. § 5201 ...........................................................................41

28 U.S.C. § 1605B .........................................................................61

28 U.S.C. § 2072 ..................................................................................61

28 U.S.C. § 2074 ..................................................................................61

Pub. L. No. 99-399, 100 Stat. 853 (1986).............................................60

Pub. L. No. 114-222, 130 Stat. 852 (2016)...........................................60

**RULES**

Fed. R. Civ. P. 4 .............................................................................passim

Fed. R. Civ. P. 26 .................................................................................19

Fed. R. Civ. P. 54 .................................................................................20

Fed. R. Civ. P. 56 .................................................................................34

Fed. R. Evid. 803 ............................................................................34, 35

**REGULATIONS**

Exec. Order 14040 ...............................................................................38

**OTHER AUTHORITIES**

*9/11 Comm'n Rep.*.................................................................12, 14, 15, 36

Christopher W. Robbins, *Finding Terrorists' Intent: Aligning Civil
  Antiterrorism Law with National Security*, 83 St. John's L. Rev.
  1201 (2009).......................................................................................60

S. Rep. No. 102-342 (1992) ..................................................................59

Stephen Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106
  Va. L. Rev. 1703 (2020) ...................................................................65

Terry Richard Kane, *Prosecuting International Terrorists in United
  States Courts: Gaining the Jurisdictional Threshold*, 12 Yale J.
  Int'l L. 294 (1987) ............................................................................60

4 Wright & Miller, Fed. Prac. & Proc. Civ. § 1068.1 (4th ed.)...............................75

## INTRODUCTION

The district court correctly granted summary judgment to Dubai Islamic Bank ("DIB") for lack of personal jurisdiction. DIB has no U.S. presence and no contacts with the country to support personal jurisdiction.

After two decades of litigation and a decade of discovery, Plaintiffs have admitted there is no evidence that any money from any DIB account or financial service funded the terrorist attacks on September 11, 2001, or even funded al Qaeda generally. Nor is there evidence that DIB knew of any accountholder's terrorism affiliations or activities. To the contrary, the record shows that DIB took steps to guard against terrorism financing, including offering its cooperation directly to the United States government prior to 9/11 to combat al Qaeda. The CIA documents on which Plaintiffs almost exclusively rely are inadmissible hearsay and should have been excluded, but in any event the District Court rightly found that they could not establish any connection between DIB and 9/11 because they concern allegations between 1992 through 1996—years before the plot was even approved by Osama bin Laden in late 1998 or early 1999. Ultimately, no matter what jurisdictional standard applies, the utter lack of connection between DIB and the 9/11 attacks should result in dismissal.

That lack of contacts explains why Plaintiffs strive especially to avoid a minimum-contacts analysis, by invoking the Supreme Court's recent decision in

*Fuld v. PLO.* But *Fuld* does not help Plaintiffs. Due process protects a defendant's right to be subject only to lawful power and to have fair warning of the jurisdictional consequences of its conduct. The traditional territorial bases for personal jurisdiction afford that protection, as does a minimum-contacts analysis. In *Fuld*, the Supreme Court upheld a jurisdictional statute that also afforded protection. That statute was enacted by the political branches in the exercise of their foreign-affairs power, applies narrowly to specified claims and defendants, and prospectively ties jurisdiction to specific U.S.-related conduct. Here, by contrast, there is no comparable statute ensuring due process in the absence of minimum contacts. Nor can Plaintiffs muster historical evidence for their theory that the Fifth Amendment imposes no limit on personal jurisdiction—a theory *Fuld* itself declined to endorse. Independently, even if Plaintiffs could somehow show that due process is no obstacle, Congress has not authorized service of process as a statutory matter on a defendant lacking minimum contacts with the United States, so minimum contacts continues to govern here no matter the constitutional standard.

Plaintiffs also cannot salvage personal jurisdiction through conspiracy or aiding-and-abetting. As the District Court recognized, there is no evidence of any conspiratorial agreement between DIB and al Qaeda, and aiding-and-abetting is not a jurisdictional doctrine. In any event, the Supreme Court's decision in *Twitter v. Taamneh* and its progeny make clear that Plaintiffs' aiding-and-abetting allegations

must fail, because there is no evidence of scienter and no nexus between DIB's routine banking services and the 9/11 attacks. That failure not only undermines Plaintiffs' jurisdictional argument but also dooms their claims on the merits—providing an alternative ground to affirm the District Court's decision.

Because Plaintiffs have not established a constitutionally or statutorily permissible basis to hale DIB into a U.S. court—and because their claims fail on the undisputed record—this Court should affirm the judgment.

## BACKGROUND

### A. Dubai Islamic Bank

Dubai Islamic Bank is a publicly traded banking company incorporated under the law of the United Arab Emirates ("UAE") and headquartered in Dubai. SPA17 (Op.). Founded fifty years ago, in 1975, DIB is one of the oldest continuously functioning Islamic banks in the world. JA2019–20, 2043 (Hassan). Islamic banks offer traditional banking services such as bank accounts and financing for purchases like cars and houses, but use methods that comply with Islamic principles, such as the prohibition on paying or receiving interest and the importance of fairness and transparency. JA2031–36 (Hassan); *see In re Terrorist Attacks on Sept. 11, 2001*, 538 F.3d 71, 77, 95–96 (2d Cir. 2008) ("*Terrorist Attacks III*") (describing Islamic banking). In the years 1999 through 2001, DIB had over 200,000 different

customers and over 300,000 customer accounts, completing 7 to 10 million transactions per year.  JA2012, ¶¶ 9–12 (Dharsey).

DIB does not conduct business or provide services in the United States, other than maintaining correspondent banking accounts.[1]  SPA17.  None of its eight foreign branches is located in the United States.  *Id.*  It has always conducted all business from Dubai or its other offices in the region.  JA1896–97, ¶¶ 14–17 (Sharif).

As with a typical publicly traded bank, a Board of Directors oversees DIB.  As required by UAE law governing Islamic banking, DIB also has a Fatwa and Shariah Supervisory Board, which when required by DIB advises on whether its banking account products and investments comport with Islamic principles.  SPA17.

### B.    Pre-9/11 Fraud and Investigations

Early in 1998, DIB discovered a severe fraud against it, unrelated to al Qaeda or terrorism.  SPA18; JA2054–55 (Fine).  The perpetrator was from Mali and was later indicted by the United States for other crimes.  JA2054–58 (Fine).  The fraud cost the bank $250 million, threatening its solvency.  JA2054 (Fine).

---

[1] Foreign banks typically maintain "correspondent" bank accounts with banks in the United States to process transactions in U.S. Dollars, such as wire transfers.  *See Licci v. Lebanese Canadian Bank, SAL*, 732 F.3d 161, 165 n.3 (2d Cir. 2013).

In response, the Dubai government intervened, injecting capital into DIB and thus becoming its largest shareholder, with a 30% stake. SPA18; JA1897, ¶¶ 18–19 (Sharif); JA2109–11, ¶¶ 25, 28–29, 32 (Ansari). The government and the UAE Central Bank (which regulates UAE banks) closely supervised DIB thereafter, including a period of daily audits in 1998 and 1999. SPA37. The government also appointed an Executive Committee to run DIB in March 1998, displacing the Board of Directors (including its founder Saeed Ahmed Lootah), and then heavily influenced the selection of a new permanent Board in early 1999. SPA18; JA1897 ¶ 18 (Sharif). A UAE government official—the then-Minister of Financial Affairs and Industry—became Chairman of the Board. SPA18.

With the government's approbation, DIB hired a British consultant, Rob Ellison, to investigate the fraud. SPA18–19; JA2060, 2068 (Fine). Ellison, in turn, retained the American attorney Alan Fine to represent the bank in trying to recover the proceeds of the fraud. JA2067–68.

All of these 1998 events preceded Osama bin Laden's decision to authorize the plot that became the 9/11 attack. It is undisputed, and the District Court recognized, that the 9/11 plot was not approved until late 1998 or early 1999. SPA18.

### C.    The 1999 *New York Times* Article and DIB's Investigation

On July 8, 1999, the *New York Times* published an article claiming that the CIA had evidence of a "suspected financial relationship" between Osama bin Laden

and DIB, allowing bin Laden to move money through the bank, and that U.S. officials had traveled to Dubai to lobby the Dubai government to stop this. SPA18; JA8111 (article). At a press briefing that day, U.S. State Department spokesman James Foley fielded questions about the article and said the Dubai government had "taken steps to clean up the bank." SPA18–19; JA8116 (transcript).

DIB immediately began investigating the allegations in the 1999 article. SPA19; JA1897–98 ¶¶ 20, 22 (Sharif). Mr. Ellison himself searched DIB's database for any accounts in bin Laden's name or transfers involving bin Laden, using a variety of spellings, and found nothing. SPA19; JA2075 (Fine); JA1898 ¶ 25 (Sharif). DIB instructed Mr. Fine to seek additional information from the U.S. government about the allegations and to consider a defamation action. SPA19; JA2049 (Fine). (Years later, Fine became a Florida state-court judge. JA2065.)

Mr. Fine contacted the State Department, who pointed him to "the person who would have the most knowledge regarding any facts that could possibly substantiate the allegations": its Middle East counterterrorism expert, Steve Kashkett. JA2050, 2084–86 (Fine). Fine then spoke with Kashkett: Fine offered "DIB's full cooperation" and asked for any information that would help DIB investigate any suspected relationship with bin Laden. SPA19. Kashkett told Fine that DIB "wouldn't find anything in the name of Osama bin Laden" and that any relevant transactions happened "through other names," but he declined to provide any

"names, dates, or account numbers to search." *Id.* Fine implored him, if the State Department learned anything or had any details to share, to "please call me," but nobody ever did. JA2086–87 (Fine).

When DIB's investigation turned up no evidence of a relationship with bin Laden, Mr. Fine wrote to the *New York Times* demanding retraction. SPA19–20. The letter stated DIB had no knowledge of any transactions on bin Laden's behalf. JA2102 (letter). The paper refused to retract the story. SPA20.

Ultimately, discovery in this suit did not turn up any evidence that U.S. officials visited the UAE in 1999 on account of a "financial relationship" between DIB and bin Laden to urge the government to end "lax supervision" of DIB, as Plaintiffs alleged. *In re Terrorist Attacks on Sept. 11, 2001*, 718 F. Supp. 2d 456, 488–89 (S.D.N.Y. 2010) ("*Terrorist Attacks IV*"). Indeed, DIB was supervised through August 1999 by a UAE Central Bank official "responsible for overseeing all examiners who inspected banks"—and thus who "should have been alerted about any US or UAE government concerns about money laundering or terrorist financing at banks operating in the UAE"—but he is "not aware of any meetings between the US government and the UAE Central Bank or other parts of the UAE government concerning terrorist financing concerns at DIB." JA1895–96 ¶¶ 4–5, 10–11 (Sharif). Nor, while at the Central Bank, was he ever "aware of any concerns of any alleged involvement by DIB in terrorist financing or money laundering." JA1896 ¶ 12

-7-

(Sharif). And in discovery, in response to Plaintiffs' request for "all documents relating to the meeting(s) held between U.S. officials and representatives of DIB and the U.A.E., occurring in or around July 1999" regarding bin Laden, money laundering, or terrorism financing, DIB searched its records for evidence of any such meeting and found none.

In the fall of 1999, a few months after the *New York Times* article, DIB engaged in further efforts to counter terrorism. DIB distributed two notices from the U.S. Treasury Department's Office of Foreign Assets Control ("OFAC"), which added names to its Specially Designated Nationals and Blocked Persons ("SDN") list. SPA20; JA2108 ¶ 16 (Ansari). The notices included the "Usama bin Laden Network" and "Usama bin Laden Organization," also known as "al Qaeda." SPA20; JA2116 (notice). DIB circulated the lists to any office "where accounts could be opened or transactions could be conducted, to ensure that DIB did not conduct any business with any party named." SPA20; JA2108 ¶ 16 (Ansari). DIB's branches kept copies of these lists to ensure no accounts were opened for anyone named. JA2109 ¶ 21 (Ansari). Employees had to consult these lists when opening accounts and conducting transactions. *Id.*

After the 9/11 attacks (before this litigation), DIB again searched its records for accounts in the name of Osama bin Laden, including variations on his name

identified by OFAC in September and October 2001. JA1900–01 ¶ 43 (Sharif). Again, it found no such accounts. *Id.*

### D.    The 9/11 Attacks and Initial Litigation

On September 11, 2001, members of al Qaeda carried out terrorist attacks in the United States. In the aftermath, plaintiffs sued numerous defendants alleged to have provided support and resources to bin Laden and al Qaeda. SPA14; *see In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 659, 665 (2d Cir. 2013) ("*Terrorist Attacks VII*") (describing litigation). Several complaints named DIB as a defendant, pleading claims under the Anti-Terrorism Act ("ATA"), 18 U.S.C. § 2331 *et seq.*, among other state and federal-law grounds.

From the start, DIB has contested personal jurisdiction. In 2005, before any discovery, DIB moved to dismiss on that ground and others. ECF 956.[2] In opposition, Plaintiffs argued that DIB purposefully directed its activities towards the United States by knowingly providing assistance to al Qaeda. ECF 1064, at 10.

In 2010, Judge Daniels denied DIB's motion to dismiss. *Terrorist Attacks IV*, 718 F. Supp. 2d at 488–95. He reasoned that Plaintiffs had alleged not just that DIB provided "routine banking services" but that it had "intentionally provided material support to al Qaeda." *Id.* at 489. He focused on four of Plaintiffs' allegations:

---

[2] "ECF" citations are of filings on the MDL docket, No. 1:03-MD-01570, unless otherwise specified.

(1) that the U.S. government in 1999 announced DIB "was laundering money for" bin Laden; (2) that U.S. officials visited the UAE to "put a halt to such a relationship"; (3) that DIB "disregarded the warnings," "refused to adhere to even minimal banking standards," and "continued to knowingly provide financial and other forms of material aid to" bin Laden and al Qaeda; and (4) that bin Laden's CFO, Mustafa Ahmed al-Hisawi, "transferred thousands of dollars … from DIB to two of the hijackers," who used the money in "preparing for the 9/11 terrorist attacks."  SPA16 (summary by District Court).

### E.    A Decade of Discovery

Over a decade of documentary, testimonial, and expert discovery ensued.

***Document Discovery.***  DIB responded to 150 document requests and searched its legacy electronic account database for 629 names (provided by Plaintiffs) of potential accountholders of interest.  That included searching for accounts in the names of bin Laden (again) and his businesses, and variations on Hisawi's name. Those searches came up empty.  JA3380–81 ¶¶ 13–15 (SUMF Resp.).

Document discovery yielded information on ten accountholders of potential relevance to Plaintiffs' claims, as the District Court summarized.  SPA20–22.  Unlike bin Laden, none of them was on any OFAC list or otherwise blacklisted as a terrorist before 9/11.  SPA22 & n.4.  Nor is there evidence that the accounts and services provided to these customers differed from the routine banking services provided to

any customer. SPA37. More specifically, as the District Court recognized—and Plaintiffs admitted—discovery yielded "*no specific evidence that any of the [DIB] accounts held by individuals or entities with links to al Qaeda provided funding for the terrorist organization's operations, let alone for the 9/11 Attacks*." SPA36 (emphasis added); *see* JA3398–407 ¶¶ 52–67 (SUMF Resp.). Nor, similarly, did discovery yield evidence that money from any *other* account at DIB was "used by the 9/11 hijackers or other 9/11 plot principals in carrying out the 9/11 terrorist attacks." SPA22.

Ignoring this undisputed bottom line, Plaintiffs in their opening brief nevertheless highlight three of the ten accountholders:

Ali Abdul Aziz Ali briefly held an account at DIB. According to the 9/11 Commission, he and Hisawi (also spelled Hawsawi) helped the hijackers "finance their operation and travel." SPA20–21. But it is undisputed that Aziz Ali *did not use his DIB account to help the hijackers*. After he opened the account in August 2000, he never withdrew or transferred funds *out* of the account until September 10, 2001, after the 9/11 plot was fully developed and funded. *Id.*; *see* JA2854–55 (account statements). In addition, Plaintiffs have never alleged, and there is no evidence, that DIB *knew* about Aziz Ali's affiliation, his terrorist activities (using non-DIB-held funds), or his September 10 flight to Pakistan. And his fellow financier, Hisawi, never held an account at DIB. SPA21.

Fayez Rashid Ahmed Hassan al Qadi was one of the hijackers. He held an account at DIB that was *low-value and that he ceased using more than a year before the 9/11 attacks*, before he moved to the United States. SPA8; JA3403 ¶ 62 (SUMF Resp.). Plaintiffs admit there is no evidence Qadi used his account to fund 9/11 or any other al Qaeda operations. JA3400–04 ¶¶ 57–63 (SUMF Resp.). Here too, there is no evidence DIB knew before 9/11 that Qadi had any connection to al Qaeda or to terrorism at all. And none of the transactions in his (or Aziz Ali's) accounts involved transfers to or through the United States. JA2013 ¶ 15 (Dharsey).

Seedi al Madani al-Ghazi al Tayyib, a high-ranking member of al Qaeda who helped manage bin Laden's money in the mid-1990s, held an account at DIB. SPA21. The account included a few high-value transactions over half-a-decade before 9/11, between 1993 and 1995. SPA 21; JA8084–87 (account statements). Tayyib *ceased using his account after 1996*. JA3746 ¶ 5 (Dharsey). He was detained by Saudi Arabia in 1997. *See 9/11 Comm'n Rep.* at 122.[3] There is no evidence that Tayyib used his account to fund al Qaeda's operations, much less the 9/11 attacks, and Plaintiffs do not claim otherwise. JA3713–18 ¶¶ 106–16 (Aver. Resp.).

*Witnesses.* Plaintiffs named 37 fact witnesses in connection with DIB (ECF 3925, at 81) and were authorized to depose up to 75 fact witnesses as to the six-

---

[3] Available at https://9-11commission.gov/report/

defendant group of which DIB was a part in the MDL (ECF 3894). Yet they scheduled just one deposition as to DIB—of Mr. Fine—and then questioned him for less than two hours. Although Mr. Lootah (DIB's founder) was the first name on Plaintiffs' list (ECF 3925, at 81), they never sought to depose him, and he passed away in 2020 near the close of discovery. DIB itself initiated the deposition of Dr. Hussein Hamid Hassan, Chairman of DIB's Fatwa and Shariah Supervisory Board, to preserve his testimony. ECF 3524. Dr. Hassan stated in no uncertain terms that "Islam is against terrorists" and that 9/11 "was the most criminal act." JA2026, 8615.[4]

***Expert Discovery and Admissions.*** Fact discovery closed by 2019, and two years of expert discovery followed. During it, none of Plaintiffs' experts offered any opinion on DIB, and Plaintiffs declined to depose any of the seven experts DIB proffered.

As of the close of discovery, Plaintiffs had admitted three key facts regarding the ten accountholders in response to DIB's requests for admission: There was *no funding*, *no designation*, and *no knowledge*. That is, they admitted they lacked

---

[4] Plaintiffs' aside targeting Dr. Hassan is unfounded. Br. 8 n.2. They cite paragraph 151 of their averment for the idea that Dr. Hassan had significant "connections" to Abdullah Azzam, but that paragraph cites zero evidence. JA3730 ¶ 151 (Aver. Resp.). And Plaintiffs' attempt to associate Dr. Hassan with Azzam's 1987 book— which Dr. Hassan denied—rests entirely on inadmissible, unreliable hearsay. JA3731–33 ¶¶ 155–58 (Aver. Resp.).

evidence (1) that any of the ten accountholders used DIB accounts to fund the 9/11 attacks or even al Qaeda more generally, JA3020–44; (2) that any of the accountholders were on any OFAC or other sanctions list before 9/11, JA3008–15; or (3) that DIB knew of any accountholder's involvement with al Qaeda before 9/11, JA3053–65.

### F.    The CIA Files

At the end of 2021, DIB renewed its challenge to personal jurisdiction, moving to dismiss or in the alternative for summary judgment.  ECF 7420.

In the spring of 2022, before briefing concluded, the U.S. government gave Plaintiffs access to heavily redacted copies of previously classified files from the CIA and other agencies, dated before and after 9/11.  Four CIA documents make mention of DIB or its former Chairman, Saeed Ahmed Lootah.  (The *9/11 Commission Report*, published in 2004, cited all four of documents but said nothing about DIB or Mr. Lootah.)  Although he had founded DIB in 1975, by "at least 1995" Mr. Lootah ceased to have any hand in its day-to-day operation or even have an office at the bank.  JA2111 (Ansari).  And by 1998, he ceased to serve as Chairman of the Board.  JA2110–11.  All four CIA documents are constrained, explicitly or implicitly, to bin Laden's time in exile in Sudan—from 1992 to 1996 (*e.g.*, Br. 11), years before authorization (SPA18) and planning of the 9/11 attacks.  Indeed, after

he moved to Afghanistan in 1996, "there is little evidence that Bin Ladin or core al Qaeda members used banks." *9/11 Comm'n Rep.* at 171.

1. The first of the four documents describes allegations gathered from a single, unnamed source in early 1996. JA7735. It begins with the caveat that his allegations "may have been intended to influence as well as to inform" and that only "some" had been corroborated. *Id.* It then lists companies that, according to the source, are owned by or cooperate with bin Laden. Among the latter is an "unidentified business" that "works with Sa'id Ahmad Lootah's businesses," which also are not identified and for which the source had "NFI," that is, no further information. JA7739. The source claimed that "Lootah is the one [who] authorizes (stamps and signs) some of bin Ladin's letters of credit." *Id.* The document does not mention DIB.

2. The second document is a 1997 "research paper" by an unnamed CIA analyst, entitled, "Funding Islamic Extremist Movements: The Role of Islamic Financial Institutions." JA7806. It includes a few allegations concerning Mr. Lootah and DIB. First, the paper says that "Bin Ladin and his Sudan-based companies maintain several accounts at DIB" and that "Bin Ladin's Sudan-based companies are customers of DIB." JA7807, 7820. Mirroring the document above, the paper also says "Lootah personally authorized, stamped, and signed some letters of credit opened by Bin Ladin's companies in Khartoum through DIB." JA7832.

But the unnamed analyst acknowledges that the CIA does not know under what circumstances Mr. Lootah authorized letters of credit for bin Laden or anyone else: "It may be the case that Lootah routinely authorizes all letters of credit beyond a particular monetary value." *Id.*; SPA23–24 (District Court noting same). Finally, the paper asserts bin Laden and Mr. Lootah were "friends," though it provides no source and the analyst's confidence wavers: On one page, the author says "Lootah is a close friend and business associate of Usama Bin Ladin's." JA7820. On another, the author speculates that bin Ladin's "use of [DIB] *probably* stems from his *purported* friendship with DIB Chairman Lootah." JA7821 (emphases added).

Apparently based on just these three factual assertions, the analyst paints DIB in broad strokes in the overview and introduction. The author asserts that DIB is a "key financial conduit for Usama Bin Ladin's Islamic Army." JA7807. He or she does not explain how "several accounts" and "some" likely-routine letters of credit amounted to a "key" conduit. The introduction also asserts DIB "management's apparently witting involvement in the financial activities" of "Bin Ladin's Islamic Army" and other groups. JA7813. In the unredacted body of the paper, however, no "management" is named other than Mr. Lootah, and no connection between DIB and the "Islamic Army" (al Qaeda) is discussed—only the aforementioned supposed "customer" relationship with bin Laden and his Sudan-based companies (JA7820), which a decade of discovery in this suit failed to show.

-16-

**3.**     The third document is a 1998 report entitled "Usama Bin Ladin's Finances: Some Estimates of Wealth, Income, and Expenditures."  JA7712.  The allegations in this document are similar.

The report notes bin Laden departed Sudan for Afghanistan in May 1996 and says his finances moved "underground," a change from his previous reliance on "identified commercial ventures" and "established financial institutions."  JA7715. Bin Laden's financial difficulties then stemmed, in part, from "greater scrutiny" by "foreign governments," including one reported episode in which his accounts in "Dubai" were frozen in response to "government action."  JA7716.

In an appendix on Islamic banks, the report says they "possibly" "may" serve as repositories for bin Laden's wealth.  JA7732.  It reiterates the claim, now in the past tense, that "Bin Ladin and his companies maintained … accounts at DIB."  *Id.* It also repeats, word-for-word, the allegations that Mr. Lootah is friends with bin Laden and stamps letters of credit.  JA7721, 7732.  The only new alleged fact is that Tayyib and other al-Qaeda members "held numerous accounts at [DIB]."  JA7717. As discussed above, discovery had already revealed Tayyib's account—which he ceased using by 1996—and Tayyib was apparently arrested in 1997, more than a year before the 9/11 plot was approved.  *Supra* at 12.

**4.**     The final document is a 2003 report entitled "Al-Qa'ida in Sudan, 1992-96: Old School Ties Lead Down Dangerous Paths."  JA7619.  The "scope note" says,

-17-

consistent with its title, that it concerns bin Laden's activities in Sudan from 1992 to 1996. JA7623. The document includes a single sentence regarding DIB, mirroring the previous documents: "Bin Ladin's Sudan-based companies and his financial officers opened bank accounts and letters of credit at Dubai Islamic Bank (DIB) with the active help of DIB Chairman Sa'id Ahmed Lootah." JA7626.

Absent from all four documents is any indication that Mr. Lootah's alleged actions were intended to or did aid any attack on the United States (9/11 or otherwise) or even that *he knew* about bin Laden's terrorist activities or intentions. Also absent is any indication that *DIB itself* was involved in or even knew about Mr. Lootah's alleged actions. Nevertheless, invoking the CIA files, the Plaintiffs withdrew their admission that DIB did not know of any accountholder's involvement with DIB. Plaintiffs continued to admit that there is no evidence that any of the ten accountholders used DIB accounts to fund the 9/11 attacks or even al Qaeda more generally and admit that none of the accountholders were on any OFAC or other sanctions list before 9/11. JA3008–15, 3075–145.

### G. Summary Judgment on Personal Jurisdiction

About ten weeks after disclosure of the declassified CIA files, DIB renewed its motion further challenging personal jurisdiction. ECF 8127.[5] DIB argued that

---

[5] On the same date, without advance notice, Plaintiffs filed a purported supplementary expert report addressing the CIA documents' references to DIB. JA7553. This would have been the first of any of Plaintiffs' experts to address DIB.

the CIA documents were inadmissible hearsay but, even if considered, there was still no evidence it purposefully directed its conduct toward the United States. Critically, there remained no evidence that (i) any DIB account was used to fund 9/11 or al Qaeda or (ii) that DIB knew of any accountholder's affiliation with al Qaeda before 9/11 or provided those customers with anything other than routine banking services. DIB highlighted that discovery had yielded no support for Plaintiffs' allegations that had caused the District Court to deny DIB's original motion to dismiss for lack of personal jurisdiction. (*E.g.*, ECF 8127.)

Judge Daniels granted summary judgment on personal jurisdiction. SPA14. Although the District Court held the CIA documents admissible for purposes of the motion, it agreed that DIB nevertheless lacked minimum contacts with the United States necessary for personal jurisdiction consistent with due process. SPA30–43. The court explained there was no evidence that there was any connection between accounts at DIB and the 9/11 attacks or, further, that DIB was aware of the accountholders' affiliation, especially given that it provided only "routine banking services" and "took steps before 9/11 to combat terrorism financing." SPA37–38. The court also highlighted the utter failure of proof on the four allegations that had

---

Magistrate Judge Netburn struck the report, finding it was not a proper supplement under Civil Rule 26(e). SPA1. Plaintiffs filed objections, which Judge Daniels overruled. SPA44.

caused it to deny DIB's initial motion: The facts had proven to be "materially different from the allegations on which th[e] Court premised personal jurisdiction in 2010," and those "key allegations" had been shown to "lack factual support." SPA24–25; *see* SPA16 (summarizing those four allegations).

On January 6, 2025, the District Court entered a partial final judgment under Civil Rule 54(b), dismissing DIB from the MDL. JA9002. After the court entered judgment, Plaintiffs in the six consolidated cases filed notices of appeal. JA9005–15.

## SUMMARY OF ARGUMENT

**I.**     The District Court correctly held that DIB lacks minimum contacts with the United States.   Indeed, DIB lacks *any* contacts on which to premise jurisdiction—even if some lesser standard applied after *Fuld v. PLO* (which it does not).  After a decade of discovery, the undisputed facts foreclose any conclusion that DIB's services were connected to the 9/11 attacks.  There is no evidence that *any* money in *any* account at DIB was used to fund 9/11 specifically or even al Qaeda's operations generally—as Plaintiffs have admitted.  There is also no evidence that DIB was aware of *any* accountholders' terrorist affiliations or activities.  To the contrary, when allegations surfaced in 1999 of a purported relationship between DIB and bin Laden, the Bank responded by attempting to root out any bin Laden accounts and by offering cooperation directly to the U.S. government.

Plaintiffs try to contest DIB's knowledge, pointing to statements in four partially declassified CIA files concerning the actions of DIB founder Saeed Ahmed Lootah.  Those files are inadmissible hearsay.  But even crediting them, they do not establish any intent on DIB's part.  Nothing in the documents indicates that Mr. Lootah—much less DIB—knew of bin Laden's terrorist activities or intended to aid them.  And it is undisputed that Mr. Lootah ceased to have any role at DIB years before the 9/11 attacks.

**II.**     Minimum contacts are still required as a constitutional matter,

-21-

notwithstanding the intervening decision in *Fuld*. Due process protects defendants by ensuring that the exercise of judicial power is lawful and that defendants have fair notice. Traditional bases for jurisdiction—such as presence, consent, or minimum contacts—provide that protection. In *Fuld*, the Supreme Court approved another basis consistent with due process. Specifically, the Court held that the political branches may use their foreign-affairs power to define U.S.-related conduct that will subject a defendant to suit in U.S. courts. The statute in *Fuld* accorded with due process because it was tailored to advance specific national interests by granting jurisdiction over a narrow set of claims, defendants, and jurisdiction-triggering conduct, and it provided prospective warning to those defendants. Here, by contrast, there is no such statute, so the minimum-contacts analysis continues to govern.

Plaintiffs also fail to muster historical evidence for the theory that the Fifth Amendment imposes *no* limit on Congress's power to extend personal jurisdiction. And even if there were no limit, Plaintiffs' own caselaw makes clear only Congress can extend jurisdiction beyond traditional limits, which it has not done here.

**III.** Even if there were no due process issue, Congress has not authorized service of process in this case as a statutory matter. The ATA itself authorizes service only within the United States, but DIB was served in the UAE. And Rule 4(k)(2) was promulgated to authorize service over defendants *with minimum contacts* (with the United States as a whole), which has been the unanimous understanding of the

courts for decades. Nothing in *Fuld* purported to upend that settled view of Rule 4(k)(2), nor do Plaintiffs try to explain how far the rule would otherwise extend.

**IV.** Plaintiffs cannot get around DIB's lack of contacts by claiming that there is a conspiracy between DIB and al Qaeda, such that al Qaeda's contacts are attributable to DIB. After a decade of discovery, there is no evidence of any agreement—the core of any conspiracy—between DIB and al Qaeda.

**V.** Plaintiffs' also cannot rely on a new theory of aiding-and-abetting jurisdiction. Such a basis does not exist, because there is no agency relationship between a principle and an aider-and-abettor. Even if aiding-and-abetting jurisdiction existed, recent precedent makes clear that DIB cannot be liable for aiding and abetting. Plaintiffs lack evidence of any nexus between DIB's actions and the 9/11 attacks specifically, so they must show that DIB's assistance to al Qaeda was so pervasive, systemic, and culpable that it is liable for all of al Qaeda's acts. But Plaintiffs cannot show that here, because DIB offered nothing more than routine banking services.

**VI.** Finally, the District Court's decision should be affirmed on the merits. Although the District Court did not reach the merits, the aiding-and-abetting caselaw referenced above makes clear that Plaintiffs' claims are doomed. Because that conclusion is foreordained, this Court can avoid the question of personal jurisdiction and grant judgment to DIB on this alternative ground.

# ARGUMENT

## I. PERSONAL JURISDICTION FAILS UNDER ANY STANDARD BECAUSE DIB LACKS ANY RELEVANT CONTACTS WITH THE UNITED STATES.

The District Court correctly held that it could not exercise personal jurisdiction over DIB consistent with due process, given DIB's lack of "minimum contacts" with the United States. On appeal, latching onto *Fuld v. PLO*, Plaintiffs now argue that due process only requires some (undefined) lesser showing. That is incorrect; minimum contacts are still necessary for all the reasons detailed below in Arguments II and III. But even if that were wrong, it would not matter, because the undisputed facts show that DIB lacks *any* contacts on which to premise jurisdiction.

Most starkly, the *allegations* on which the District Court initially based personal jurisdiction over DIB all failed to find any supporting evidence, as the District Court recognized. Beyond that, discovery failed to yield any other evidence supporting personal jurisdiction and actually yielded evidence *undermining* it, as the District Court also recognized—and all that is even with the hearsay from the CIA files, which the District Court should have excluded. Under any conceivable theory, the evidence does not establish personal jurisdiction.

### A. The minimum-contacts analysis requires intentional conduct aimed at the forum and causing in-forum effects.

A court may exercise specific jurisdiction over a defendant, consistent with "the necessary 'fair warning' requirement" of due process, if the defendant "has '*purposefully directed*' his activities at residents of the forum, and the litigation

results from alleged injuries that '*arise out of or relate to*' those activities." *Terrorist Attacks VII*, 714 F.3d at 674 (emphases added) (quoting *Burger King Corp. v. Rudzewicz,* 471 U.S. 462, 472–73 (1985)). "Put another way," the defendant must have taken "'intentional, and allegedly tortious, actions … expressly aimed' at the forum"—here, the United States—that have effects there. *Id.* (quoting *Calder v. Jones*, 465 U.S. 783, 789 (1984)); *see Charles Schwab Corp. v. Bank of Am.*, 883 F.3d 68, 87 (2d Cir. 2018) (recognizing the *Calder* formulation "is typically invoked" where exclusively foreign conduct has in-forum effects). Because the conduct must be *purposefully* directed or *intentionally* aimed at the forum, it is not enough that harm there is "foreseeable." *Terrorist Attacks VII*, 714 F.3d at 674; *Walden v. Fiore*, 571 U.S. 277, 289 (2014) (same).

This Court has repeatedly applied those principles in this MDL, and repeatedly found jurisdiction lacking over banks and other defendants. In *Terrorist Attacks III*, it found jurisdiction lacking where plaintiffs "rel[ied] on a causal chain to argue a concerted action theory of liability" in which the defendants allegedly supported charities "*knowing* that their money would be diverted to al Qaeda, which then used the money to finance the September 11 attacks." 538 F.3d at 94 (emphasis added). Even if the defendants "could and did foresee that recipients of their donations would attack targets in the United States," that would not be "intentional" conduct "expressly aimed" at the United States, where the defendants were not

alleged to have "directed the September 11 attacks or commanded an agent (or authorized al Qaeda) to commit them." *Id.* at 94–95.

Then, in *Terrorist Attacks VII*, this Court built on this by finding jurisdiction lacking over banks and financial institutions based on allegations that they "*knowingly maintained* bank accounts for individuals associated with al Qaeda as well as for purported front charities that aided al Qaeda" and that "those accounts *were used* for al Qaeda operations." 714 F.3d at 676 (emphases added); *see id.* at 668 ("knowingly and intentionally provided financial services … to al Qaeda"). The Court similarly reasoned that "'the provision of financial services to an entity that carries out a terrorist attack on United States citizens'" is not "expressly aiming" conduct at the United States. *Id.* (quoting *Terrorist Attacks III*, 538 F.3d at 96). Perhaps, as a matter of mere causation, "[i]t may be that, but for access to financial institutions, al Qaeda could not have funded its terrorist attacks," but the banks have not thereby "purposefully directed" their conduct at the United States. *Id.* at 675 (quoting *Terrorist Attacks III*, 538 F.3d at 96).

Here, as DIB explains below, the lack of minimum contacts follows *a fortiori* from those decisions.

-26-

### B. Plaintiffs' jurisdictional allegations found no evidentiary support.

Fifteen years ago, the District Court held that Plaintiffs' *allegations* against DIB were sufficient to establish personal jurisdiction. And indeed, those allegations were sensational:

- "DIB was laundering money for Osama bin Laden";

- DIB "disregard[ed] warnings" from the United States to stop assisting bin Laden and "refus[ed] to adhere to even minimal banking industry standards" on terrorism and money laundering;

- "al Qaeda operatives used their bank accounts at DIB to send money to suspect charities"; and

- money from the DIB account of "bin Laden's Chief Financial Officer" paid for 9/11 "directly," including the hijacker's "flight lessons."

*Terrorist Attacks IV*, 718 F. Supp. at 488–89. Based on these allegations, the District Court allowed the case to go to discovery, finding that DIB was more than a "passive conduit" providing "routine banking and financial services." *Id.* Instead, Plaintiffs alleged that "DIB was an intentional, knowing and direct participant in providing money laundering services to al Qaeda, which allowed for direct funding of terrorist attacks," knowing full well "that the United States and its residents would likely bear the brunt of the resulting injuries." *Id.*

But all of those key allegations failed to find any support in the evidence after more than two decades of litigation. As the District Court observed in granting summary judgment, Plaintiffs by mere allegation had "depicted a financial

institution that was actively helping al Qaeda launder money in 1999, undeterred by the U.S. government's public calls for it to stop facilitating terrorism," with the result that money from DIB accounts paid for 9/11 preparations. SPA37–38. *In reality*, the evidence showed that DIB "took steps before 9/11 to combat terrorism financing," and there is no evidence that any funds from DIB "provided funding for [al Qaeda's] operations, let alone for the 9/11 Attacks." *Id.* Moreover, the District Court found no evidence that DIB had any "awareness" that individuals affiliated with al Qaeda were using its "routine financial services." *Id.* In short, "[t]hese key allegations lack factual support." *Id.*

It is the Plaintiffs' burden to establish personal jurisdiction. *Charles Schwab*, 883 F.3d at 83. They purported to meet it with particular allegations, and after lengthy discovery none of those allegations found support in the evidence. That should effectively end the matter.

## C. Discovery further confirmed the absence of DIB contacts with the United States.

Apart from proving that Plaintiffs' jurisdictional allegations were baseless, discovery actually yielded evidence that *confirmed* DIB lacks any "constitutionally sufficient relationship" with the United States on which to premise personal jurisdiction. *Omni Capital Int'l v. Rudolf Wolff & Co.*, 484 U.S. 97, 104 (1987).

As the District Court explained on summary judgment, looking back on a decade of discovery, DIB's actual conduct was "no more intentional or direct" than

-28-

that of the defendants dismissed from the other *Terrorist Attacks* cases. SPA36. Indeed, the evidence in this case makes it even weaker, both as to any *nexus* between DIB accounts and al Qaeda's operations and as to DIB's *knowledge* of al Qaeda's activities.

Of the ten accountholders of potential relevance to Plaintiffs' claims (discussed above Part E of the Background), there is no evidence that any money from any of their accounts "provided funding for the terrorist organization, let alone for the 9/11 Attacks." SPA36. Plaintiffs have *admitted* this. In short, DIB's financial services had no connection to the 9/11 Attacks. That should dispose of any theory of specific personal jurisdiction resulting from DIB's conduct.

Moreover, there is no evidence that DIB "was aware of the terrorist nature of the accountholders." SPA37. After all, none of the ten accountholders appeared on any pre-9/11 OFAC (or other) list, as Plaintiffs also have admitted. SPA22. And because DIB gave the accountholders "routine banking services" (*id.*), there is no special treatment from which to infer that DIB was attempting to aid al Qaeda. SPA36. Nor is there any other evidence establishing that DIB intended to aid al Qaeda's operations generally, much less 9/11 specifically.

On the contrary, when the *New York Times* reported in mid-1999 on the "suspected financial relationship" between DIB and bin Laden, DIB's conduct demonstrated the *opposite* of an intent to aid al Qaeda: DIB swiftly investigated,

used a U.S. lawyer to contact the U.S. State Department, "offered its cooperation to the U.S. government," and found zero evidence of such a relationship. SPA19–20; JA1897–99 ¶¶ 20, 22, 25; JA2049, 2075, 2086–87. Later that year, when DIB received the OFAC lists naming several bin Laden entities, DIB acted "to ensure" that no accounts were opened and no transactions conducted for those entities. SPA20; JA2108–09 ¶¶ 16–21. And all that happened while the Dubai government with the UAE Central Bank had recapitalized DIB, begun closely monitoring it, and replaced the management of DIB. SPA18, 37.

Ignoring this evidence and their own admissions (as well as the failure of their jurisdictional allegations), Plaintiffs insist DIB "provided direct, material financial support to al Qaeda" with the "specific intent to further al Qaeda's terrorism against the United States." Br. 38–39. They rely almost entirely on the four declassified CIA documents that, in addressing bin Laden and al Qaeda's Sudan years (1992–96), mention DIB and its former chairman, Mr. Lootah. Br. 38–42. Indeed, apart from those documents, Plaintiffs in discovery *admitted* they have *no evidence* of *knowledge* by DIB. And Plaintiffs continue to admit that they have no evidence that money from any DIB account funded the attack or that any of its relevant customers were designated as terrorists prior to the attack. *Supra*, Bkgd. E & F, at 13–14 & 18. Even crediting the conclusory statements in those documents, however, the evidence still falls far short of providing any basis for jurisdiction.

First, the CIA documents speculate about a connection between Mr. Lootah and bin Laden a *half-decade* before 9/11, "a period too remote to establish the requisite contacts." SPA36–37. Second, the uncontroverted evidence is that, by at least 1995, Mr. Lootah had no role in DIB's day-to-day operations, not even an office at the bank. JA2111 ¶ 34. Third, he had no role at all at the bank from early 1998 onwards, after the government of Dubai intervened and displaced and then replaced the board in response to the unrelated fraud. SPA18. Thus, at the very latest, the CIA files concern alleged conduct that predates 9/11 by over three years and predates even bin Laden's approval of the 9/11 plot in late 1998 or early 1999. This temporal gap undermines any notion that Mr. Lootah's alleged actions were "connected in any meaningful way, for the purpose of establishing personal jurisdiction, to the September 11, 2001 attacks," either in intention or in effect. *Terrorist Attacks VII*, 714 F.3d at 676–77 (affirming dismissal of bin Laden family business and of family members who supported bin Laden with money and contracts up through 1993, while he was in Sudan); *see Terrorist Attacks IV*, 718 F. Supp. 2d at 483 (dismissing defendant because "material support to al Qaeda in the early 1990's, enabling it to expand its base of operations in the Sudan, is too remote"), *aff'd*, 714 F.3d 109 (2d Cir. 2013).

Plaintiffs try to distinguish this Court's decision in *Terrorist Attacks VII*, claiming this case is "different," because that case did not involve "inten[t]" to fund

al Qaeda or funding "in fact." Br. 42. But neither does this case. Nothing in the CIA files indicates that Mr. Lootah's alleged actions were intended to or did serve the purpose of an attack on the United States, or that he—much less DIB—even knew of bin Laden's terrorist activities or intentions. Merely "provi[ding] … financial services to an entity that carries out a terrorist attack on United States citizens" does not suffice for jurisdiction. *Terrorist Attacks III*, 538 F.3d at 96. Although one analyst asserted DIB "management's apparently witting involvement in the financial activities" of al Qaeda, that single, vague, openly agnostic speculation hardly hazards any position on whether DIB intended to target the United States, which is the question here. Even as to that solitary anonymous comment, the District Court observed, Plaintiffs could "offer no other support." SPA37. To the contrary, when allegations surfaced in 1999 that DIB was facilitating terrorism financing, "it initiated an investigation," which showed no such involvement, *and* "offered its cooperation to the U.S. Government." *Id.* Nor, in any case, would *Mr. Lootah's* purported conduct establish that *DIB* expressly aimed its conduct at the United States. *Cf. Terrorist Attacks III*, 538 F.3d at 95–96 (recognizing distinction between banks that may have "actively sponsored" al Qaeda and banks' managers).

Plaintiffs also highlight the CIA analyst's assertion that DIB was a "key financial conduit" for bin Laden and al Qaeda. Br. 38. But that statement (again,

concerning 1996 or before) is based on three points of little or no evidentiary value: that (1) bin Laden and his Sudan-based companies maintained accounts at DIB; (2) Mr. Lootah authorized and signed letters of credit opened by bin Laden's companies through DIB; and (3) bin Laden's use of DIB "probably stem[med] from his purported friendship" with Mr. Lootah. JA7807, 7820–21. Discovery utterly failed to substantiate the first claim: DIB searched for accounts in bin Laden's name on multiple occasions and has never located any such account; it also searched the names of bin Laden's businesses, as provided by Plaintiffs, and found nothing. JA3380 ¶¶ 13–15 (SUMF Resp.). As to the second claim, as the District Court observed, the analyst admitted that Mr. Lootah's supposed actions may have been "standard practice for letters of credit of a certain value." SPA23–24; JA7832. So the "evidence" is insufficient on its face. And the third statement is admitted speculation.

In sum, DIB neither was a "primary participant[] in terrorist acts," *Terrorist Attacks III*, 538 F.3d at 93–94, nor did it "*directly* provide[] financial and other resources to al Qaeda knowing that al Qaeda was engaged in a global campaign of terror directed at the United States," *Terrorist Attacks VII*, 714 F.3d at 678. *At most*, as the District Court concluded, the record could show that DIB, in Dubai, maintained *ordinary* accounts and processed *routine* transactions for customers who

*later* turned out to be affiliated with al Qaeda. That is not remotely enough for DIB by its conduct to have established minimum contacts with the United States.

### D. The District Court should have excluded the CIA documents as inadmissible hearsay, which would have reinforced its recognition that DIB lacks minimum contacts.

Plaintiffs must establish jurisdiction with admissible evidence. Fed. R. Civ. P. 56(c); *Vasquez v. Hong Kong & Shanghai Banking Corp.*, 477 F. Supp. 3d 241, 251 (S.D.N.Y. 2020). The CIA documents, however, not only fail to support Plaintiff's assertions but also are inadmissible hearsay. The District Court held that they satisfied the hearsay exception for "factual findings" issued by a "public office" absent any "circumstances indicat[ing] a lack of trustworthiness." Fed. R. Evid. 803(8). They do not, and the District Court should have excluded them. Plaintiffs' case for personal jurisdiction was already insufficient, and correctly excluding the documents would have further confirmed this failure.

*First*, the files do not set out "factual findings" of a "public office." *Id.* This Court distinguishes between a "final report or finding of a government agency" and an "interim" report prepared by "staff" that may not reflect the agency's ultimate "conclusion." *City of New York v. Pullman Inc.*, 662 F.2d 910, 914 (2d Cir. 1981). Applying this logic, for example, a district judge excluded monographs and statements prepared by known 9/11 Commission staff, because they were "findings of the Commission staff, and not a public office or agency" and were intended only

-34-

to "inform the development of the Commission's recommendations." *In re Sept. 11 Litig.*, 621 F. Supp. 2d 131, 155 (S.D.N.Y. 2009). Here, the documents were prepared by unknown staff of unknown rank for unknown purposes, and they do not purport to be the CIA's final *factual findings* on any of the subjects treated, nor is there any indication of how if at all the CIA used them. Plaintiffs have no basis to say these documents are the "final report or finding of a government agency."

*Second*, the documents lack "trustworthiness." Fed. R. Evid. 803(8). Trustworthiness turns on "the special skills or experience of the [investigating] official"; "possible motivation problems"; "whether a hearing was held"; and "the timeliness of the investigation." *Bridgeway Corp. v. Citibank*, 201 F.3d 134, 143 (2d Cir. 2000). The CIA documents flunk every factor.

At the outset, each report "does not fall within the exception for public records because the name of the investigator is unknown," so it is "impossible to evaluate the trustworthiness of the report." *Ferguson v. Valero Energy Corp.*, 2010 WL 11550025, at *2 (E.D. Pa. Feb. 16, 2010); *Sullivan v. Dollar Tree Stores*, 623 F.3d 770, 778 (9th Cir. 2010) ("impossible to assess the author's skill or experience" when the author "is unidentified and unknown"). Likewise, the court and parties know nothing "about the circumstances under which the documents were created, the duty of the authors to prepare such documents, [or] the procedures and methods used to

reach the stated conclusions." *United States v. El-Mezain*, 664 F.3d 467, 499 (5th Cir. 2011).

The anonymous authorship should be dispositive, but other aspects compound unreliability. One is the inherent motivation problem: CIA staff cannot be expected to neutrally "report on an avowed enemy," especially in a classified document not subject to public scrutiny. *Bridgeway*, 201 F.3d at 144 n.4. In the present context in particular, the CIA suffered from a "culture of the newsroom," cranking out "fresh reports" at an "ever faster pace," trying to add value to the "round-the-clock news" cycle while paying "declining attention to the craft of strategic analysis." *9/11 Comm'n Rep.* ch. 3.4.

None of the documents purports to discuss matters within the authors' personal knowledge. Instead, they rest on undated hearsay from "unidentified individuals who were not subject to cross-examination." *Coughlin v. Tailhook Ass'n*, 1994 WL 780904, at *1 (D. Nev. Sept. 2, 1994). The documents themselves concede the hearsay was likely "intended to influence" the CIA, and that only some could be "corroborated." JA7735. Nor is it possible to tell whether the information was communicated in unreliable circumstances, such as through the use of "questionable investigative techniques." *In re Sept. 11 Litig.*, 621 F. Supp. 2d at 156. In short, the documents are hearsay within hearsay, and Plaintiffs are not entitled to a "presumption" of trustworthiness "when the preparer relies on potentially

untrustworthy hearsay evidence from another individual under no duty to provide unbiased information." *Miller v. Field*, 35 F.3d 1088, 1091–92 (6th Cir. 1994) (citing *Parsons v. Honeywell, Inc.*, 929 F.2d 901, 907 (2d Cir. 1991)).

Furthermore, the CIA held no public hearings on its collection of "unsworn statements," so the author(s) (and source(s)) were never "subject to cross examination." *Grant v. Lockett*, 2021 WL 5816245, at *2 n.3 (2d Cir. Dec. 8, 2021); *Hines v. Brandon Steel Decks*, 886 F.2d 299, 303 (11th Cir. 1989) (weighing "inability to cross-examine" authors); *Lakah v. UBS AG*, 996 F. Supp. 2d 250, 256 (S.D.N.Y. 2014) (rejecting report where "no hearings occurred"). Compounding this issue, the documents' redactions "inhibit[] a meaningful assessment of the trustworthiness," because there is no "'ascertainable record on which the findings are based.'" *Rambus, Inc. v. Infineon Techs.*, 222 F.R.D. 101, 109 (E.D. Va. 2004); *Ferguson*, 2010 WL 11550025, at *2 ("impossible" to assess trustworthiness due to redactions). Nor is there any way to tell when the documents were first circulated, whether they have been edited, or whether any "investigation" to develop their contents was close in time to the reported events.

The District Court nevertheless found the CIA documents admissible "for the limited purposes of this motion," but its reasons do not withstand scrutiny, and it thus abused its discretion. SPA26.

On the first prong, in a single sentence, the court concluded that the documents are "factual findings" of the CIA because they are "publicly available." SPA25. The court cited *United States v. Gluk*, 831 F.3d 608 (5th Cir. 2016), but it does not help: The court there held that a pair of SEC memos and an SEC "clawback complaint" were "presumptively" "factual findings" of the SEC because they were purposefully "transmit[ted]" or filed by the agency. *Id.* at 613–14. The District Court did not explain how that logic would apply here, and it does not.

The only document of the four that contains evidence of any transmission is the oldest document, which appears to have been sent to various agencies and policymakers in January 1997. JA7734. But of the four, that document is also the one that most obviously is not the "factual findings" of the CIA. It merely summarizes information from a single, unidentified source. JA7735. So it is straightforward "hearsay within hearsay." *Parsons*, 929 F.2d at 907. Even if transmission "presumptively" suggests a factual finding (*Gluk*, 831 F.3d at 614), any such presumption is overcome here.

The other three documents show no indication of having been "transmitted" by the CIA. To be sure, the documents are now "publicly available." SPA25. But that is because, decades later, the CIA was ordered to review old documents for potential declassification. *See* Exec. Order 14040. That declassification was not an "official communication" of the CIA, in the sense that the CIA was expecting the

-38-

documents to be relied upon or that the CIA was adopting an "official" position. *Gluk*, 831 F.3d at 614. Apart from its faulty reliance on *Gluk*, the District Court had no reason to characterize these documents, prepared by unknown authors for unknown purposes, as "factual findings" of the CIA.

As for trustworthiness, the District Court reasoned that the documents "carry the imprimatur of the CIA, which largely cures any reliability concerns." SPA 25–26. But the court cited no authority for this idea, and it proves far too much. For the public-records exception even to be at issue, the document must have been produced by the government. Yet the rule still turns on "trustworthiness." So the fact that a document merely seems to carry the "imprimatur" of some part of the government, which will always be the case, is not enough. The District Court also worried that declining to admit the documents would render a "host" of sensitive documents inadmissible. SPA26. But a court is not entitled to disregard the rules of evidence based on policy concerns. Nor is it enough that there is no evidence that the CIA later "repudiated the documents" (SPA26), because the documents lack indicia of trustworthiness to begin with.

The authors are unknown, the sources are unknown, there was never any hearing, and there is no evidence that the CIA viewed these documents as its final word. To the contrary, it is altogether possible—indeed likely—that, like many intelligence reports, they were simply one piece of a mosaic of information that

intelligence agencies collate with other reports to piece together broader conclusions on an overall threat assessment. That, however, is the opposite of an agency's final factual findings. In these circumstances, it is "impossible" to ensure that the documents are trustworthy. *Sullivan*, 623 F.3d at 778.

Even with the CIA documents, Plaintiffs lacked any evidence connecting DIB to the United States sufficient for the exercise of personal jurisdiction. Without them, that lack of evidence is even more obvious.

### E. Personal jurisdiction would remain inappropriate under any "more flexible" standard than minimum contacts that might conceivably apply here.

Plaintiffs resist minimum-contacts analysis primarily by arguing that they should not have to show minimum contacts after *Fuld v. PLO*, 606 U.S. 1 (2025). They are wrong, as detailed below in Arguments II and III. But, regardless, any connection between DIB and the United States is so lacking that personal jurisdiction would not lie under any conceivable alternative standard.

Plaintiffs claim that the minimum-contacts test is "no longer useful" following *Fuld*. Br. 20–22. But they tellingly do not attempt to explain what the appropriate replacement test *is*. They first appear to employ an analogy to the facts and circumstances of *Fuld*. Br. 22–29. They also suggest that some "more flexible" version of the minimum-contacts analysis might be appropriate (Br. 36), or might

not (Br. 41). In any case they do not specify which part of the analysis would be relaxed, or why.

That evasion and incoherence is enough to reject Plaintiffs' position—it leaves DIB and other defendants with the *opposite* of the regularity and predictability due process should provide (*infra*, Arg. II.A&B)—but, ultimately, it does not matter: DIB's contacts with the United States are so lacking that personal jurisdiction would be inappropriate even under some looser rubric.

As for Plaintiffs' analogy to *Fuld*, even setting aside the absence of any statute comparable to the one at issue in that case (*infra*, Arg. II.B.3), DIB's supposed contacts with the United States are nothing like the PLO and PA's contacts. As the Supreme Court emphasized, the PLO and PA had "*decades of meaningful contacts*, ties, and relations with the United States." 606 U.S. at 22 (emphasis added) (quotation marks omitted). Already in 1987, Congress "had restricted their *activities on U.S. soil*," after finding that the PLO had "taken credit for, and been implicated in, *the murders of dozens of American citizens* abroad." *Id.* at 6 (quoting 22 U.S.C. § 5201(a)(3)) (emphases added). It enacted similar restrictions on the PA in 2006. *Id.* (citing 22 U.S.C. § 2378b). Still, the PLO and PA "lawfully maintain an office in the United States," and the "Chief Representative of the PLO and the PA was served with process *at his home in the United States*." *Fuld v. PLO*, 101 F.4th 190, 208–09 (2d Cir. 2024) (Menashi, J., dissenting from denial of rehearing en banc)

-41-

(emphasis added). And in 2018, Congress passed a statute targeting payments "for acts of terrorism against … United States citizens." 22 U.S.C. § 2378c-1(a)(1)(B). Those meaningful contacts with the United States—activities on United States soil and knowing sponsorship of terrorism against United States citizens—are reflected in the jurisdictional statute before the Supreme Court in *Fuld*. 606 U.S. at 22; *see* 18 U.S.C. § 2334(e)(1).

DIB, by contrast, has no such history and has engaged in no such conduct. Indeed, it has *no* physical presence in the United States (and never has) and does not provide services here (and never has). SPA17. The evidence shows nothing more than that DIB provided routine banking services to customers outside the United States without knowledge they were affiliated with al Qaeda. And those services, Plaintiffs admitted in discovery, *did not contribute to* any harm in or to the United States. DIB is a "stranger[ ] to" the United States, apart from having been trapped in this case. *J. McIntrye Mach., Ltd. v. Nicastro*, 564 U.S. 873, 880 (2011) (plurality).

Plaintiffs allude to this Court's separate test for evaluating the extraterritorial application of American criminal law, which requires "a sufficient nexus between the defendant and the United States." Br. 26; *United States v. Epskamp*, 832 F.3d 154, 168 (2d Cir. 2016). But for "non-citizens acting entirely abroad" (like DIB), a sufficient nexus exists only when "the aim of [the defendant's] activity is to cause

harm inside the United States or to U.S. citizens or interests." *United States v. Al Kassar*, 660 F.3d 108, 118 (2d Cir. 2011). There is no evidence that DIB's aim in providing routine banking services outside of the United States to accountholders it did not know were affiliated with al Qaeda was to harm the United States.

On this record, Plaintiffs cannot show that DIB has any contacts with or "nexus" to the United States, and DIB had no fair warning of being subject to jurisdiction in the United States, as due process demands. Thus, no reading of *Fuld* can authorize personal jurisdiction in this case.

## II. THE TRADITIONAL REQUIREMENT OF MINIMUM CONTACTS CONTINUES TO GOVERN THIS CASE AS A MATTER OF DUE PROCESS.

Although DIB lacks any relevant contacts on which to premise jurisdiction and therefore should prevail under any standard, the correct standard in this case remains the traditional minimum-contacts analysis, which the District Court applied. Plaintiffs argue otherwise based on *Fuld v. PLO*, but Plaintiffs misunderstand *Fuld*. Due process has always required some basis for the lawful and predictable exercise of judicial authority over a foreign defendant. *International Shoe* held that minimum contacts provide that basis, and *Fuld* similarly held that the political branches of the Federal Government may provide for that basis, prospectively, with a narrow and tailored statute. But there is no such statute here. That dooms Plaintiffs' argument. As a matter of due process, personal jurisdiction here still turns on whether DIB has minimum contacts with the United States.

### A. Jurisdiction depends on a defendant's initiation of a relationship with a sovereign indicating submission to its authority and making the exercise of judicial power predictable.

To render a decision, "a court must have power over the parties before it," that is, "personal jurisdiction." *Fuld*, 606 U.S. at 11 (quoting *Lightfoot v. Cendant Mortgage Corp.*, 580 U.S. 82, 95 (2017)). And under longstanding precedent, that requirement "flows from the Due Process Clause." *Id.* (quoting *Ins. Corp. of Ireland v. Compagnie des Bauxites de Guinee*, 456 U.S. 694, 702 (1982)); *see, e.g.*, *Omni*, 484 U.S. at 104 (same).

Originally, the recognized bases for such judicial power were strictly territorial: "[T]he Anglo-American legal tradition recognized that a tribunal's competence was generally constrained only by the 'territorial limits' of the sovereign that created it." *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 128 (2023) (plurality). The hallmarks were some sort of *presence* or *consent*. A court could acquire jurisdiction through service of process on anyone present within its jurisdiction, even temporarily—also known as "tag jurisdiction." *Burnham v. Superior Ct. of Cal., Cnty. of Marin*, 495 U.S. 604, 610–16 (1990) (opinion of Scalia, J.). A court also could exercise jurisdiction over its citizens. *E.g.*, *Blackmer v. United States*, 284 U.S. 421, 438 (1932). And a court could exercise jurisdiction over a defendant who consented to its power through voluntary appearance or otherwise. *Pennoyer v. Neff*, 95 U.S. 714, 733 (1877); *see Mallory*, 600 U.S. at 130–37 (plurality) (corporate

-44-

consent). In *Pennoyer*, the Supreme Court held that this longstanding territorial basis for judicial power was a matter of due process. 95 U.S. at 733.

In *International Shoe*, the Supreme Court expanded the bases for jurisdiction that could be consistent with due process. *Int'l Shoe Co. v. Washington*, 326 U.S. 310 (1945); *see Mallory*, 600 U.S. at 138–39 (*International Shoe* was "expanding" jurisdiction by "stak[ing] out an *additional* road"). Responding to growth in transportation and cross-jurisdiction economic activity, particularly by corporations, the Court held that an absent, non-citizen defendant could still be subject to personal jurisdiction if it had "certain minimum contacts with" the forum. *Int'l Shoe*, 326 U.S. at 316; *see Burnham*, 495 U.S. at 617–18 (opinion of Scalia, J.). That is, if the "quality and nature" of its "activity" made jurisdiction consistent with "'traditional notions of fair play and substantial justice.'" *Int'l Shoe*, 326 U.S. at 316, 319; *Mallory*, 600 U.S. at 138 (same); *Burnham*, 495 U.S. at 618 (opinion of Scalia, J.) (same).[6] These minimum contacts "take the place of physical presence," "by *analogy* to 'physical presence.'" *Burnham*, 495 U.S. at 618–19 (opinion of Scalia, J.).

---

[6] For a *state* court's jurisdiction, these contacts also needed to make jurisdiction in that State "reasonable, in the context of our federal system of government." *Int'l Shoe*, 326 U.S. at 317; *see Fuld*, 606 U.S. at 12 (recognizing same); *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 592 U.S. 351, 360 (2021) (Fourteenth Amendment's due process limits on personal jurisdiction reflect "two sets of values—treating defendants fairly and protecting 'interstate federalism'").

*International Shoe*'s standard led to the rules governing "general" and "specific" jurisdiction. *Fuld*, 606 U.S. at 12; *Burnham*, 495 U.S. at 618 (opinion of Scalia, J.) (specific jurisdiction as a basis for "dispens[ing] with in-forum personal service" was "derived from the *International Shoe* standard"). If a defendant's "relationship" with a forum is substantial enough—for instance, citizenship or domicile—a court has "general" jurisdiction, to hear any claim against that defendant. *Bristol-Myers Squibb Co. v. Superior Ct. of Cal., San Francisco Cnty.*, 582 U.S. 255, 262 (2017). If a defendant's relationship with a forum is more attenuated, a court can still exercise "specific" jurisdiction, to hear claims that "arise out of or relate to the defendant's contacts with the forum." *Id.* (emphasis omitted); *see, e.g.*, *Ford Motor Co. v. Montana Eighth Judicial Dist. Ct.*, 592 U.S. 351, 365 (2021) (looking to the strength of the "relationship among the defendant, the forum, and the litigation"). And for a claim in federal court, it might be sufficient under "the Fifth Amendment" to "exercise personal jurisdiction … based on an aggregation of the defendant's contacts with the Nation as a whole," not just a given district or State. *Omni*, 484 U.S. at 102 n.5; *see Nicastro*, 564 U.S. at 884 (plurality) ("For jurisdiction, a litigant may have the requisite relationship with the United States Government …."); *see also Fuld*, 606 U.S. at 11, 16–18 (citing *Omni*, 484 U.S. at 102 n.5, and citing and quoting *Nicastro*, 564 U.S. at 884).

### 1. The due process requirement of personal jurisdiction limits sovereign power to promote fairness and predictability.

The requirement of personal jurisdiction has always been a limit on sovereign power whose boundaries turn on the defendant's conduct. This aspect of due process is an individual right that protects individuals from *arbitrary* and *unforeseeable* assertions of judicial authority.

*First,* "due process protects the individual's right to be subject only to lawful power." *Fuld*, 606 U.S. at 17 (quoting *Nicastro*, 564 U.S. at 884). And lawfulness depends on "whether the defendant's activities manifest an intention to submit to the power of a sovereign." *Nicastro*, 564 U.S. at 882; *see id.* (jurisdiction requires that "the defendant can be said to have targeted the forum"); *id.* at 880 ("As a general rule, neither statute nor judicial decree may bind strangers to the State."); *Burger King*, 471 U.S. at 474 ("whether the defendant purposefully established 'minimum contacts' in the forum"). The original territorial bases for jurisdiction all provide grounds "to infer … an intention to submit to the laws of the forum State." *Nicastro*, 564 U.S. at 880–81.

So also, under *International Shoe*, a defendant may submit to sovereign authority "through contact with and activity directed at [the] sovereign," whether because the defendant intends to "benefit from" the sovereign's laws or to "obstruct" them (in the case of an intentional tort). *Id.* In sum, "[t]he actions of the defendant may amount to a legal submission to the jurisdiction of the court, whether voluntary

or not." *Ins. Corp. of Ireland*, 456 U.S. at 704–05. Given that submission, requiring the defendant to respond to a suit was "reasonable and just"—not "undue." *Int'l Shoe*, 326 U.S. at 319–20.

*Second*, linking sovereign power to the defendant's intentional conduct regarding that sovereign "similarly provides defendants with 'fair warning'— knowledge that 'a particular activity may subject it to the jurisdiction of a foreign sovereign.'" *Ford Motor*, 592 U.S. at 360 (quoting *Burger King*, 471 U.S. at 472). Indeed, in *Burger King*, the Court described this as a "'fair warning' *requirement*." 471 U.S. at 472 (emphasis added). "[T]he foreseeability that is critical to due process analysis … is that the defendant's conduct and connection with the forum State are such that he should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980). This foreseeability "gives a degree of predictability to the legal system that allows potential defendants to structure their primary conduct with some minimum assurance as to where that conduct will and will not render them liable to suit." *Id.*; *see Burnham*, 495 U.S. at 626 (opinion of Scalia, J.) ("traditional territorial rules of jurisdiction were designed precisely to avoid[] uncertainty and litigation over the preliminary issue of the forum's competence").

The fair-warning requirement of due process may be satisfied even if a defendant does not have "minimum contacts" with the forum in the *International*

*Shoe* sense, if there is some other law providing clear, advance notice of jurisdictional consequences. In *Burnham*, the Court reaffirmed the viability of "tag jurisdiction"—even though it "would not satisfy the contacts-based test for general jurisdiction." *Mallory*, 600 U.S. at 171 (Barrett, J., dissenting). Tag jurisdiction is so longstanding and settled that "anyone entering [a forum] should have known about it." *Burnham*, 495 U.S. at 625 (opinion of Scalia, J.); *id.* at 636 (Brennan, J., concurring in the judgment) (agreeing that defendant has "clear notice that he is subject to suit" based on presence). Laws providing for corporate consent to suit in exchange for doing business in a jurisdiction similarly provide clear, advance notice. *See Mallory*, 600 U.S. at 131–36.

## 2. The federal government is subject to the requirements of due process in asserting personal jurisdiction.

The bulk of Supreme Court precedent construing personal jurisdiction has arisen under the Fourteenth Amendment's Due Process Clause rather than the Fifth Amendment's. But the foregoing principles do not depend on this distinction. Fundamentally, the same kind of analysis applies, just accounting for the different sovereign.

As *Nicastro* explained and *Fuld* reiterated, "'personal jurisdiction requires a sovereign-by-sovereign analysis,'" and it is a "straightforward premise that 'the United States is a distinct sovereign.'" *Fuld*, 606 U.S. at 16 (quoting *Nicastro*, 564 U.S. at 884 (plurality)). Therefore, "a defendant may in principle be subject to the

jurisdiction of the courts of the United States but not of any particular State," because it has "*the requisite relationship with the United States Government* but not with the government of any individual State." *Nicastro*, 564 U.S. at 884 (emphasis added). Likewise in *Omni*—involving the Fifth Amendment—the Court earlier observed that due process requires "*a constitutionally sufficient relationship* between the defendant and the forum" and recognized this might be "*with the Nation as a whole.*" 484 U.S. at 102–04 & n.5 (emphases added).

The Fourteenth Amendment also takes into account federalism—requiring that personal jurisdiction be not only consistent with "traditional notions" generally but also reasonable within the federal system, as noted above—and federalism interests "do not apply" to the federal government. *Fuld*, 606 U.S. at 15. Even when those interests are stripped away, however, the individual right to due process remains. The "two sets of values" under the *Fourteenth* Amendment's Due Process Clause, of treating defendants fairly and protecting federalism, are "related, but distinguishable." *Id.* at 13–14 (quoting *World-Wide Volkswagen*, 444 U.S. at 291–92); *see Ford Motor*, 592 U.S. at 360.

Apart from federalism concerns, due process still protects "*defendants' interests*" individually, whether grounded in "reciprocity" with the sovereign (making "power … lawful") or "fair warning." *Ford Motor*, 592 U.S. at 360 (emphasis added); *Fuld*, 606 U.S. at 14. That this due-process right is waivable

-50-

confirms that it is not merely a structural check in the service of federalism but that it protects individual liberty: "Because the requirement of personal jurisdiction represents first of all an individual right, it can, like other such rights, be waived." *Ins. Corp. of Ireland*, 456 U.S. at 703; *accord Mallory*, 600 U.S. at 144 (plurality) ("a *personal* defense").

      **B.**      **Under *Fuld*, Congress and the President may define U.S.-related conduct triggering personal jurisdiction as to specific claims apart from "minimum contacts," but they have not done so here.**

In *Fuld*, as in *International Shoe*, the Supreme Court recognized an additional basis for personal jurisdiction that could be consistent with due process. Under *International Shoe*, a minimum-contacts analysis relies on the connection between a defendant's forum-directed conduct and the claims against it to justify jurisdictional power and assure fair warning. Under *Fuld*, the federal government may by law premise jurisdiction on an extraterritorial defendant's future, specified U.S.-related conduct. This, too, justifies jurisdictional power and assures fair warning.

In the context of this case, however, Congress and the President have *not* displaced minimum contacts as the due-process protection. And *Fuld* reiterated that "[g]reat care and reserve should be exercised when extending our notions of personal jurisdictional into the international field." 606 U.S. at 19 (quoting *Asahi Metal Industry Co. v. Superior Ct. of Cal., Solano Cty.*, 480 U.S. 102, 115 (1987)). Thus,

under *Fuld* and the other precedent set out in the previous section, and given the absence of presence or consent, due process continues to require minimum contacts here.

### 1. *Fuld* upheld a statute narrowly tailored to specific claims, defendants, and jurisdiction-triggering conduct.

*Fuld* involved ATA lawsuits against the Palestine Liberation Organization (PLO) and Palestinian Authority (PA) by Americans injured in terrorist attacks in Israel. 606 U.S. at 6–7. The PLO and PA's Chief Representative "was served with process at his home in the United States." *Fuld*, 101 F.4th at 208–09 (Menashi, J.). In a first appeal, this Court held the district court lacked personal jurisdiction under a minimum-contacts analysis because the PLO and PA's conduct was "unconnected to the forum" and "not expressly aimed at the United States." *Fuld*, 606 U.S. at 6–7 (quoting *Waldman v. PLO*, 835 F.3d 317, 337 (2d Cir. 2016)).

Congress responded, enacting both the Anti-Terrorism Clarification Act of 2018 and the Promoting Security and Justice for Victims of Terrorism Act (PSJVTA) the year after. The PSJVTA names the PLO and PA (and only those entities) and "deem[s]" them "to have consented to personal jurisdiction" if—within certain periods "after the date of the enactment"—they engaged in one of two specifically enumerated acts—either making certain payments to terrorists (or their families) or conducting certain activities in the United States (such as maintaining an office). 18 U.S.C. § 2334(e)(1), (5). The provision authorizes jurisdiction only for civil ATA

claims, under § 2333, which provides a cause of action for any U.S. national injured or killed "by reason of an act of international terrorism." *Id.* § 2333(a). The PLO and PA thereafter satisfied at least "the payments prong." *Fuld*, 606 U.S. at 10. In a second appeal, this Court held the PSJVTA unconstitutional, including because it did not ground jurisdiction on "litigation-related conduct." *Fuld v. PLO*, 82 F.4th 74, 91 (2d Cir. 2023); *see Fuld*, 606 U.S. at 9–10.

The Supreme Court reversed. The Court reasoned that, because the "territorial reach of the Federal Government's sovereign power" extends beyond the nation's borders (unlike the States' powers), due process under "the Fifth Amendment necessarily permits a more flexible jurisdictional inquiry" than a pure "minimum contacts" analysis. 606 U.S. at 16. And the PSJVTA was within the bounds of that flexibility. (Because the statute "ties the assertion of jurisdiction to predicate conduct that in and of itself bears a meaningful relationship to the United States," the Court did not consider "consent." *Id.* at 23.) The Court, however, declined to embrace the plaintiffs' "unbounded" theory "that the Fifth Amendment imposes *no* territorial limits on personal jurisdiction." *Id.* at 18.

In holding that the statute satisfied due process, the Court emphasized three aspects of it. *First*, it was the product of a joint effort of the "political branches" in their "considered" and "delicate judgments." *Id.* at 19; *see id.* at 19–25 (noting that "the Executive and Congress have spoken with one voice"; that "Congress and the

President made a considered judgment"; and that the statute was "the prerogative of the political branches"). That judgment was necessary for balancing the federal government's "strong interest" in providing a forum for terrorism victims with "sensitive and weighty interests of national security and foreign affairs" in extending jurisdiction to persons outside the United States. *Id.* at 20. And that judgment was not one-off: The statute was an installment in the "complex, longstanding relationships" between "the Federal Government" and the quasi-sovereign PLO and PA, building on "decades of meaningful contacts, ties, and relations," including statutes targeting those entities as far back as 1987. *Id.* at 20, 22 (quotation marks omitted).

*Second*, the statute itself was "specific and narrow," "suitably limited" to the federal government's interests in three mutually reinforcing ways. *Id.* at 20–21. It applied only to ATA claims, not putting the PLO and PA "at broad risk of being haled into U.S. courts for myriad civil liability actions." *Id.* Also, the statute's prospective "triggering predicates" (payments or domestic activities) were tied "directly" to the PLO and PA's "relationships with the United States," each one part of "longstanding policy," so the triggering conduct was far from an "anything-goes approach." *Id.* at 21. Further, the statute applied only to specified and *sui generis* foreign entities," not roping "just any run-of-the-mill private defendant into American courts." *Id.* at

-54-

21–22.  In sum, the PSJVTA covered a "narrow category of claims," with "narrow" predicate conduct, and "only two" defendants.  *Id.* at 20–22.

*Finally*, the Court highlighted that "the statute's targeted applicability put the PLO and PA *on full notice* that they could be subject 'to personal jurisdiction' in ATA suits in U.S. courts."  *Id.* at 22 (emphasis added) (quoting 18 U.S.C. § 2334(e)).  And again, the PLO and PA "in the PSJVTA were put *on clear notice* … that continuing to engage in certain specified conduct would open them up to potential federal court jurisdiction."  *Id.* at 25 (emphasis added).

### 2. The statutory extension of personal jurisdiction in *Fuld* accords with existing due process principles.

The Supreme Court's analysis in *Fuld* comports with its longstanding view of due process as requiring "lawful power" and "fair warning," explained above in Argument II.A.  The PSJVTA, the Court explained, ensured both.

*First*, the federal government's considered and focused advancement of its foreign policy by an express and targeted statute was an exercise of lawful power, far from arbitrary.  Much like specific jurisdiction under a minimum-contacts analysis, it "ties federal jurisdiction to conduct," but only with respect to a "narrow category of claims."  *Fuld*, 606 U.S. at 18, 20.  And the Court spent much time ensuring that the narrow statute was "suitably limited" given the government's ends—grounded in the United States' extraterritorial "foreign affairs power," *id.* at 19–20; triggering jurisdiction based on conduct that "in and of itself bears a

-55-

meaningful relationship to the United States," *id.* at 23; and applying only to defendants who have "decades of meaningful contacts, ties and relations with the United States," *id.* at 22 (quotation marks omitted).

*Second*, the PSJVTA also afforded fair warning. It both clearly defined the conduct that would subject the PLO and PA to jurisdiction and made that conduct matter only prospectively. It thus put them "on full notice" and gave them "clear notice." *Fuld*, 606 U.S. at 22, 25. This was, the Court observed, *better* notice than the average defendant receives. *Id.* at 25. So, the statute preserved a "degree of predictability" in the legal system at least as well as a minimum-contacts analysis would. *World-Wide Volkswagon*, 444 U.S. at 297.

*Fuld* thus staked out a path for the *political branches* (not courts or parties), by *express, clear, and prospective* action (not by implication or after-the-fact), to deviate from the need for traditional minimum contacts in *narrow, tailored* circumstances (not broadly or haphazardly). When they have done so, traditional notions of fair play and substantial justice are satisfied, and due process is provided—apart from *International Shoe*, yet similarly to it. When they have *not* done so, neither *Fuld* nor any other precedent justifies a deviation. So what is then available to ensure due process are the traditional bases for personal jurisdiction— the original ones and minimum contacts.

### 3. In this case, there is no statute extending personal jurisdiction beyond minimum contacts.

The political branches have *not* done here what they did in the PSJVTA, so the traditional requirements of minimum contacts remain in force. *Fuld* itself counsels as much, consistent with other authority. 606 U.S. at 19 (urging "care and reserve" in "extending our notions of personal jurisdiction" internationally); *see also id.* at 42 (Thomas, J., concurring in judgment) (recognizing that deference to "the political branches' power to conduct foreign policy" counsels restraint in finding statutory authorization for jurisdiction); *Omni*, 484 U.S. at 110–11 & n.13 (refusing to imply an authorization of service given the "possibility of disrupting the Nation's foreign policy objectives"); *cf. Dynegy Midstream Servs. v. Trammochem*, 451 F.3d 89, 96 (2d Cir. 2006) (declining "to come up with an alternate method to close a gap that may reflect an intentional choice on the part of Congress"). *Fuld* certainly creates no "conflict, incompatibility, or inconsistency" with continuing to apply here a nationwide minimum-contacts analysis, as the District Court did. *E.g.*, *Gilead Cmty. Servs. v. Town of Cromwell*, 112 F.4th 93, 100 (2d Cir. 2024).

Though Congress amended the ATA to expressly authorize personal jurisdiction over the PLO and PA in response to decisions of this Court (*see* Br. 25), it has for years *refrained* from otherwise amending the ATA in response to other decisions of this Court dismissing ATA defendants on jurisdictional grounds. *See, e.g.*, *Terrorist Attacks III*, 714 F.3d at 676 (rejecting personal jurisdiction based on

allegations that defendants "knowingly maintained bank accounts for individuals associated with al Qaeda"). Apart from the PSJVTA, Congress has left minimum contacts in place for ATA suits.

The Plaintiffs nevertheless seem to contend that *Fuld* newly warrants grounding personal jurisdiction—apart from minimum contacts—by reference to two provisions: the ATA's authorization of nationwide service of process, 18 U.S.C. § 2334(a), and the federal long-arm rule, Civil Rule 4(k)(2). But Plaintiffs do not directly claim that either one by itself (or the two together) suffices under *Fuld*. As explained below, § 2334(a) does not even apply in this case and Rule 4(k)(2) lacks *any* characteristics or limits of the sort *Fuld* emphasized.

*First*, the ATA, like a few dozen other federal statutes, has its own provision authorizing service of process in civil ATA suits, nationwide: "Process in such a civil action may be served in any district where the defendant resides, is found, or has an agent." § 2334(a). It does not mention jurisdiction, unlike the PSJVTA, but Plaintiffs nevertheless allude to it as a reason why personal jurisdiction might comport with due process. Br. 18, 25–26.

But § 2334(a)—whatever its implications for due process—does not apply here because it was not used to serve DIB. That provision authorizes service *within* the United States: it authorizes service in "any district" of the nation, and nothing in it mentions service outside the United States. Plaintiffs' citation (Br. 18) of *Zobay*

-58-

*v. MTN Grp. Ltd.*, confirms as much. *See* 695 F. Supp. 3d 301, 322 (E.D.N.Y. 2023) (finding § 2334(a) satisfied because defendants "were served in the United States"); Br. 18 (quoting *Zobay*). DIB was not served under § 2334(a)—it has no presence in the United States (SPA17) and was served (by publication) in the UAE (*Terrorist Attacks IV*, 718 F. Supp. 2d at 490). Plaintiffs therefore have no basis to assert that "personal jurisdiction is based on the Anti-Terrorism Act service-of-process provision." Br. 25.

Plaintiffs instead mainly use § 2334(a) as an excuse to invoke *another provision* of the ATA and a snippet of its *legislative history*. Neither does what Plaintiffs claim or otherwise helps them.

The legislative history comes from the Senate Report on the 1992 bill that added civil claims to the ATA. The report says the bill "opens the courthouse door to victims of international terrorism" by "extend[ing] the same jurisdictional structure that undergirds the reach of American criminal law to the civil remedies that it defines." S. Rep. No. 102-342, at 45. It is talking about § 233<u>3</u>, the new civil *remedy* (the original ATA had only criminal provisions), not § 233<u>4</u>, as the heading above the statement confirms. *Id.* ("Section 2333. Civil remedies"); *see also Fuld*, 606 U.S. at 16 (quoting this language in discussing the government's substantive

powers).[7]  This language is not about personal jurisdiction or even service of process but rather what is called *prescriptive* jurisdiction, the distinct question of "the reach of a nation's … laws." *United States v. Prado*, 933 F.3d 121, 133 (2d Cir. 2019); *see Nicastro*, 564 U.S. at 879, 886 (noting the distinction).  The broad substantive reach of the criminal provisions had been highly unusual when enacted.  Christopher W. Robbins, *Finding Terrorists' Intent: Aligning Civil Antiterrorism Law with National Security*, 83 St. John's L. Rev. 1201, 1217–20 & nn.57–58 (2009).  The report is merely saying the bill extends that substantive innovation to the civil realm.

Plaintiffs also highlight a sentence from the statement of purpose in the later Justice Against Sponsors of Terrorism Act (JASTA), which amended the ATA.  Congress declared it intended to give civil litigants "the broadest possible basis" to pursue relief against defendants, "wherever they may be found."  Pub. L. No. 114-222, § 2(b), 130 Stat. 852, 853 (2016).  This statement does not mention jurisdiction and, similarly to the earlier legislative history, was about a change in the ATA's *substantive* scope, this time authorizing civil aiding-and-abetting and conspiracy liability.  And while JASTA included a provision that did mention "the jurisdiction

---

[7] The original, only-criminal ATA did not even address service of process.  Pub. L. No. 99-399, 100 Stat. 853, 896–97 (1986).  In a criminal case, personal jurisdiction is not usually an issue because it is acquired by force, via extradition. Terry Richard Kane, *Prosecuting International Terrorists in United States Courts: Gaining the Jurisdictional Threshold*, 12 Yale J. Int'l L. 294, 333 (1987) ("Extradition is unquestionably the most commonly used method ….").

of the courts," it appears elsewhere and addresses only jurisdiction over "foreign states." 28 U.S.C. § 1605B.

*Second*, Plaintiffs argue that, after *Fuld*, Rule 4(k)(2) somehow ensures due process apart from minimum contacts. Br. 22–26, 29. But they do not argue for applying Rule 4(k)(2) in an unbounded manner or even try to distill some bounded, workable rule of jurisdiction from it. On the contrary, Plaintiffs urge the Court to ignore the looming question "whether Rule 4(k)(2) could permissibly support jurisdiction in other types of civil cases." Br. 29. This concession, however, gives up the game.

Rule 4(k)(2) provides that, for any "claim that arises under federal law," service "establishes personal jurisdiction" over any defendant that is not subject to the jurisdiction of any state court if "exercising jurisdiction is consistent with the United States Constitution and laws." In contrast to the PSJVTA, it is not a judgment of the political branches in exercising their foreign affairs power, and it is not limited to a narrow class of claims, specific triggering conduct, or specific defendants. It is, rather, a general rule, promulgated by the Supreme Court under the Rules Enabling Act and not even requiring action by Congress or the President to take effect. 28 U.S.C. §§ 2072, 2074(a). It was promulgated to *implement minimum contacts analysis* (*infra* 73–76), to "correct[] a gap" in authorization of service, in cases where a defendant had sufficient "contacts with the United States" but not "with any single

state." Fed. R. Civ. P. 4, Advisory Comm. Note (1993); *see Omni*, 484 U.S. at 103 (identifying the gap). It applies to "*any* run-of-the-mill private defendant" and "*myriad* civil liability actions." *Fuld*, 606 U.S. at 20–22 (emphases added).

So the rule in itself provides *no* assurance in any given suit that personal jurisdiction would be an exercise of "lawful power," because it is not "suitably limited" to any particular extraterritorial policy. *Id.* at 17, 20. And it does not provide *any* warning, much less *fair* warning, to defendants of the jurisdictional consequences of their actions, because it does not turn on defendants' conduct at all. It has no resemblance to what *Fuld* upheld. Its general reference to the Constitution thus leaves no standard to govern a jurisdictional analysis consistent with due process other than the background one of minimum contacts (absent consent or presence).

*Third*, and more generally, Plaintiffs get *Fuld* backwards, asserting that "nothing in the Anti-Terrorism Act, JASTA, or *Fuld* suggests that Congress intended to *foreclose* reliance on Section 2334(a) or Rule 4(k)(2) to establish personal jurisdiction over foreign perpetrators of terrorist acts against the United States." Br. 24–26 (emphasis added). The question is, rather, whether either provision is a *special authorization* of the sort *Fuld* upheld, one that ensures lawful power over and fair warning to foreign defendants rather than inviting ad-hoc, free-form due-process judgments. Neither comes close, either textually or historically. Rather,

Plaintiffs in invoking them invite precisely the "anything-goes approach" *Fuld* avoided. *Fuld*, 606 U.S. at 20–21.

Indeed, if Plaintiffs were right, *Fuld*'s detailed analysis of and emphasis on the PSJVTA's narrow contours was all for naught. The general provisions of the ATA and Rule 4(k) were equally available in *Fuld*, which mentioned both. *Fuld*, 606 U.S. at 7, 11, 20–21. And, as noted above, the agent of the PLO and PA was served *in person* and *within the United States*. By Plaintiffs' logic, the Court could have reached the same result if Congress never enacted the PSJVTA. The Court wasted everyone's time.

In sum, the political branches have not acted to extend jurisdiction to a defendant like DIB apart from minimum contacts. Without a statute like the PSJVTA, Plaintiffs must rest on settled bases for jurisdiction, which ensure that the exercise of jurisdiction is lawful and that defendants have fair notice.

### C. Due process constraints on personal jurisdiction are consistent with the original meaning of the Fifth Amendment.

Failing to find any toehold in *Fuld*, Plaintiffs also argue that, as an original matter, the Due Process Clause of the Fifth Amendment imposed *no* territorial limits on personal jurisdiction, though they spare fewer than three pages for this sweeping historical claim. Br. 33–35. In *Fuld*, the seven-justice majority declined to embrace this "unbounded" theory—heeding the government's warning that it is "not easily confirmed as a historical matter." 606 U.S. at 18. Given that warning, it is

unsurprising that Plaintiffs here have mustered scant evidence for their theory. To the contrary, since the Founding, the process of courts has indisputably incorporated notions of territorial limits on their personal jurisdiction. And even if Plaintiffs were right, all it would mean is that *Congress* is entirely free to provide for jurisdiction (which it has not done here).

**1.** For centuries, the Supreme Court has explained that due process under our Constitution is an independent check on governmental power, grounded in historical practice. As the Court put it in a landmark case more than a decade before the Fourteenth Amendment existed, to define "due process," "we must look to those settled usages and modes of proceeding existing in the common and statute law of England" and state law "at the time of the adoption of [the Fifth] Amendment." *Murray's Lessee v. Hoboken Land & Imp. Co.*, 59 U.S. 272, 277 (1855); *see Fuld*, 606 U.S. at 34 (Thomas, J., concurring in judgment) (acknowledging *Murray's Lessee*). Although "due process" may be "difficult[]" to define in general, at least as to judicial proceedings it "no doubt" means "those rules and principles which have been established in our systems of jurisprudence for the protection and enforcement of private rights." *Pennoyer*, 95 U.S. at 733.

Founding-era courts, in turn, regularly acknowledged territorial limits on judicial jurisdiction. *See Mallory*, 600 U.S. at 128 (plurality) (summarizing "the Anglo-American legal tradition" regarding "a tribunal's competence"). The general

rule, derived from both the common law and law of nations, was that a court could not lawfully exercise jurisdiction over persons and property outside its territory. *Picquet v. Swan*, 19 F. Cas. 609, 612 (C.C.D. Mass. 1828) (Story, J.) ("recognized" at "common law" and based on "universal jurisprudence").

For example, in one case predating the Constitution, a Connecticut court refused to recognize a Massachusetts judgment because the defendant "was not within the jurisdiction" of the Massachusetts court—that is, not within its territory. *Kibbe v. Kibbe*, 1 Kirby 119, 126 (Conn. Sup. Ct. 1786); *see Kilburn v. Woodworth*, 5 Johns 37, 41 (N.Y. Sup. Ct. 1809) (similar). As the Supreme Court later summarized, a proceeding without jurisdiction was "deemed an illegitimate assumption of power, and resisted as mere abuse." *D'Arcy v. Ketchum*, 52 U.S. 165, 174 (1850).

To be sure, courts enforcing territorial limits invoked the common law and law of nations, rather than "due process" specifically. Stephen Sachs, *The Unlimited Jurisdiction of the Federal Courts*, 106 Va. L. Rev. 1703, 1717–1720 (2020). But that is an anachronistic distinction without a difference: It is precisely those "settled usages and modes of proceeding" that compose the *foundation* of "due process." *Murray's Lessee*, 59 U.S. at 276–77; *see Burnet v. Brooks*, 288 U.S. 378, 405–06 (1933) (in assessing whether a federal tax was consistent with due process, explaining that "[w]e determine national power in relation to other countries and

their subjects by applying the principles of jurisdiction recognized in international relations"); *Fuld*, 606 U.S. at 14–16 (relying on *Burnet*).

**2.**     Plaintiffs nevertheless claim Congress has always had unbounded authority to override traditional rules of personal jurisdiction. Br. 34–35; *see Fuld*, 606 U.S. at 38–41 (Thomas, J.) (concurring in judgment). But they cannot muster convincing evidence. When the First Congress established the district courts in the Judiciary Act of 1789, it limited them to service of process within their districts, consistent with and thereby reinforcing the traditional rule. *Omni*, 484 U.S. at 108. Because Congress itself hewed to "settled usages" from the outset, there was little occasion for courts to assess whether it had free rein in authorizing expansive and unprecedented exercises of jurisdiction.

And, contrary to Plaintiff's claim, neither *Picquet v. Swan* nor *Toland v. Sprague* establishes that it could. Br. 34–35. In *Picquet*, the plaintiff sued in federal court, invoking a Massachusetts statute that (like statutes in other States) allowed seizure of in-state property belonging to an out-of-state defendant to induce the defendant's appearance. 19 F. Cas. at 609–10. The question was how to reconcile the Judiciary Act of 1789—which authorized federal courts to issue process only in a district where the defendant "is an inhabitant" or is "found"—with the Judiciary Act of 1792—which adopted "forms of process … according to the state jurisprudence." *Id.* at 614. Justice Story, riding circuit, concluded that the Judiciary

Act of 1789 confines federal courts to "the limits of their districts." *Id.* at 615. But he mused that, if "Congress had prescribed such a rule [as Massachusetts had], the court would certainly be bound to follow it." *Id.*

From this dicta simply endorsing an existing state procedure, Plaintiffs would deduce that Congress faced *zero* limits in expanding the bounds of personal jurisdiction. Br. 34. But they pluck this statement from its context, which involved only that Massachusetts statute, which was keyed to *property within the State's territory*. Indeed, earlier in his opinion, Justice Story rejected an argument of statutory interpretation that "supposes" a court could subject a foreign citizen who "has not *any* property" in the United States to suit in its courts. 19 F. Cas. at 613 (emphasis added). Because such a rule would be contrary to "principles of justice" and "repugnant to the general rights and sovereignty of other nations," a court should not "presume[]" that any statute embodies such an intent, "unless it is established by irresistible proof." *Id.*; *cf. Burnet*, 288 U.S. at 396–400, 406 (similar, upholding as consistent with due process federal tax on securities that, although owned by non-resident foreigner, were "physically within" the United States). And he did not say the courts would nevertheless be *bound to follow* that hypothetical broader rule.

*Toland* likewise involved a state law providing for attaching *in-state property* to induce appearance of the defendant. 37 U.S. at 302. The Supreme Court largely "concur[red]" with *Picquet*'s reasoning on how to reconcile the Judiciary Acts of

1789 and 1792, concluding that state-process provisions could not expand federal courts' jurisdiction beyond what Congress authorized. *Id.* at 328. The Court observed that Congress could authorize process "beyond the limits of [judicial] districts" through "positive legislation." *Id.* at 330. But that dicta does not suggest Congress had *unlimited* power to do so—elsewhere the Court contemplates only that federal process might have "run into any state of the Union." *Id.* at 328. And in interpreting the statute, *Toland* acknowledged that Congress theoretically might have (but did not) "act[] under the idea that the process of the circuit courts could reach persons in a foreign jurisdiction" (*id.* at 330), but, again, neither embraced that idea nor suggested Congress would have unlimited power to do so. Indeed, the Court rejected as "unjust" the idea that the courts could render judgment against a person "who is beyond the limits of their jurisdiction." *Id.* at 329.

In any case, Justice Story's musings in *Picquet* and the Court's dicta in *Toland* are about *Congress's* power to expand federal courts' jurisdiction through "positive legislation," just as *Fuld* was. *See Fuld*, 606 U.S. at 35 (Thomas, J., concurring in judgment) ("The Fifth Amendment was never understood to constrain *Congress's* ability to extend federal jurisdiction." (emphasis added)). Neither decision suggests federal personal jurisdiction is boundless in the *absence* of Congressional action. To the contrary, if a court is going to do something "so repugnant" to settled practice and foreign sovereignty as exercise jurisdiction over absent foreigners, it should at

least have "irresistible proof" of Congress's intention. *Picquet*, 19 F. Cas. at 613; *Fuld*, 101 F.4th at 218 & 221–22 (Menashi, J.) (arguing only that "Congress could depart from the default rules of international law"—which require that "a foreign person's conduct" have "a substantial, direct, and foreseeable effect" in the territory—"by a clearly worded statute"); *see Isbrandtsen Co. v. Johnson*, 343 U.S. 779, 783 (1952) (employing similar presumption "favoring the retention" of common law principles unless "a statutory purpose to the contrary is evident"). While the PSJVTA provided such proof, it is utterly lacking here, as already shown. *Supra*, Arg. II.B.3, at 57–63.

That Congress's enumerated powers may extend extraterritorially also does nothing to prove Plaintiffs' position. *See* Br. 34. As the Court recognized in *Nicastro*, "[a] sovereign's legislative authority to regulate conduct may present considerations different from those presented by its authority to subject a defendant to judgment in its courts." 564 U.S. at 886 (plurality). It does not follow that, simply because Congress may enact laws extending outside the United States, it could provide for personal jurisdiction over each and every foreign defendant in the world who might be accused of violating those laws. This distinction between the reach of the law and the reach of judicial power is unsurprising. American jurisprudence has long drawn the even finer distinction between a court's subject-matter jurisdiction and its personal jurisdiction. For instance, in *Ex parte Graham*, the court explained

that while federal courts sitting in admiralty were effectively "unlimited as to the subject matter of which they have cognizance," it was "nevertheless essential" to the court's exercise of jurisdiction "that the person or thing against whom or which the court proceeds, should be within the local jurisdiction of each court." 10 F. Cas. 911, 912–13 (C.C.E.D. Pa. 1818) (Washington, Circuit Justice).

In the end, Plaintiffs fail to point to a *single example* of an early federal court recognizing unbounded personal jurisdiction, while many court decisions recognize territorial limitations. The cases they highlight are, at best, about Congress's power. This Court should hew to the "settled usages" of law that form the basis of all due-process rights in judicial proceedings, especially in the absence here of specific Congressional authorization.

## III. NO STATUTE AUTHORIZES SERVICE HERE WITHOUT SATISFYING MINIMUM CONTACTS.

Even if the District Court could exercise personal jurisdiction over DIB as a *constitutional* matter without minimum contacts, Congress has not authorized service as a *statutory* matter without minimum contacts, which is an independent basis for concluding that minimum contacts is still required here. Personal jurisdiction requires not only "a constitutionally sufficient relationship between the defendant and the forum" but also (absent consent) "authorization for service of summons on the defendant." *Omni*, 484 U.S. at 104. The power to authorize or "limit service of process" belongs to Congress. *Id.* at 109–10.

-70-

In this appeal, Plaintiffs argue for the first time that the ATA's nationwide service provision (18 U.S.C. § 2334(a)) authorizes jurisdiction here, including *apart from* minimum contacts. Br. 17–20. Plaintiffs also continue to argue that Rule 4(k)(2) authorizes jurisdiction, but now *apart from* the minimum contacts that the District Court held necessary under that rule. SPA27–29. Both arguments fail.

## A. The ATA authorizes service only within the United States or, at most, on a defendant with minimum contacts.

Plaintiffs' reliance on the ATA's nationwide-service provision is doubly wrong. Br. 17–18. Most simply, § 2334(a) only authorizes service "in" a "district" of the United States, which did not and could not happen here. It does not authorize service on extraterritorial defendants, so could not be authorizing personal jurisdiction over them either. Any statutory authorization for that situation must come from elsewhere, which is presumably why Plaintiffs did not invoke § 2334(a) below. Indeed, the conclusion that a plaintiff "cannot invoke the ATA" as authorizing jurisdiction over a defendant served "*outside* the United States"—is an "easy one." *Schrier v. Qatar Islamic Bank*, 632 F. Supp. 3d 1335, 1349–50 (S.D. Fla. 2022); *see also Zobay*, 695 F. Supp. 3d at 322 (recognizing § 2334(a) authorizes service "in" the United States).

Plaintiffs nevertheless contend for the first time that § 2334(a) authorizes jurisdiction merely because they "have properly served DIB under the Federal Rules." Br. 18. But Plaintiffs cite *no authority* adopting this argument, which has

no support in the statutory text. They only cite (without explanation) the District Court's decision on DIB's motion to dismiss addressing DIB's challenge to the alternative mode of service under Rule 4(f). Br. 18 (citing *Terrorist Attacks IV*, 718 F. Supp. 2d at 490). But the court there does not even address the ATA's service provision, and Rule 4(f), by its terms, addresses only the "means" of service. Plaintiffs also cite the statement of purposes in JASTA, but, as explained above, that was not about either § 2334(a) or personal jurisdiction. *Supra*, Arg. II.B.3, at 59.

If § 2334(a) nevertheless might be thought to have anything to say about personal jurisdiction apart from nationwide service in the United States, it *contemplates minimum contacts*, so still could not help Plaintiffs. It authorizes service "in any district where the defendant resides, is found, or has an agent." The most natural reading of "found" in this context is, of course, physical presence, which does not exist here. To be sure, it could also be read in light of *International Shoe* as contemplating that a defendant could be deemed "found" in a district where its "contacts are sufficient to satisfy the minimum contacts test." *I.A.M. Nat'l Pension Fund v. Wakefield Indus.*, 699 F.2d 1254, 1257 (D.C. Cir. 1983) ("found" incorporates "the history of judicial pronouncements on the meaning of that term"); *PT United Can Co. v. Crown Cork & Seal Co.*, 138 F.3d 65, 71 (2d Cir. 1998) (similar). But that too is fatal to Plaintiffs because, as explained above, they come nowhere close to satisfying that standard.

**B.**    **Since its inception, Rule 4(k)(2) has been understood to authorize service only over defendants having minimum contacts with the United States as a whole.**

Plaintiffs' reliance on Rule 4(k)(2) also fails to help them.  That rule "establishes personal jurisdiction" for a claim "arising under federal law," if "the defendant is not subject to jurisdiction in any state's courts of general jurisdiction" and if "exercising jurisdiction is consistent with the United States Constitution and laws."  The District Court correctly adopted the premise that Rule 4(k)(2) contemplates jurisdiction over a defendant having minimum contacts "with the United States as a whole."  SPA30 (emphasis omitted).  It was never meant to extend jurisdiction *beyond* that, as Plaintiffs now claim for the first time (even while refusing to say *how far* beyond, Br. 29).  Only Congress can decide whether to do that.

The history of Rule 4(k)(2) establishes this.  It was promulgated following the Supreme Court's decision in *Omni Capital Int'l. v. Rudolf Wolff & Co.*  When *Omni* was decided in 1987, district courts were authorized by rule (subject to any statute addressing the question) to serve process (1) anywhere within the territorial limits of the State in which they sat and (2) outside those territorial limits when authorized by state long-arm laws.  *Douglass v. Nippon Yusen Kabushiki Kaisha*, 46 F.4th 226, 233–34 & n.11 (5th Cir. 2022) (en banc).  In *Omni*, plaintiffs sought to sue British defendants under a federal statute.  484 U.S. at 99–100.  The federal district court,

in Louisiana, held they could not be reached through Louisiana's long-arm statute. *Id.* at 108. And, for the claim plaintiffs asserted, the federal statute lacked a service provision. *Id.* at 105–07. The Supreme Court refused to find service nevertheless authorized, in light of the "longstanding assumption" that a "legislative grant of authority" is necessary for a court to exercise jurisdiction. *Id.* at 109–10. It suggested that a "narrowly tailored service of process provision" might be warranted for when a defendant "is not amenable to service under the applicable state long-arm statute," but left that responsibility "with those who propose the Federal Rules of Civil Procedure and with Congress." *Id.* at 111. The Court also flagged (without resolving) the argument that "a federal court could exercise personal jurisdiction, consistent with the Fifth Amendment, based on an aggregation of the defendant's contacts with the Nation as a whole, rather than on its contacts with the State in which the federal court sits." *Id.* at 102 n.5.

The Advisory Committee took up the Supreme Court's *Omni* invitation, promulgating the new Rule 4(k) in 1993. The Committee notes are of course "a reliable source of insight into the meaning of a rule." *Waetzig v. Halliburton Energy Servs.*, 604 U.S. 305, 312 (2025). The Committee explained Rule 4(k)(2) as responding to *Omni* along the lines *Omni* suggested, including the by-then background rule of minimum contacts: "This paragraph corrects a gap in the enforcement of federal law" where the defendant has "contacts with the United

States sufficient to justify the application of United States law" but "insufficient contact with any single state to support jurisdiction under state long-arm legislation or meet the requirements of the Fourteenth Amendment." Fed. R. Civ. P. 4, Advisory Comm.'s Notes (1993). The Committee assured Congress, however, that "[t]here remain constitutional limitations on the exercise of territorial jurisdiction by federal courts," stemming "from the Fifth Amendment rather than from the Fourteenth." *Id.* The Fifth, the Committee explained, required "affiliating contacts with the United States sufficient to justify the exercise of personal jurisdiction." *Id.* (citing *Wells Fargo & Co. v. Wells Fargo Express Co.*, 556 F.2d 406, 418 (9th Cir. 1977)).[8]

The Committee's view of Rule 4(k)(2) as requiring minimum contacts with the United States as a whole has been the "unanimous[]" view of the circuit courts across more than two decades. *Douglass*, 46 F.4th at 232 n.8; *Lewis v. Mutond*, 62 F.4th 587, 592 n.2 (D.C. Cir. 2023) (collecting circuit-court decisions); 4 Wright & Miller, Fed. Prac. & Proc. Civ. § 1068.1, at n.31 (4th ed.) (collecting cases). It was also the view of Plaintiffs themselves below. Pls.' SJ Opp. 28 (ECF 8315) ("Rule

---

[8] On the cited page, the Ninth Circuit had said: "If policy considerations do indeed dictate that an alien defendant's conduct with the entire United States should be aggregated, and if the Constitution does not forbid such a practice at least where the plaintiff is suing in federal court on a federal cause of action, the Federal Rules should be amended to authorize such a practice." Absent that, the only possible authorization for "such aggregation" was "when a federal statute authorizes world-wide service of process," which would be subject to "fifth amendment due process."

4(k)(2) acts 'to fill a "gap" in the enforcement of federal law,' permitting the exercise of jurisdiction based on the defendant's minimum contacts in the United States, consistent with principles of due process."). And that was the understanding the District Court shared and applied. SPA30 ("[I]f Rule 4(k)(2) provides the statutory basis for jurisdiction, the due process analysis turns on the defendant's contacts with the United States *as a whole.*").

Since 1993, Civil Rule 4 has been amended five times (in 2000, 2007, 2015, 2016, and 2017), including an amendment of Rule 4(k) itself (in 2007). But there has been no change in Rule 4(k)(2). So this understanding is settled. *See Texas Dep't of Hous. & Cmty. Affairs v. Inclusive Cmtys. Project*, 576 U.S. 519, 536 (2015) ("If a word or phrase has been … given a uniform interpretation by inferior courts …, a later version of that act perpetuating the wording is presumed to carry forward that interpretation.") (quoting A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 322 (2012)).

And, as designed and understood, Rule 4(k)(2) truly was the "narrowly tailored" provision that *Omni* contemplated. 484 U.S. at 111. A defendant will have "the requisite relationship with the United States Government but not with the government of any individual State" only in "an exceptional case." *Nicastro*, 564 U.S. at 884–85 (plurality). Usually, foreign defendants' contacts will be "target[ed] or concentrate[d] on particular States, subjecting them to specific jurisdiction in

those forums." *Id.* The Rule, as designed and understood, thus succeeds in its purpose of merely filling a "gap," by aggregating nationwide minimum contacts in rare cases. Fed. R. Civ. P. 4 Advisory Comm.'s Notes (1993).

Plaintiffs would upend all this based on *Fuld*, which *did not mention* Rule 4(k)(2), and without saying how they would read Rule 4(k)(2) (Br. 29). They identify no authority or rationale for pulling the rug out from under Congress, the courts, and defendants. And they do so despite *Fuld*'s *caution* about "extending our notions of personal jurisdiction into the international field" and the corresponding *deference* to "the political branches" to make the "delicate judgments on matters of foreign affairs." 606 U.S. at 19. At this point, to rewrite the understanding of Rule 4(k)(2) to expand authorization for personal jurisdiction would be to do by judicial fiat what the Supreme Court in *Omni*, again exercising caution and deference, refused to do. *Omni*, 484 U.S. at 110–11 & n.13.

Plaintiffs also would transform a small question of authorization for filling a "gap" into a major question under the Rules Enabling Act. *See Semtek Int'l v. Lockheed Martin*, 531 U.S. 497, 503 (2001) (avoiding interpretation of rule that "would arguably violate the jurisdictional limitation of the Rules Enabling Act"); *cf. West Virginia v. EPA*, 597 U.S. 697, 723 (2022) ("We presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies.") (internal quotation omitted). In promulgating Rule 4(k)—the first and only rule

expressly addressing whether service "establishes personal jurisdiction"—the Committee opened its report with a special note: "Mindful of the constraints of the Rules Enabling Act, the Committee calls the attention of the Supreme Court and Congress to new subdivision (k)(2). Should this limited extension of service be disapproved, the Committee nevertheless recommends adoption of the balance of the rule …" Fed. R. Civ. P. 4 Advisory Comm.'s Notes (1993); *supra*, Arg. II.B.3 at 61 (explaining Rules Enabling Act); *cf. Vanegas v. Signet Builders*, 125 F.4th 837, 839–41 (7th Cir. 2025) (Maldonado and Jackson-Akiwumi, JJ., dissenting from denial of rehearing en banc) (opining that Rule 4(k)(2) violates the Rules Enabling Act). What has been tolerable for the rare exceptional case would be intolerable as the basis of a new, boundless norm extending personal jurisdiction without limitation.

For all these reasons, the permissible grounds for personal jurisdiction absent a jurisdictional pronouncement from Congress remain the traditional bases that predated *Fuld*—presence, consent, or (relevant here) minimum contacts.

## IV.   PLAINTIFFS' THEORY OF JURISDICTION BASED ON CONSPIRACY FAILS ON THE EVIDENCE.

To try to save their failed showing of personal jurisdiction, Plaintiffs invoke a conspiracy theory of jurisdiction, claiming DIB "conspired with … al Qaeda's attack on the United States." Br. 43. That theory requires a plaintiff to show that "(1) a conspiracy existed; (2) the defendant participated in the conspiracy; and (3) a co-

conspirator's overt acts in furtherance of the conspiracy had sufficient contacts with [the forum] to subject that co-conspirator to jurisdiction in that [forum]." *Charles Schwab*, 883 F.3d at 87.

As the District Court held, "Plaintiffs stumble at the first hurdle—proving a conspiracy existed." SPA39. A conspiracy requires an "agreement between two or more persons … to participate in an unlawful act." *Halberstam v. Welch*, 705 F.2d 472, 477 (D.C. Cir. 1983). The parties must share a "conscious commitment to a common scheme designed to achieve an unlawful objective." *Freeman v. HSBC Holdings PLC*, 57 F.4th 66, 79 (2d Cir. 2023).

Here, there is no evidence that DIB even knew about al Qaeda's plan (initiated in late 1998 or early 1999) to attack the United States, much less that it was "intentionally complicit" in that plot. SPA40; *supra* at 28–33. Plaintiffs again point to CIA documents (Br. 43), but, as discussed above, those documents concern the earlier Sudan period from 1992 to 1996, and nothing in them shows that DIB, years later, knowingly and intentionally aided al Qaeda in 9/11, or for that matter in any of its operations against the United States (or any of its operations at all). *Supra*, Bkgd. F., at 14; Arg. I, at 31–33.

## V. PLAINTIFFS' NOVEL THEORY OF "AIDING AND ABETTING" JURISDICTION FAILS ON THE LAW AND THE EVIDENCE.

Plaintiffs also seek to extend the conspiracy theory of jurisdiction to aiding and abetting. Br. 44. The District Court rejected this invitation, noting that no court

has done so.  SPA41.  For good reason: The law deems co-conspirators "agents for one another."  *United States v. Russo*, 302 F.3d 37, 45 (2d Cir. 2002).  And courts attribute the acts of an agent to the principal for jurisdictional purposes.  *Halliburton Energy Servs. v. Ironshore Specialty Ins. Co.*, 921 F.3d 522, 543 n.21 (5th Cir. 2019).  Because the same rules do not apply to aiders-abettors, aiding and abetting provides no basis for personal jurisdiction.  As the District Court explained, it would be "constitutionally suspect" to "attribut[e] a principal's contacts to an aider-abettor."  SPA41.  And "it would violate due process for a district court to reach foreign aiders-and-abettors that lacked any contacts with the United States."  *Hawkins v. i-TV Digitalis Tavkovlesi zrt.*, 935 F.3d 211, 229 (4th Cir. 2019).

Even if personal jurisdiction could be based on aiding and abetting, it would not help Plaintiffs here, given the evidence below.  Plaintiffs' JASTA claims clearly fail on the factual record under authority such as *Twitter v. Taamneh*, 598 U.S. 471 (2023); *Smith & Wesson Brands v. Estados Unidos Mexicanos*, 605 U.S. 280 (2025); and *Ashley v. Deutsche Bank Aktiengesellschaft*, 144 F.4th 420 (2d Cir. 2025).

### A. Anding and abetting liability requires both general awareness and knowing and substantial assistance of terrorism.

Congress in JASTA extended liability under the ATA "to any person who aids and abets, by knowingly providing substantial assistance, or who conspires with the person who committed such an act of international terrorism."  18 U.S.C. § 2333(d)(2).  JASTA pointed to the D.C. Circuit's decision in *Halberstam* as

-80-

"providing the proper legal framework" for aiding-and-abetting liability. § 2(a)(5), 130 Stat. 852. Under *Halberstam*, the defendant must "be generally aware of his role as part of an overall illegal or tortious activity at the time he provides the assistance" and "knowingly and substantially assist the principal violation." 705 F.2d at 477. The Supreme Court expounded this provision and framework in *Twitter*.

In *Twitter*, victims of an overseas terror attack sued Facebook, Twitter, and Google (as owner of YouTube), on the theory they aided and abetted ISIS by failing to detect and remove its recruiting and fundraising content on their internet platforms. 598 U.S. at 481–82. On a motion to dismiss, the Court analyzed *Halberstam* and "the common-law tradition from which it arose." *Id.* at 485.

On what it means to "aid and abet," the Court explained that the concept "has never been boundless" and "generally does not impose liability for mere omissions, inactions, or nonfeasance." *Id.* at 488–89. Instead, courts "cabin aiding-and-abetting liability to cases of truly culpable conduct." *Id.* at 489. That means, generally, "the defendant has to take some affirmative act with the intent of facilitating the offense's commission," as something "he wishes to bring about." *Id.* at 490. This standard avoids imposing liability on "mostly passive actors like banks," which should not be "liable for all of their customers' crimes by virtue of carrying out routine transactions." *Id.* at 491; *see id.* at 500 (courts have "long been leery of imposing aiding-and-abetting liability for mere passive nonfeasance"). So

-81-

a defendant must give "*knowing **and** substantial* assistance to the primary tortfeasor," "with a lesser showing of one demanding a greater showing of the other." *Id.* at 491–92 (emphasis added).

And *what* the defendant must aid and abet is the "commission of the actionable wrong—here, an act of international terrorism." *Id.* at 495. As a result, it is generally "not enough" that a defendant aids "a transcendent 'enterprise' separate from and floating above all the actionable wrongs that constitute it," whereas "a close nexus between the assistance and the tort" can establish liability. *Id.* at 495–96. A defendant's role in an enterprise might "be so systemic that the secondary defendant is aiding and abetting every wrongful act committed by that enterprise," but at that point "aiding-and-abetting liability begins to blur with conspiracy liability." *Id.* at 496.

Applying these standards, the Supreme Court held that plaintiffs failed to state a claim. First, they failed to plead a close "nexus" between the companies' alleged action (or inaction) and the terror attack. There was no allegation "that ISIS used defendants' platforms" to further the specific attack at issue. *Id.* at 498. More generally, the defendants' websites were available "to the public writ large," and ISIS used them "just like everyone else," without "any special treatment." *Id.* at 498–99.

Given the lack of a close nexus, plaintiffs would need to offer "a strong showing of assistance and scienter" to establish liability, but they failed to do so. The defendants' alleged relationship with ISIS was the same as with everyone else: "arm's length, passive, and largely indifferent." *Id.* at 500. And their theory of liability "would necessarily hold defendants liable as having aided and abetted each and every ISIS terrorist act committed anywhere in the world." *Id.* at 501. Such an expansive, quasi-conspiracy theory of aiding-and-abetting liability could only be viable based on "pervasive, systemic, and culpable assistance," which plaintiffs did not allege. *Id.* at 502.

Two other recent precedents elaborate on *Twitter*'s rule. In *Smith & Wesson*, Mexico sued gun manufacturers for aiding and abetting firearms offenses by failing to take certain precautions. The Supreme Court rejected the claim on a motion to dismiss. As it reiterated from *Twitter*, aiding-and-abetting liability usually applies to "*specific* wrongful acts" and only extends more broadly when participation is "pervasive, systemic, and culpable." 605 U.S. at 292. And because it "usually requires misfeasance rather than nonfeasance," "a provider of generally available goods or services" is usually not "liable for a customer's misuse of them" absent affirmative conduct. *Id.* at 292–93. Mexico failed this standard, because it alleged only that the manufacturers *knew* that some subset of gun dealers violated the law. But the manufacturers' supposed failure to do more "to figure out who those rogue

dealers are, and then to cut off their supply," was just like the allegation of "indifference, rather than assistance," that the Court rejected in *Twitter*. *Id.* at 296–97.

Then, in *Ashley*, this Court similarly found that plaintiffs failed to state a claim for aiding and abetting under the ATA with regard to several banks. For instance, one bank refused to stop providing services to fertilizer companies whose products were used to make terrorist bombs, even after the United States military asked it to stop. 144 F.4th at 440. Although the bank thereafter was necessarily "generally aware" it had *some* role, plaintiffs failed to plausibly allege the assistance was *substantial and knowing*. There was no close nexus, only a "tenuous connection between the banking services and the terrorist attacks." *Id.* And plaintiffs failed to make up for that lack with strong allegations of substantial assistance or scienter. The bank "simply offered the Companies basic commercial banking services"; it was not "treating the Companies differently than it treated its other clients." *Id.* at 441–43.

This Court in *Ashley* also rejected aiding-and-abetting liability against banks accused of engaging in money laundering for individuals connected to terrorism. Plaintiffs failed to plead a "discernable nexus between the money laundering and the attacks committed against Plaintiffs." *Id.* at 444. And, lacking any nexus, plaintiffs also failed to plead the kind of "pervasive, systemic, and culpable" conduct that

might make these banks liable for *all* of the terrorists' actions. *Id.* at 445. Finally, this Court rejected an aiding-and-abetting claim against banks alleged to have aided in tax fraud connected to terrorists. There were no allegations that any bank was even "aware of its customers' connections" and, as to certain customers, the scheme ended by 2010, meaning "the Banks' involvement concluded before the attacks here began" the following year, in 2011. *Id.* at 446–47.

### B. Plaintiffs have not established aiding and abetting even if that were the standard for personal jurisdiction.

Even if personal jurisdiction could rest on aiding and abetting, the evidence fails to establish aiding and abetting as set forth by the Supreme Court and this Court.

*First*, there is no evidence that DIB was even "generally aware of" any "role" with respect to al Qaeda or that group's targeting of the United States. DIB would need to have been "aware of the customers' connections with the terrorist organization." *Ashley*, 144 F.4th at 438. But "[t]here is *no evidence* that DIB … was aware of the terrorist nature of the accountholders." SPA37 (emphasis added).

Although Plaintiffs quarrel with this conclusion by focusing on Mr. Lootah's alleged connection to bin Laden, there is no evidence that Mr. Lootah's purported provision of letters of credit was "anything more than standard bank policy." *Id.* (Even the anonymous CIA analyst did not claim to know otherwise.) Nor is there evidence that Mr. Lootah—much less DIB—knew about bin Laden's terrorist activities. And *all* of Mr. Lootah's supposed actions were at least *five years* before

the 9/11 attacks, during bin Laden's Sudan exile (or, most charitably, at least three-and-a-half years before)—multiple times greater than the one-year gap in *Ashley*. *See* 144 F.4th at 447. Consequently, the District Court itself, even before *Twitter*, concluded on the undisputed facts that "the evidence indicates that DIB *lacked the general awareness* required to be found to have been an aider-abettor of al Qaeda." SPA38 (emphasis added). Moreover, there is no evidence of any connection between the purported letters of credit and any act of terrorism.

*Second*, and independently, the evidence falls far short of "knowing and substantial assistance." *Ashley*, 144 F.4th at 438. At the outset, there is no evidence of *any* nexus, much less a close one, because—as Plaintiffs have *admitted*—there is no evidence that any accounts "provided funding for the terrorist organization, let alone for the 9/11 Attacks." SPA36. And the supposed letters of credit "concluded before the attack[] here," *Ashley*, 144 F.4th at 447—indeed, again by contrast to *Ashley*, more than three years before—given that Mr. Lootah, the purported authorizer, was uninvolved in the bank by March 1998 at the latest. SPA17.

Lacking *any* "concrete nexus between [DIB's] services and the [9/11] attack," Plaintiffs have to stretch for the broader theory that DIB is liable "as having aided and abetted each and every [al Qaeda] terrorist act committed anywhere in the world." *Twitter*, 598 U.S. at 501; *see* Br. 38–39 (arguing al Qaeda used DIB's services to "grow" in general). But to support that conspiracy-like theory, Plaintiffs

-86-

need "a strong showing of assistance and scienter." *Twitter*, 598 U.S. at 500; *Smith & Wesson*, 605 U.S. at 294 ("it cannot help but heighten [the] burden"). The evidence does not "meet that high bar." *Ashley*, 144 F.4th at 445. Plaintiffs fail to make a *heightened showing* of substantial or knowing assistance because there is no evidence that DIB provided accountholders *anything* other than "routine banking services." SPA36; *see* SPA38 ("more akin to a 'passive conduit'"); *see also supra*, Arg. I.C, at 29. Such passive provision of services to the general public falls far short of evidence that DIB participated in al Qaeda's attacks as something it "wished to bring about." *Twitter*, 598 U.S. at 498; *see id.* (ISIS accessed platforms "just like everyone else," without "any special treatment."); *Smith & Wesson*, 605 U.S. at 295 ("[T]he manufacturers treat rogue dealers just the same as they do law-abiding ones").

Indeed, in *Ashley*, this Court found the bank not "liable for its refusal to stop providing routine banking services" even after the United States military *asked* it to stop. 144 F.4th at 430, 441. Here, discovery turned up no evidence that the United States met with the Dubai government to reform DIB (as reported by the *Times*), but DIB nevertheless reacted to that report by searching its records for any accounts held by bin Laden and offering its assistance to the U.S. government. *Supra* at 6. If the bank in *Ashley* was not an aider-and-abetter by *refusing* to cut off routine services, DIB cannot be an aider-and-abetter by *cooperating* with the United States's

purported concerns. Aiding-and-abetting liability attaches to direct, culpable conduct—"lest mostly passive actors like banks become liable for all of their customers' crimes by virtue of carrying out routine transactions." *Twitter*, 598 U.S. at 491; *Ashley*, 144 F.4th at 437 (same). This case is no exception.

## VI.   IN THE ALTERNATIVE, THIS COURT SHOULD AFFIRM BECAUSE PLAINTIFFS' CLAIMS FAIL ON THE MERITS.

Plaintiffs' failure of factual support for aiding-and-abetting not only undermines aiding-and-abetting *jurisdiction* (even if the law permitted such a theory) but also establishes the failure of Plaintiffs' case on the *merits*. That failure provides an alternative ground for affirming the District Court and avoiding a futile remand in this two-decade-old litigation.

Though a federal court generally cannot rule on the merits of a case without first determining its jurisdiction, the Court can "assume[] jurisdiction" "where the outcome on the merits has been 'foreordained' by another case such that the 'jurisdictional question could have no effect on the outcome.'" *Center for Reproductive L. & Pol'y v. Bush*, 304 F.3d 183, 193 (2d Cir. 2002) (quoting *Steel Co. v. Citizens for a Better Environment*, 532 U.S. 83, 98 (1998)). Plaintiffs' ATA claims and related state-law claims have been "foreordained" by Supreme Court, Second Circuit, and New York precedent, such that this Court can rule in DIB's favor on the merits in lieu of or in addition to deciding the jurisdictional question.

This Court "may affirm on any grounds for which there is a record sufficient to permit conclusions of law, including grounds not relied upon by the district court." *Woods v. Centro of Oneida, Inc.*, 103 F.4th 933, 941 (2d Cir. 2024). And doing so is appropriate "where the issue is purely legal and there is no need for additional fact-finding." *Baker v. Dorfman*, 239 F.3d 415, 420 (2d Cir. 2000).

Here, there is a sufficient record and no need for additional factfinding to affirm on this alternative ground. The parties have completed over a *decade* of extensive discovery—documentary, fact witness, and expert. *Supra*, Bkgd. E. And the material evidence from that record is already before this Court—after all, in litigating personal jurisdiction, Plaintiffs had every incentive to highlight any shred of evidence connecting DIB to 9/11 to try to satisfy minimum contacts, including on their conspiracy theory and novel aiding-and-abetting theory. DIB identified 67 undisputed material facts in support of its motion (JA3375–407, SUMF Resp.), and Plaintiffs not only responded to those but also purported to aver *190* additional facts (JA3695–741, Aver. Resp.). Indeed, the overlap prompted the District Court to look to aiding-and-abetting principles in deciding personal jurisdiction, SPA34, finding them not met, SPA 38. And Plaintiffs themselves point to the same overlap. Br. 39. So there is no reason to think Plaintiffs omitted evidence at summary judgment on personal jurisdiction that would somehow improve their case on the merits.

Plaintiffs' lack of evidence of aiding and abetting undermines their principal claim under the ATA (aiding and abetting under JASTA), as explained above. *Supra* Arg. V.B, at 85–88. And it also undermines their tagalong state common-law claims. Br. 17 n.3.

Plaintiff's intentional-tort claims—for trespass, assault and battery, and intentional infliction of emotional distress—fail for the same reasons as their ATA claim. *See Volunteer Fire Ass'n of Tappan v. Cnty. of Rockland*, 956 N.Y.S.2d 102, 105 (N.Y. App. Div. 2012) (elements of trespass); *Charkhy v. Altman*, 678 N.Y.S.2d 40, 41 (N.Y. App. Div. 1998) (assault and battery); *Howell v. New York Post*, 612 N.E.2d 699, 702 (N.Y. 1993) (IIED). Nobody contends DIB itself intentionally committed any tort—only that it somehow acted with al Qaeda to do so. *Terrorist Attacks IV*, 718 F. Supp. 2d at 492–94 (Plaintiffs' remaining claims turn on "concerted action theories of liability"). But the evidence cannot support conspiracy or aiding and abetting, as discussed above. *Supra* Args. IV & V.B, at 78–88. And *Twitter*'s discussion of aiding-and-abetting was (like that in *Halberstam*) drawn from the common law and thus governs beyond the ATA. 598 U.S. at 484 ("common-law terms" like aiding and abetting "bring the old soil with them"); *see Smith & Wesson*, 605 U.S. at 292 (applying *Twitter* to non-ATA claims). So Plaintiffs' failure to muster evidence sufficient for aiding-and-abetting liability under the ATA dooms their intentional-tort claims too, which arise out of the same facts.

Plaintiffs' remaining claims—for negligence and negligent infliction of emotional distress—fail for lack of duty or proximate cause. *See Pisula v. Roman Cath. Archdiocese of New York*, 159 N.Y.S.3d 458, 472 (App. Div. 2021) (listing elements). As for duty, "banks and other financial institutions do not owe non-customers a duty to protect them from the intentional torts of their customers." *In re Terrorist Attacks on Sept. 11, 2001*, 714 F.3d 118, 126 (2d Cir. 2013). For that reason, this Court has already dismissed claims against bank defendants from the 9/11 attacks. *Id.* These claims also fail for lack of proximate cause, which "may be decided as a matter of law where only one conclusion may be drawn from the established facts." *Riccio v. Kid Fit, Inc.*, 5 N.Y.S.3d 521, 522 (App. Div. 2015). Proximate cause means "the defendant's negligence was a substantial cause of the events which produced the injury." *Id.* Plaintiffs survived a motion to dismiss by alleging that money from DIB was "used specifically to prepare for the 9/11 attacks," yielding an "articulable nexus" between DIB's services and "the specific terrorist attacks." *Terrorist Attacks III*, 718 F. Supp. 2d at 493. But post-discovery, there is no evidence that any accounts "provided funding for the terrorist organization, let alone for the 9/11 Attacks." SPA36.[9]

---

[9] Plaintiffs' derivative claims for wrongful death and survival depend on "some underlying wrongful action against the decedent." *Meroni v. Holy Spirit Ass'n for Unification of World Christianity*, 119 A.D.2d 200, 207 (N.Y. App. Div. 1986). So they fall with Plaintiffs' substantive claims.

## CONCLUSION

The Court should affirm the District Court's order granting summary judgment to DIB.

Dated: October 10, 2025

Respectfully submitted,

*/s/ Noel J. Francisco*
Noel J. Francisco
Steven T. Cottreau
C. Kevin Marshall
Gabrielle E. Pritsker*
Brett J. Wierenga
Julia E. Fine*
JONES DAY
51 Louisiana Avenue, NW
Washington, D.C. 20001
(202) 879-3939
*admission pending*

Juan P. Morillo
QUINN EMANUEL
URQUHART & SULLIVAN, LLP
1300 I Street NW
Suite 900
Washington, D.C. 20005
(202) 538-8000

*Counsel for Defendant-Appellee*
*Dubai Islamic Bank*

## CERTIFICATE OF COMPLIANCE

This brief complies with the length limitations of this Court's April 10, 2025 Order, Dkt. No. 42, which increased the word limit for this consolidated brief to 22,000 words.  The brief contains 21,999 words, excluding the items exempted by Fed. R. App. P. 32(f).  This brief also complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6). It was prepared using Microsoft Office Word 2016 in a 14-point, proportionally spaced Times New Roman font.

Dated:  October 10, 2025

*/s/ Noel J. Francisco*
Noel J. Francisco
*Counsel for Defendant-Appellee*
*Dubai Islamic Bank*

## CERTIFICATE OF SERVICE

I certify that on October 10, 2025, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Second Circuit using the CM/ECF system. I further certify that the foregoing was served on all counsel of record in this appeal by CM/ECF pursuant to Second Circuit Rule 25.1.


Dated: October 10, 2025                     */s/ Noel J. Francisco*
                                            Noel J. Francisco
                                            *Counsel for Defendant-Appellee*
                                            *Dubai Islamic Bank*